# EXHIBIT 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                          )
DENNIS WHITE,                             )
                                          )
                    Plaintiff,            )
                                          )
            v.                            )
                                          )        Civil Action No. 21-CV-10952-LTS
THE CITY OF BOSTON, and ACTING MAYOR      )
KIM JANEY                                 )
                                          )
                    Defendants.           )
_____)

**PLAINTIFF DENNIS WHITE'S SECOND AMENDED COMPLAINT AND JURY
DEMAND**

# I.  <u>INTRODUCTION</u>

1.      This case arises from the wrongful termination of Plaintiff Dennis White ("Mr. White") from his position as Commissioner of the Boston Police Department ("BPD") and the complete destruction of his reputation in connection with that termination, all of which violated his constitutional, statutory and contractual rights and caused him irreparable harm.  In connection with his termination, Defendants the City of Boston ("City") and Acting Mayor Kim Janey ("Acting Mayor") improperly published the extremely defamatory report by the City's investigator (the "investigator's report"), which was replete with false allegations made by unidentified and unsworn alleged witnesses regarding alleged domestic violence by Mr. White. The Acting Mayor and City simultaneously made statements and took actions which communicated that these ruinous allegations were true.

2.      In fact, the allegations of domestic violence against Mr. White are false.  The City had known about these allegations and previously investigated them more than twenty years earlier and had concluded that they were without merit.  As a result, the City and former Mayor Martin Walsh retained and repeatedly promoted Mr. White, including eventually to the position of Commissioner responsible for the entire Boston police force.  Furthermore, prior to his termination, Mr. White presented sworn testimony from witnesses with intimate knowledge of his family.  Their testimony demonstrates he conducted himself peacefully and lawfully.  Indeed, the sworn testimony demonstrates that he was the victim of domestic violence, and that his ex-wife, Sybil Mason, has engaged in a lifetime of violent assaults on many, including Mr. White, their daughter Tiffany White, her brother who she stabbed with a knife and many boyfriends and girlfriends.

3.      Unlike the sworn testimony that Mr. White presented to establish his innocence, Defendants terminated Mr. White based on the unsworn testimony of four unidentified witnesses whose basis of knowledge was not disclosed in the report.  After Defendants expressed their intent to terminate Mr. White, Sybil Mason publicly claimed to be one of the four witnesses who spoke to the investigator about alleged domestic violence by Mr. White more than twenty years ago.  Her (unsworn) statements are demonstrably unreliable.  According to the sworn testimony of one witness who is friendly with Sybil Mason and does not know Mr. White, Sybil Mason admitted to him that she wanted to "ruin" and "destroy" Mr. White and that she fabricated her original allegation that Mr. White threatened to shoot her in 1999 to gain leverage in a contentious divorce.  Further, she reported to the police and court in 1999 that Mr. White had not physically abused her in their relationship.  And, she has been implicated as a co-conspirator in the massive overtime fraud scheme carried out within the BPD's Evidence Control Unit ("ECU") where she has worked for many years.  Because of her participation in this significant crime of dishonesty, which has cost taxpayers hundreds of thousands of dollars in false overtime payments to her and others in the ECU, she likely could not testify as a witness in court regarding BPD matters because of her obvious lack of credibility.  Given this extremely troubling information and all the sworn evidence that stacks up against her, Sybil Mason's allegations against Mr. White have no merit and should have been rejected.

4.      Chapter 322, Section 7, of the Acts of 1962 (the "Removal Statute") provides that the Mayor of Boston who seeks to remove the Commissioner may only remove the Commissioner for cause.  Defendants lacked cause to terminate Commissioner White.  He did not engage in domestic violence; there is no credible, sworn evidence that he did; and the City and former Mayor Walsh knew of the allegations and rejected them after investigation.  The City

2

cannot fire him for alleged domestic violence allegations the City knew about when the City appointed him as Commissioner. Also, Mr. White only served for two days as Commissioner before he was placed on administrative leave; he did nothing during that short period as Commissioner to provide cause for his removal.

5. By their actions, the City and Acting Mayor harmed him in the most severe and permanent way – the complete and undeserved crushing of his reputation. In violation of his due process rights under the Massachusetts and United States Constitutions, they denied him his right to a public name-clearing hearing with an opportunity to present witnesses and to cross-examine adverse witnesses. Instead, the Acting Mayor and City provided him a closed-door hearing that lasted a mere twenty minutes at which no witnesses were allowed to be called. Mr. White was only allowed to make a statement, after which the Acting Mayor and City did not ask a single question or provide any substantive response. The Acting Mayor and City then terminated him.

6. Mr. White - a father, a husband, a son, and a survivor - became a casualty in Defendants' rush to judgment against a Black man accused of domestic violence. Defendants' uncritical and automatic acceptance of the allegations against him reflect their gender-based prejudice that a man could not be a victim of domestic violence. The Acting Mayor doubled down on that gender-based prejudice and publicly stated upon terminating Mr. White, "…I will not turn a blind eye to domestic violence against Black women, or any women, for that matter" notwithstanding the lack of sworn, reliable evidence against Mr. White and the serious and substantiated sworn evidence that he and others were victims of Sybil Mason's domestic violence.

7. The City has also discriminated against Dennis White based on his race. The City's decision to conduct an investigation of allegations of domestic violence after Mr. White's

3

appointment as Commissioner when the City had known about and previously investigated and rejected the same allegations more than twenty years earlier reflects disparate treatment as compared with other white Boston Police Commissioners.  One or more of those other Commissioners had allegations against them of a serious nature, but those prior Commissioners were not investigated and terminated based on those allegations.  The City's willingness to cavalierly trash and throw in the gutter Mr. White's career, reputation and livelihood, after his nearly forty years of honorable public service, is unparalleled and disturbing.  No white Police Commissioner with a similar record of service and achievement has ever been treated with such disregard and disdain.

8.      The Acting Mayor and the City also violated Mr. White's constitutional right to free speech, which protects the right to speak and not to speak.  Mr. White, in his good judgment, believed it would be inappropriate during the investigation to make a public statement about the matters under investigation.  Yet, the Acting Mayor cited Mr. White's failure to speak publicly about the domestic violence matters under investigation as a reason for his termination. Terminating him for not speaking on this matter during the investigation violated his constitutional free speech rights.

9.      The Acting Mayor and City also violated Mr. White's privacy by publishing the investigator's report which was a personnel record containing (false) information of the most sensitive personal nature.  Even if the media had made a public records request for the investigator's report, they would not have been permitted to obtain a copy under well-established public records law.  Yet, the Acting Mayor and City ignored that law - and Mr. White's privacy rights - and published the report freely and widely without any concern for the massive harm that would cause him.

10.     Mr. White is entitled to be reinstated as Commissioner and to recover his substantial damages, punitive damages, and his reasonable attorney's fees.

## II.  **JURISDICTION AND VENUE**

11.     Jurisdiction is conferred on this Court by 28 U.S.C. § 1331. The claims alleged here arise, in part, under the laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiff's state law claims because those claims are related to Plaintiff's federal law claims and arise out of a common nucleus of related facts. Plaintiff's state law claims form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) because the facts giving rise to the claims occurred within this district. Additionally, Defendants reside or are located within the District of Massachusetts.

## III.  **PARTIES**

13.     Plaintiff Dennis White is a Black man from Boston, Massachusetts and the former BPD Commissioner. He served as a BPD commander and officer for thirty-two years. He grew up and lived most of his adult life in Dorchester and continues to live in Massachusetts.

14.     Defendant City of Boston is a body politic that can sue and be sued.

15.     Defendant Acting Mayor Kim Janey represents Roxbury in the City Council and, as President of the City Council, became Acting Mayor when Mayor Walsh resigned during his term.  The City hired the investigator and was, along with the Acting Mayor, responsible for the investigation into domestic violence allegations against Mr. White.  The Acting Mayor had the final authority to determine the kind of hearing that the City would provide Mr. White and ultimately to terminate Mr. White, albeit unlawfully.

## IV.  <u>FACTUAL BACKGROUND</u>

**Commissioner White Served the City Well as a Dedicated First Responder Throughout His Career.**

16.     Dennis White is a career first responder.  After five and a half years as a firefighter, he worked the last thirty-two years as an officer in the Boston Police Department.

17.     During those thirty-two years as an officer, Mr. White rose steadily through the ranks.  He first became a Boston police officer in 1987.  After ten years as a patrol officer, he was promoted to Sergeant in 1997.  He was promoted to Sergeant Detective in 2007.  He reached the rank of Lieutenant in 2012.

18.     In 2014, Mr. White was a candidate for the BPD Command Staff.  With the election of Mayor Walsh in November 2013, Commissioner Edward Davis resigned and William Evans became the Acting Commissioner, soon to be appointed the permanent Commissioner.

19.     In January 2014, Frank Mancini was the Superintendent and Chief of Professional Standards and was responsible for overseeing Internal Affairs ("IA").  In January 2014, Commissioner Evans, through his assistant, directed Superintendent Mancini to provide a summary of the contents in Mr. White's IA records to Commissioner Evans as part of the process for vetting Mr. White for promotion to the Command Staff.  *See* Frank Mancini audiovisual testimony[1].  The contents of Mr. White's IA records included the 1993 and 1999 allegations of domestic violence against Mr. White and the results of the IA investigation about those allegations.  Superintendent Mancini accessed Mr. White's IA records as part of this vetting process on January 13, 2014, and provided this information to Commissioner Evans, through his assistant.

---

[1]  The sworn audiovisual testimony of Mr. White, Mr. Mancini, Tiffany White and Connie Owens, referenced herein, was obtained as part of this lawsuit and can be made available to the Court.

20.     No later than January 2014, therefore, Commissioner Evans was informed of Mr. White's IA records, including the allegations of domestic abuse by Sybil Mason regarding an alleged shooting threat in 1999 and an alleged physical altercation with his 19 year-old niece-through-marriage in 1993.  The BPD, after investigation, concluded these allegations were without merit.

21.     In 2014, Mr. White was promoted to the Command Staff as Deputy Superintendent by Mayor Walsh with Commissioner Evans' approval.

22.     In or about August 2018, Commissioner Evans resigned and became the Director of Security for Boston College.  Mayor Walsh then appointed William Gross as the BPD Commissioner and, with Commissioner Gross's approval, promoted Mr. White to Superintendent, Chief of Staff to the Commissioner, the third highest-ranking position in the BPD.

23.     In 2019, Mr. White achieved the civil service rank of Lieutenant Detective.

24.      In late January 2021, Commissioner Gross resigned.  On February 1, 2021, Mayor Walsh appointed Mr. White as BPD Commissioner based on his distinguished record of service as a BPD officer and commander for over thirty years.  As demonstrated by the sworn testimony of Mr. White and former Commissioner William Gross, Mayor Walsh was aware of the domestic violence allegations in Mr. White's  IA record when he promoted him to Commissioner.  *See* Affidavit of William Gross ¶¶ 6-9; Dennis White audiovisual testimony.

25.     On February 2, 2019, the Boston Globe published a story concerning Sybil Mason's domestic violence allegations from 1999.

26.     On February 3, Mayor Walsh placed Mr. White on administrative leave in a phone call in which he told Mr. White there would be an investigation of the 1999 allegation of

domestic abuse contained in his IA file. Affidavit of Dennis White ("White Aff."), ¶ 12.  Mr. White was not provided with any written notice of his leave, nor was he provided with any guidelines for his conduct during the administrative leave and investigation.  *Id.*, ¶¶ 11-12. Mr. White was on duty for two days as Commissioner.

**The City's Investigation Was Grossly Negligent and Biased.**

27.     The City engaged an investigator to investigate the decades-old (false) allegations of domestic violence against Mr. White.  The City's investigation was flawed from the outset. First, there was no basis to investigate Mr. White; no prior Commissioner had been vetted after their appointment as Commissioner.  These were known allegations which the BPD had already investigated and had not sustained.  Commissioner White was never charged with a crime.  Even Mayor Walsh and the City determined that the investigation was unnecessary; within one week, the City cancelled the investigation.  However, without explanation, the City recommenced the investigation a week later.

28.     Second, the City's investigation was conducted in bad faith.  During what was supposed to be an investigation into alleged domestic abuse allegations in 1999, the City considered terminating Commissioner White on other (meritless) grounds, namely, a purported residency requirement violation.  Commissioner White, along with other white commanders, lived outside of Boston when the residency requirement was established.  He and these other commanders were exempted from the law.  On information and belief, there was no inquiry whether the white commanders living outside of Boston could be terminated.  The fact that the City was looking apparently for any means to terminate Mr. White reflected the City's bad faith and malicious intent.  It also caused Mr. White to be cautious regarding the investigation which appeared a pretext to terminate him.

29.     Third, the investigator initially sought records that were completely unrelated to the scope of the investigation, as Mayor Walsh had defined it in the call with Mr. White.  For example, the investigator demanded Mr. White's tax records and credit history.  Mr. White's financial records had nothing to do with the domestic abuse allegations.  Mr. White was not told by anyone at the City whether he had to provide these records.  He appropriately refused.

30.     Indeed, the Acting Mayor and the City subsequently clarified that the scope of the investigation was limited to the domestic violence allegations in his IA records.  Specifically, the City's attorney and the investigator informed Mr. White that the scope of the investigation would be questions related to his IA records and "related issues."  They also stated that the investigation would look into his personnel record and CORI record, but those presented no issues and, thus, were not pursued by the investigator once she obtained those records.  *See* White Aff., Exhs. A & B.  The only document that he ultimately was required to provide was his CORI authorization document.

31.     Other than requiring this document, the Acting Mayor and City failed to provide Mr. White any guidance as to expectations, limitations, or restrictions during the investigation. The only information he received from the Mayor's Office and the City was during the initial call from Mayor Walsh on February 3.  Otherwise, not a single person from the City or Mayor's Office called or reached out to Mr. White to discuss the parameters of his administrative leave or the investigation until April 1.

32.     On April 1, the Acting Mayor and the City's attorney, Henry Luthin, held a Zoom meeting with Mr. White and his attorney, who appeared from Mr. White's BPD office due to Covid concerns that prevented Mr. White from participating with his attorney from his house. Mr. White's wife was particularly vulnerable to Covid.  During the April 1 Zoom meeting, the

Acting Mayor did not provide any further guidance or instruction to Commissioner White.  The Acting Mayor simply communicated that she was going to wait for the investigation to be completed and then would make her decision about Mr. White.  She did not tell Mr. White that he should not have used his office or his BPD computer for the Zoom conference.

33.     In full cooperation with the investigator, Mr. White, accompanied by his attorney, then sat for a full interview by the investigator on April 15, 2021.  The interview was conducted over Zoom from Commissioner White's office for the same reasons that the April 1 meeting was conducted there.  *See* White Aff., ¶ 43.

34.     Mr. White answered all the investigator's questions truthfully, and the interview only ended upon the investigator exhausting her questions and then notifying Mr. White that she was terminating the interview.  *See* White Aff., ¶ 33.  Commissioner White did not end the interview.

35.     Consistent with his sworn testimony, which he has provided to Defendants in the form of two written affidavits and a videotaped affidavit, Mr. White told the investigator that he never physically abused, nor did he threaten to shoot or physically abuse, his ex-wife, his niece-by-marriage or anyone.  Consistent with his sworn testimony, he also told the investigator that he never sexually harassed or coerced his ex-wife or his niece-by-marriage.

36.     On the advice of counsel, Mr. White did not answer the following questions: an initial question about what if any medications he was currently taking, and questions about his private sexual activities with consenting adults over the last thirty years or so. *See* White Aff.,  ¶ 33.  His consensual sex life in the past thirty years was not relevant and constituted an attempt to invade his privacy unnecessarily and with malicious intent.

37.     Although Mr. White declined to answer the medications question because it was private health information, he did suggest and agree to answer a follow-up question about whether he was on any medications that would interfere with his ability to answer the investigator's questions truthfully during the interview, and he responded there were none. *See* White Aff., ¶ 33.

38.     At the end of the interview, which lasted more than an hour, the investigator said she did not know if she would see Mr. White again, which he understood to mean the interview was concluded. *See* White Aff., ¶ 34.

39.      During the interview, the investigator displayed serious bias.  Mr. White acknowledged that he had at times pushed Sybil Mason away from him if she was aggressively assaulting him with her body and he needed to leave the house or separate himself from her.  He made it clear it was not violent pushing and that he never pushed her off her feet or into any object and he never injured her.  Yet, the investigator followed up by questioning him about this pushing which she characterized, on her own and without basis, as "violent pushing."  Mr. White, by his attorney, had to correct the investigator, but her leap to a false conclusion on such a critical issue was highly inappropriate and disturbing.

40.      Although Mr. White understood that the interview was complete, the investigator several days later stated that she wanted to ask some follow-up questions.  Mr. White agreed to answer follow-up questions in writing.  The investigator refused.  Mr. White was not told that he was required to answer follow-up questions or that he must do so in person. *Id.*

41.     The investigator made an issue of the BPD's response to her investigation.  In her report, she communicated that allegedly 14 of 21 police witnesses she asked to speak to refused

to speak to her and that this reflected a lack of police transparency and accountability.  This had nothing to do with Mr. White.  By including it in her report, however, the City's investigator sent the false and inappropriate message that Mr. White was somehow to blame for the alleged difficulties that the investigator encountered from others.  That message was reinforced by the Acting Mayor when she published the report to the media.

42.     Whether the investigator actually encountered difficulties is impossible to verify based on the report because she did not identify the allegedly non-cooperative witnesses and what she considered a lack of cooperation.  There is reason to believe the investigator acted unreasonably toward some or all of these witnesses.  For example, at least one officer was prepared to meet in person with the investigator but wanted their union representative with them because the interview concerned BPD business – a reasonable request that the investigator denied.  On information and belief, the investigator counted this person as a non-cooperating witness, and the Acting Mayor counted this person as more evidence of "fear" and "intimidation" that Mr. White was somehow responsible for.

43.     Mr. White did not instruct, directly or indirectly, anyone not to cooperate with the investigator.

44.     The Acting Mayor improperly and without basis blamed Mr. White for "confusing" and "intimidating" BPD witnesses.

45.     The City's investigation was also deeply flawed because the investigator deliberately chose not to interview witnesses that had exculpatory evidence, including information that contradicted the false narrative that Dennis White had abused his ex-wife or anyone.  For example, the investigator never interviewed or even sought to contact Mr. White's eldest daughter, Tiffany White, who has extensive personal knowledge of her parents and their relationship and who had made public statements stating that the domestic abuse allegations

against Mr. White were false.  Failing to interview Tiffany White demonstrates a reckless

disregard for the truth and bias.  If the investigator had interviewed Tiffany, she would have

learned of other key witnesses who prove that Mr. White in fact was the victim, not the

perpetrator, of domestic violence while living with Sybil Mason.  Those other witnesses include

Connie Owens, Sybil Mason's sister, and Jamiel Howard, who has firsthand knowledge that

Sybil Mason fabricated the allegations of abuse against Mr. White.

### Tiffany White: Sybil Mason lied about Dennis White and physically abused him, Tiffany and many others.[2]

46.     Tiffany White provided sworn testimony that her mother, Sybil Mason, physically

abused Dennis White. Based on her sworn testimony, Sybil[3] hit Dennis; threw objects at him;

and when he tried to leave, she often tried to physically block him.

47.     In one instance, Tiffany witnessed her mother grab a portable television and

throw it at Dennis while they were in the kitchen.  She then picked up a lamp and threw it at him,

causing it to shatter.  Dennis yelled, "Sybil stop, the kids are here."  At that moment, Tiffany

grabbed her sister, Brittany, who was in diapers and ran to the other room.  After several

minutes, Sybil called Tiffany back into the kitchen.  Tiffany witnessed Dennis on his knees

crying and hugging Sybil around the legs, begging her to stop.

48.     Based on her personal knowledge, Tiffany testified that when Sybil struck or

threatened to strike Dennis, he would put his hands up in a defensive stance, covering his chest

and face area in attempt to block her and protect himself. He did not strike Sybil in response.

One time Tiffany witnessed her father grab Sybil's wrists to try to get her to stop assaulting him.

---

[2]  The information from Tiffany White is contained in sworn audiovisual testimony that she provided as part of this case.

[3]  For clarity and convenience, some of the parties and witnesses are referred to at times by their first names because they were part of the same family with a shared last name.  No disrespect is intended.

49.     Tiffany testified that after Sybil attacked him, he would always walk away and often he would leave the house altogether.  Many times he took Tiffany with him.  Tiffany recalls that he would then drive her to his parents' house where she could be safe, and sometimes he would just drive around with her.  She observed him crying as they drove in the car after some of these incidents.

50.     As Tiffany stated under oath, Dennis never physically abused Sybil.  In fact, Sybil was the person who engaged in serious and repeated domestic abuse of family and boyfriends and girlfriends.  Tiffany testified about extremely serious physical and emotional abuse that Sybil inflicted on her when she was a child.  Sybil would often tell Tiffany, "You look like your fucking father" and "you're fat and stupid".  She also physically beat her when Dennis was at work.

51.     When Tiffany was eleven or twelve years old, Sybil said to her, "you're fat and lazy" and slapped Tiffany hard in the face.  Tiffany was hurt, upset and angry.  Sybil then said, "you want to fight me" and she punched her, knocked her to the ground, and as Tiffany tried to crawl under the bed to escape, Sybil kicked her and stomped on her ankle, injuring her.  Tiffany screamed. Then her mother went to the room to get a belt and started striking Tiffany with the belt.  Dennis was not home and Tiffany was too afraid of her mother to tell him.

52.     In another later incident when Tiffany was about eleven or twelve years old, Sybil yelled at her because she thought Tiffany was not moving fast enough to wash the dishes. Then Sybil punched Tiffany so hard in the back that it knocked the wind out of Tiffany who screamed out and struggled to breathe.  Sybil's sister, Connie Owens, was present and immediately yelled at Sybil that she could not hit a child like that, it was wrong.

53.     Later, Dennis found Tiffany crying in her room and asked what was wrong. Eventually Tiffany told him what happened.  Dennis was upset and angry and told Sybil: "If you hit her again, I will call the police and you will go to jail."  Sybil did not hit Tiffany again after that.  It was around this time that Dennis and Sybil began to live separately within the same house, and Tiffany testified that Sybil's abuse of Dennis stopped.

54.     Tiffany's sworn testimony also detailed how Sybil Mason physically assaulted several boyfriends and girlfriends with whom she was romantically involved.  For example, Tiffany witnessed Sybil punching one girlfriend in the face and brutally beating her.  After one incident, Tiffany recalled seeing blood drops on the floor of the White's Dorchester home. Another girlfriend told Tiffany that Sybil punched her so hard in the head that she developed a temporary verbal stutter.  Tiffany also recalled another girlfriend walking into the kitchen with a bloody face and her shirt ripped open after an altercation with Sybil.

55.      Tiffany also recounted at least one time when she walked in on Sybil and her boyfriend fist fighting and exchanging blows with each other.

56.      Sybil also went out to clubs and came back with bruises and cuts. Sybil explained to Tiffany she had received these injuries from fights she had had in the clubs.

57.     Concerning allegations in the investigative report about Dennis White sleeping with a gun under his pillow, Tiffany testified that her father had warned her of that fact as a safety precaution to ensure that neither she nor the other children in the house, who she looked after, surprised him on the third floor of the Dorchester home while he was sleeping.  He would sleep with a gun under his pillow for security because of the nature of his job as a police officer and the fact that there were several people in and out of the house on the first floor where Sybil lived.

15

58.     Tiffany recalled that after her father told her mother he wanted a divorce, Sybil spoke to the police about Dennis in early May of 1999.  In connection with that report, Sybil threatened Tiffany, stating that if she did not tell the police what Dennis said about the service weapon under his pillow, Sybil would call social services, tell them falsely that Tiffany was abusing drugs (which in fact she has never used), and have them take Tiffany's child.

**Connie Owens: Sybil Mason lied about Dennis White and physically abused him, Tiffany and many others.[4]**

59.     Connie Owens, Sybil Mason's younger sister by a year, grew up with Sybil and went to high school with Sybil and Dennis.  She helped to introduce them.  According to Connie's sworn testimony, Sybil was always a fighter growing up and never stopped.

60.     When Sybil was little, she bullied the smaller boys in the neighborhood.  As an older teenager (between 16-18 years old), Sybil got into a fight with their brother, Charles, and reached into her pocket, pulled out a knife and stabbed him in the upper thigh, then ran away.  Their mother came out of the house and took Charles to the hospital where he required stitches.

61.     As an adult, Connie was frequently at Dennis and Sybil's house in Dorchester because they were close and they had children about the same age.  Connie frequently observed Sybil acting aggressively toward Dennis, bumping her chest into him forcefully, hands and fingers in his face, trying to provoke him.

62.     According to Connie's sworn testimony, Dennis is not and never was a fighter.  With everyone who tried to provoke him, including Sybil, he just walked away.  The most he did

---

[4]  The information from Connie Owens is supported by sworn testimony that she provided as part of a videotaped affidavit she provided in connection with this case.  She came forward to testify under oath because she wanted "the truth to be told" about Mr. White and she knows Sybil's allegations to be false. *See* Connie Owens audiovisual testimony.

would be to push her away or to the side so he could leave the house if she was acting aggressively toward him.  He never assaulted Sybil.

63.     By way of example, in one instance, Sybil was berating Dennis and in his face. He tried to leave, but she blocked him.  Once outside, she repeatedly tried to block him from leaving.  He would walk one way, she would get in front of him; he would go the other way, she would move and again try to block him.  Once he got to the car, she stood in front of the door and prevented him from opening it.  When he got into the car, she stood in front of it preventing him from leaving.  Eventually, Sybil moved, and Dennis left.  He never got provoked.

64.     Connie also testified to a pattern of violence that she witnessed Sybil engage in with romantic partners. She recounted several physical fights that Sybil had with women during the time that Dennis lived upstairs in the Dorchester home.  Connie recalled a specific incident where Sybil got into a physical altercation with a woman who then reported Sybil to the police. Connie was interviewed by the police about the domestic incident and recalls that, as a result of the incident, Sybil had her service weapon taken away for a period of time.  The woman that Sybil assaulted had a disability.  Connie also recalled an instance where Sybil got into a physical altercation with another girlfriend while she was pregnant and Connie stepped in to try to prevent her pregnant sister from sustaining any injuries.

65.     Connie characterized Sybil's relationship with a woman Sybil was living with on the first floor as a bullying situation where Sybil would belittle and bully the woman in front of Connie, which Connie told Sybil was not appropriate.

**1999 Allegations:  Dennis White Did Not Threaten To Shoot Sybil; She Lied To Get Leverage and The House.**

66.     Sybil Mason's domestic violence allegation that Dennis White threatened to shoot her and her friend is false.

67.     Around the time Ms. Mason falsely made the allegation, her marriage was coming to an end with Mr. White.  They owned a house in Dorchester, however lived separately on different floors.  Mr. White still cared for Ms. Mason and was upset when he found out that Ms. Mason was in a relationship with another Boston Police Officer, Steven H.

68.     In 1998, Mr. White observed Ms. Mason at Steven H's house.  Mr. White approached her outside and asked what hope there might be for their marriage and if the marriage was permanently over.  Ms. Mason refused to answer and drove away.  Mr. White was upset and hurt.  He then had a conversation with Steven H. about the relationship.  Mr. White asked Steven H. if he was having an affair with his wife.  Steven H. replied by asking, "what did she tell you?"  Mr. White stated that "[i]f you want, bring your vehicle over and take her [Ms. Mason] and all her things if you want. But otherwise don't come by the house again."  White Aff., ¶ 23.  Mr. White never made any threats towards Ms. Mason or Steven H. *Id.*

69.     A few months later, on December 26, 1998, Mr. White was driving through Dorchester on patrol with Officer Wayne Hester, and saw Linda Figueroa in her car.  White Aff., ¶ 24.  Ms. Figueroa was a family friend at the time and Mr. White had not seen her for a while. *Id.*  They engaged in friendly conversation and the relationship between Ms. Mason and Steven H. came up. *Id.* Mr. White told Ms. Figueroa about seeing the two together at Steven H's house months earlier and while describing it explained to her that Mr. White **felt** so upset that he could have shot both of them. *Id.*  Mr. White also stated that he was finished with the marriage and ready to move on. *Id.*

18

70.     Ms. Figueroa did not mention Mr. White's statement to Sybil Mason for four months.  It was not until April of 1999 that Ms. Figueroa told Ms. Mason how upset Mr. White had been when he encountered her at Steven H's house.  It was then that Ms. Figueroa told Ms. Mason that Mr. White said he felt so upset at the time that he could have shot both of them.  White Aff., ¶ 25.

71.     Sybil Mason did nothing upon hearing how Mr. White had felt approximately six months earlier.

72.     On May 4, 1999, three weeks after her conversation with Ms. Figueroa, Mr. White told Ms. Mason to get a lawyer because he was divorcing her.  Ms. Mason exploded in anger at Mr. White, as documented in a contemporaneous police report.  Riva Aff., at attached May 4 report at 5:30 p.m..  Ms. Mason then filed a false report with the police immediately afterward alleging that he had threatened to shoot her and her friend three weeks earlier.  Riva Aff., at attached May 4  report at 6:10 p.m.  She then sought a restraining order. White Aff., ¶¶ 26-27.

73.     Because she was angry at Mr. White for divorcing her, Ms. Mason sought to hurt him and to gain an advantage in the divorce and custody proceedings.

74.     Mr. White had never threatened to shoot her and Steven H.

75.     Nevertheless, based solely on Ms. Mason's false allegation, the Court issued a restraining order against Mr. White.

76.     As soon as Mr. White agreed to Ms. Mason's financial demands in the divorce, namely, that he assume all the financial obligations for the house and pay for their younger daughter's private education, Ms. Mason asked the Court to vacate the restraining order.  White

Aff., ¶ 27.  On Ms. Mason's request, the Court vacated the restraining order in June 1999, approximately 5-6 weeks after it was entered.

77.    Ms. Mason did not file a criminal complaint against Mr. White for this matter.

**Jamiel Howard: Sybil Mason Admitted The Allegations Were False and She Made Them To Get Financial Leverage and to "Destroy" Dennis White**

78.    Sybil Mason admitted her scheme to a friend, Jamiel Howard, while he was a tenant in her Dorchester home.

79.    Mr. Howard, a 41-year-old man born and raised in Mattapan, Massachusetts, got to know Ms. Mason in the 1990s and currently remains friendly with Ms. Mason.  Mr. Howard does not personally know Mr. White.  Affidavit of Jamiel Howard ("Howard Aff."), filed herewith, ¶¶ 2-3, 10.

80.    In the early 2000s Mr. Howard moved into 35 Bullard Street in Dorchester as a tenant where Ms. Mason resided at the time.  He rented the separate unit upstairs from Ms. Mason's apartment for one year. Howard Aff. ¶¶ 11-12.

81.    Ms. Mason and Mr. Howard talked frequently as friends. *Id.,* ¶ 13.  While Mr. Howard was renting from Ms. Mason, they had several conversations where Ms. Mason expressed her anger towards Mr. White.  *Id.,* ¶ 14.  She remained bitter that Mr. White divorced her and moved on with his life with another woman.  *Id.*  Ms. Mason said that she was "going to get him."  *Id.*

82.    Ms. Mason shared with Mr. Howard that she made allegations in court about him to gain "leverage to get the house."  *Id.,* ¶ 15.

83.    Mr. Howard recalled that Ms. Mason expressed that she resented that Mr. White was advancing personally and professionally and that she wanted to "ruin him" and "destroy him."  She expressed a clear vendetta against him.  *Id.,* ¶ 16.

84.     Ms. Mason explained to Mr. Howard that she had made false allegations against

him.  *Id.,* ¶ 17.  When Mr. Howard asked her whether Mr. White had ever abused her, she told

him that Mr. White had never put his hands on her.  *Id.*  This is consistent with what Ms. Mason

told the police on May 4, 1999:  there had been "no physical abuse in the relationship."  *See* Riva

Aff., at attached May 4  report at 6:10 p.m.  At the time, Mr. Howard thought that Ms. Mason's

desire to make false allegations was "morally despicable and wrong."  Howard Aff., ¶ 18.

85.     Mr. Howard had a friendly relationship with Ms. Mason's daughters, Tiffany and

Brittany. *Id.*, ¶ 19.  They expressed to Mr. Howard that Mr. White was a good father.  *Id.*

Brittany was in high school living at 35 Bullard Street during the time Mr. Howard was renting

there. *Id.*, ¶¶ 11 and 19.

86.     Mr. Howard was not aware that Mr. White had been appointed Commissioner or

the controversy regarding Ms. Mason's past allegations until Mr. Howard's brother called him

and told him what was going on. *Id.*, ¶ 20.

87.     When Mr. Howard became aware that Mr. White's position as Commissioner was

threatened due to Ms. Mason's past allegations, he felt compelled to speak out about it. *Id.*, ¶ 21.

The situation "troubled [his] heart" that years later, Ms. Mason was still trying to hurt an

innocent man.  *Id.*  He felt her actions were "just wrong."  *Id.*

**BPD's Lead Domestic Violence Investigator, Sgt. Det. Mary-Ann Riva Concluded
Dennis White Had Not Threatened Sybil Mason and That He Was Not a Threat to
Her.**

88.     Detective Mary-Ann Riva (now retired Sgt. Det. Riva) was assigned to investigate

Sybil Mason's domestic violence allegation in 1999.  She concluded:

> In my view, based on my experience as a domestic violence detective, Sybil
> White was angry and upset about the divorce which Dennis White had
> initiated and her statements were made in that context. In my experience as a
> domestic violence detective, it is not uncommon for incorrect statements to

be made by one partner against another during a divorce proceeding. That is not always the case, but it is sometimes the case. It was my opinion that Sybil White's request for a restraining order was motivated out of her being upset and angry, not because there was a real threat that Dennis White would commit violence against her. Sybil White voluntarily vacated the restraining order against Dennis White on June 23, 1999, more than ten months before it was scheduled to expire. In my view, based on my experience and investigation, Dennis White did not make a threat to commit violence on Sybil White, and did not present a threat of violence to her.

*See* Riva Aff., ¶¶ 15-16.

> **BPD's Internal Affairs Investigation Did Not Sustain Any Charges Against Dennis White Arising from Ms. Mason's Allegations.**

89.     BPD's Internal Affairs also conducted an investigation of Sybil Mason's allegations against Dennis White in 1999, following BPD protocol to investigate any time a restraining order is entered against a police officer.  Sergeant Hill conducted the fact investigation and made an initial recommendation regarding charges against Dennis White.

90.     During that investigation, Sergeant Hill asked Mr. White if there was any physical abuse between Mr. White and Ms. Mason.  Mr. White answered, "yes."  Mr. White understood "physical abuse" to mean any unwanted touching. Ms. Mason was physically violent towards Mr. White, striking him and throwing objects at him on several occasions.  Additionally, Mr. White acknowledged that he had pushed Ms. Mason away when she physically blocked him from leaving or when she would get in his face or physically attack him.   His pushing was not violent, and he never injured her.

91.     It is the role of the IA fact investigator to make an initial recommended finding in connection with any IA investigation.  As to the question whether Dennis White had violated any laws, Sergeant Hill recommended a finding of 'not sustained.'  As for the question whether Dennis White had demonstrated a 'lack of judgment' in making the alleged statement, Sergeant Hill made the initial recommendation of 'sustained.'

92.     Pursuant to BPD policy, the initial recommendation is then reviewed by various supervisors and ultimately the BPD Commissioner.  On the recommendation of Superintendent Thomas Dowd, Commissioner Paul Evans ultimately concluded that there was an inadequate basis for a 'sustained' finding against Dennis White for lack of judgment because the statement he made did not constitute a threat against Sybil Mason.  Instead, Commissioner Evans imposed the finding of "filed" meaning that the file would be kept open in case there were any subsequent incidents.  In the following twenty-two years, there have been none.

**1993 Allegation:  Dennis White Acted in Appropriate Self-Defense Against an Attack by His 19-Year-Old Niece-by-Marriage That Threatened His Career and Livelihood.**

93.     In 1993, Mr. White and Ms. Mason had offered Ms. Mason's 19-year old niece a place to stay because she was having difficulty at home with her family.  *See* White Aff., ¶ 30. She stayed with the Whites for several months but was asked to leave because Sybil found her behavior in the White's home to be inappropriate. *See* Tiffany White audiovisual testimony.  The niece became upset and aggressive when she was leaving.  She refused to return the house key while repeatedly swearing and screaming at Mr. White in front of the young children in the home.  White Aff., ¶ 30.

94.     Mr. White took his niece by the arm and escorted her down a few steps and outside the house.  *Id*.  She continued to swear and refused to return the house key.  *Id*.  She then physically attacked Mr. White, hitting him in the chest and attacked and kicked his left knee which previously had been seriously injured.  *Id.*  In fact, he was on injured leave due to his knee injury which was so severe that it kept him out of active duty for four years and nearly cost him his police department career.  *Id.*

95.     Mr. White felt very concerned when his niece attacked his knee with a kick and he reacted in self-defense by swatting her away with a swing of his arm.  *Id.*  He did not strike

23

her with a fist. *Id.* His hand was open. *Id.* That ended her attack. *Id.* She threw the house key on the ground and left, threatening that she would come back with her friends. *Id.*

96.     Her assault on Dennis White was witnessed by a neighbor who confirmed that Mr. White responded only after she kicked him in the injured knee. *Id.* Dennis reported the incident immediately to the police. *Id.* Later, he took out a complaint on her and she took out a complaint on him. The court dismissed both complaints. *Id.*

97.     With respect to the allegation of domestic violence in 1993 involving Mr. White's niece-by-marriage, he acted in appropriate self-defense against an attack that threatened his career and livelihood.

**The Investigator Disregarded and Failed to Include Information That Undermined The Key Witness's Credibility.**

98.     Records accessible to the City and its investigator indicate that Sybil Mason, the primary witness in the investigation, is implicated in the BPD's Evidence Control Unit ("ECU") criminal overtime fraud scheme. Ms. Mason has worked for years in the ECU where all or nearly all members of the unit have been indicted or implicated by the U.S. Attorney's Office for fraud in connection with false reporting of overtime hours. While not everyone implicated in the scheme has been indicted, the complaint states there are "unindicted coconspirators." Ms. Mason was apparently an unindicted coconspirator as she too submitted false and fraudulent overtime hours reports and thereby was paid thousands of dollars that she was not in fact entitled to, according to a Justice Department affidavit submitted in the federal case. Affidavit of Special Agent Shena Latta, attached hereto at Exhibit A, at p. 12.

99.     Ms. Mason's apparent involvement in the sweeping criminal conspiracy should relegate her to the Suffolk County DA's Brady list of officers. This is a list of officers whose

own prior history either prevents them from testifying or calls into grave doubt the veracity of their testimony.

100.    Ms. Mason's implication in this long-running scheme of criminal fraud and dishonesty destroys the credibility and reliability of Sybil Mason.  Yet the City's investigator in the Dennis White matter never mentioned this highly significant set of facts.  Nor did the City or Acting Mayor mention it or apparently consider it when they terminated Dennis White based primarily on Sybil Mason's allegations against him.

**The City and Acting Mayor Threatened and Coerced Mr. White and Destroyed His Reputation and Career When He Refused to Resign or Retire By Publishing the False and Defamatory Investigator's Report and Communicating that Dennis White Was a Domestic Abuser.**

101.    On April 29, the investigator delivered her final report to the Acting Mayor. Mr. White repeatedly asked for a copy of this personnel record, but the Acting Mayor refused to provide it for two weeks.  White Aff. ¶¶ 12 and Exh. H (emails to the City's Corporate Counsel dated May 1, May 2, May 3, May 4, May 7, May 10, and May 12, 2021).

102.    On May 14, the Acting Mayor telephoned Mr. White, told him that she was "troubled" by the contents of the investigator's report, and asked him if he would "resign or retire" as Commissioner.  Mr. White had not yet even seen the report, and he refused.  The Acting Mayor then told him that he needed to be on a Zoom hearing at 3:00 p.m. that day.

103.    Later that morning, the Acting Mayor and the City sent a Notice of Intent to Dismiss letter ("the Notice") and a copy of the investigator's report to Mr. White.  *Id.*, ¶¶ 35, 39. The letter stated that the Acting Mayor was notifying Mr. White of her "intent to dismiss" him from his position as BPD Commissioner.  *See* White Aff., Exh. C.

104.    On May 14, after the Acting Mayor had telephoned Mr. White, Superintendent Nora Baston called to inform him that the Acting Mayor was going to name her as

Commissioner and that the Acting Mayor had directed her to be at City Hall at 3:00 p.m. for the announcement.  *See* Dennis White audiovisual testimony; White Aff. ¶ 38.  According to Superintendent Baston, the Acting Mayor had notified her on May 12, two days prior to the scheduled termination hearing that she would be named the new Commissioner on May 14.  *Id.*

105.    The hearing that the Acting Mayor scheduled for Mr. White on May 14 was not going to be impartial, fair, or meaningful, as the Acting Mayor had already declared that she was going to remove him from the position.  Further, the basis for that decision – the investigator's report and the Notice letter – were not provided to him until just several hours before the purported hearing, precluding the opportunity for Mr. White to prepare and to gather witnesses or evidence to rebut the false allegations in the investigator's report.

106.    Mr. White, therefore, filed his complaint and a motion for preliminary injunction. That legal action stayed the hearing.

107.    In response, the City and the Acting Mayor published the investigator's report to the public and media – a highly coercive move to try to force him to leave.  The Acting Mayor and City's publication of this report and subsequent communications about Mr. White as a domestic abuser were defamatory and crushing in every respect.   The City and Acting Mayor's distribution of the report conveyed the (false) message that Mr. White in fact committed these crimes as stated by the unidentified witnesses.  This message was reinforced by the Acting Mayor and City tying Mr. White's termination to the publication of the report.

108.    The media and the public understood that message and, in turn, broadcast it widely.  Nearly every local news station and newspaper across Massachusetts immediately splashed the statements in the investigator's report that Mr. White had committed heinous acts of

domestic violence.  These false accusations reached major news sources nationally, including headlines in the New York Times characterizing Mr. White as a violent abuser.

109.    The City and the Acting Mayor knew the statements included in the report were false or acted with reckless disregard as to whether they were false.  The report was obviously flawed and unreliable.  The statements were from unidentified witnesses who were not under oath and whose basis of knowledge, if any, was not disclosed.  The City and Acting Mayor knew or should have known that the primary, if not only, source of information regarding the domestic violence allegations of Sybil Mason was Sybil Mason herself.  Yet the City and Acting Mayor relied on and published the statements as true despite the following evidence which they knew: (i)  Sybil Mason had told the police and court in 1999 there had been "no physical abuse" in her relationship with Dennis White; (ii) Tiffany White had publicly stated in the media that her mother's allegations were false and that her mother had been the aggressor in the relationship; (iii) the City's investigator had not interviewed  or even tried to interview Tiffany; (iv) the BPD had investigated the allegations contemporaneously and found that they were not sustained.

110.    In addition, the City and Acting Mayor knew or should have known that Sybil Mason was implicated in a widespread fraud scheme that bilked taxpayers of hundreds of thousands of dollars over several years.  As a result, Sybil Mason is utterly unreliable as a witness and likely could not testify even as a BPD officer.

111.    Yet the Acting Mayor and City have communicated that her allegations against Mr. White are true.  For example, on the day of his termination, the Acting Mayor clearly conveyed that that Mr. White was a domestic abuser:

> "The disparate treatment of Black people in our country is a genuine concern, but let's be clear: Racism is a burden carried by both men and women of color, and I will not turn a blind eye to domestic violence against Black women, or any women, for that matter.." - Acting Mayor Janey, The New York Times; June 7, 2021.

112.    The Acting Mayor and City's publishing of the investigative report and related statements destroyed Mr. White's personal and professional reputation, which he had built over more than 30 years of hard work and excellent service to the City.  As a result, Mr. White will never be able to secure another comparable job in his profession as a law enforcement commander or consultant.

**Defendants' Distribution of the Investigator's Report Violated Mr. White's Privacy.**

113.    The City and Acting Mayor's distribution of the report to the public was also unlawful because it constituted a confidential personnel record.  The investigator was hired as an agent of the City to conduct an investigation into an employment personnel matter concerning Mr. White.  Defendants had an obligation to handle the investigation and the subsequent report appropriately and not to disclose the report which concerned highly personal (and false) allegations.  They violated his privacy when they published the report.

**Defendants Denied Mr. White's Demand for A Name-Clearing Hearing to Protect His Reputation and Livelihood.**

114.    In his court pleadings and his correspondence with the Acting Mayor and City, Mr. White repeatedly demanded an evidentiary name-clearing hearing regarding the allegations against him, consistent with his constitutional rights.  The Single Justice of the Massachusetts Appeals Court reaffirmed his right to such a name-clearing hearing.  Docket No. 6.  In its written decision, the Single Justice stated  that "[i]n the event that the City does remove the Commissioner after a hearing, nothing in this order should be construed as constraining the Commissioner from seeking a prompt name-clearing hearing before the City in accordance with constitutional requirements..."  *Id.*

115.    On May 25, 2021, Mr. White sent Defendants a demand letter requesting (again) a public name-clearing hearing before the Acting Mayor and City where he would have the

opportunity to bring forth witnesses and have the opportunity to cross-examine any adverse witnesses, including the unidentified witnesses interviewed by the investigator. The letter also requested a list of key documents to be made available for review and use as evidence at the hearing.

116. The letter clearly stated that one of the purposes for the requested evidentiary hearing would be to give him an opportunity to prove his innocence and to clear his name.

117. Defendants, however, have disregarded every single one of Mr. White's requests for a constitutionally required name-clearing hearing.

**The City and Acting Mayor Unlawfully Terminated Dennis White.**

118. On June 2, 2021, Mr. White appeared before the Acting Mayor and the City for his termination hearing. Mr. White made a statement, but he was prevented from presenting any live witnesses or cross examining any of the City's witnesses or accessing any of his own personnel files or documents used to create the investigator's report.

119. The hearing lasted a mere twenty minutes. The Acting Mayor did not ask a single question, did not ask for clarification on any of his statements, and did not indicate what, if any, subjects she expected Mr. White to address. The meeting ended by the Acting Mayor turning her video off once Mr. White finished his statement. The public and media were not allowed to participate despite Mr. White's request for a public hearing.

120. On June 7, 2021, the Acting Mayor issued a Termination Letter to Mr. White.

121. The Termination Letter referenced and incorporated the Acting Mayor's prior Notice of Intent to Terminate dated May 14 ("the Notice").

122. The Notice cited the following reasons for Mr. White's termination:

- "The information contained in the independent investigation regarding complaints of domestic violence and abuse filed in 1993 involving your then-niece-by-marriage and in 1999 involving your then -wife, and your responses thereto."

- Mr. White's "lack of cooperation and judgment during the investigation" to include refusing to provide various documents, answer all questions by the investigator, and refusing to meet for a second interview.

- Mr. White "appeared for [his] interview with the independent investigator in the BPD Commissioner's office, as well as at other times at BPD headquarters, while on administrative leave."

- "At no time during the investigation int the earlier domestic violence allegations did [Mr. White] express any appreciation of the importance of domestic violence concerns to the public…"

*See* White Aff., Exh. C.

123.    These reasons for terminating him lack merit.  First, the Acting Mayor stated that her intent to terminate Commissioner White resulted from "the information contained in the independent investigation regarding complaints of domestic violence and abuse filed in 1993 involving your then-niece-by-marriage and in 1999 involving your then-wife, and your responses thereto."  *Id.*  This reason is facially deficient.  Mr. White was appointed Commissioner by Mayor Walsh and the City on February 1, 2021.  The City and Mayor Walsh were aware of Mr. White's IA records and knew of the allegations of domestic violence against him in 1993 and 1999.  The City cannot claim they have cause to terminate Mr. White when the underlying facts were known to the City when the City appointed him.  The City appointed him because the City determined he was qualified and that these allegations from 1993 and 1999 did not disqualify him.  The City cannot now claim the opposite.  Moreover, the evidence that Mr. White has provided to Defendants, which is referenced in summary form herein, proves that he did not, in fact, engage in domestic violence or wrongdoing in the 1993 and 1999 incidents or at any time.

124.    Second, Mr. White cooperated in the investigation, as discussed in summary form herein.  Defendants never told him prior to the Notice and Termination Letter that he had not cooperated.  As for documents, Mr. White provided the only document that he was required to provide, which was authorization for his CORI report.  *See* White Aff., ¶ 32.  In the Notice, the Acting Mayor faults Mr. White because he refused to provide certain documentary information at the beginning of the investigation.  However, the investigator's request for that documentary information, including tax returns and authorization for credit history, was outside the scope of the investigation, as the City itself defined the investigation.  *See* White Aff., Exhs. A and B.

125.    Third, Mr. White's few visits to his BPD office during his administrative leave were appropriate.  The Acting Mayor concluded that these four visits "raised the potential for confusion" and "may have intimidated witnesses who were asked to participate in the independent investigation."  However, the Acting Mayor never told Mr. White he could not visit the office while on administrative leave, not even when she personally spoke to him by Zoom in early April while he was in his office.  *See* White Aff., ¶ 43.  Further, he only visited his office approximately four times while on administrative leave for four months, and each had an appropriate purpose.  *Id.*  He could not conduct the April 1 Zoom call with the Acting Mayor at his house with his attorney present because his wife was very immune compromised due to a health issue.  *Id.*  On April 15, he appeared at his office with his attorney for the Zoom interview with the investigator for the same Covid, health-related reason.  *Id.*  Notably, the investigator did not mention during that meeting that it was inappropriate for him to be at his office.  On another occasion, he came to the office to retrieve a file from his computer that the Command Staff wanted to use. *Id.*  It was the form he had been using as Chief of Staff to track diversity and inclusion statistics in BPD employment matters.  *Id.*  The Command Staff needed the statistics

for a City Council hearing and they wanted to use the form as the model for tracking such data going forward. *Id.* The fourth time he came to the office was again to retrieve a document the Command Staff wanted from his computer. *Id.* As Chief of Staff, he had kept track of the assignment of new cars within the police department. *Id.* There were new cars arriving that he had already allocated as Chief of Staff and they wanted to rely on his allocation for these cars, and they wanted to use the form as a template for the allocation of new car orders in the future. *Id.* On each of these four occasions, he went directly into the secure garage and elevator that takes him directly to the floor where his office is, and he left the same way. *Id* . Therefore, he had very minimal contact with anyone at the BPD during these visits. *Id.* There was no intent to confuse or intimidate anyone, and there is no evidence that anyone was confused or intimidated. He was never instructed by anyone at City Hall that during his administrative leave he was not to enter BPD headquarters or access his computer. *Id.*

126.   Fourth, Mr. White remained appropriately silent during the investigation, and his not speaking publicly about matters relating to his status or the investigation is not a basis to remove him. Although the City and the Acting Mayor blamed him for not speaking publicly during the investigation about the allegations against him, Mr. White was on administrative leave and did not believe he had authority to speak publicly on the matters under investigation or that it would be appropriate to do so. *Id.* He certainly was unaware that the Acting Mayor expected him to speak publicly on this issue or any matter concerning the investigation. *Id.* Significantly too, Mr. White had a legal right under the First Amendment not to speak on public issues and cannot be terminated for his decision to remain silent. *See Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796–97 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the

difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." )

127.    In the Termination Letter, the City and Acting Mayor also stated:  "your hearing was your opportunity to give me your ideas and demonstrate your understanding of the serious and important issues and implications for the BPD and the community" arising from the domestic violence allegations.  Mr. White did speak personally at the hearing about how domestic violence is a matter of the utmost importance to him, pointing out that his own daughter had been abused.  Mr. White was not informed that he was expected to address any particular "issues and implications."

128.    The Acting Mayor also unfairly and inappropriately blamed Mr. White for seeking to defend himself at the hearing against the serious domestic violence allegations against him.  The entire reason for the investigation was to determine if the allegations of domestic violence against him were reliable and true.  Because the investigator's report was seriously flawed, Mr. White was required to demonstrate that the allegations against him were not reliable and true.  Defending his innocence against allegations of significant wrongdoing – crimes of domestic violence – cannot be a basis to terminate or fault him.

<u>COUNT I</u>
Violation of 42 U.S.C. § 1983- Stigma Plus
(Against the City of Boston and the Acting Mayor)

129.    Plaintiff repeats the allegations set forth above as if fully contained herein.

130.    At all relevant times, the Acting Mayor was acting as an official of the City of Boston.  She had the authority to remove the Commissioner only for cause pursuant to the Removal Statute.

131.    The investigator was hired by the City to conduct the investigation concerning the domestic violence allegations against Dennis White.  She acted as an agent on behalf of the City, and Defendants therefore are responsible for the investigation and the investigator's report, including as joint participants.

132.    The investigative report includes scandalous and false information that communicates Mr. White committed acts of domestic violence more than twenty years ago against his then wife, Sybil Mason, and his niece by marriage.  The allegations were made by four unidentified persons who did not speak under oath.  The report does not say if any of these witnesses had personal knowledge of their allegations.  The report omitted key exculpatory evidence which was available to the investigator, the Acting Mayor and the City.

133.     The Acting Mayor distributed the investigative report to the public on behalf of the City.  In doing so, the Acting Mayor credited and legitimized the allegations against Mr. White and used the report to justify the removal of Mr. White from his position as Commissioner.

134.    Mr. White had a constitutionally protected liberty interest to be free from being stigmatized by the government in connection with his termination as Commissioner.

135.    Defendants violated Mr. White's procedural due process rights under the Fifth and Fourteenth Amendment of the Constitution of the United States and his due process rights under the Massachusetts Constitution when she released the investigative report to the public that contained false, defamatory allegations.

136.    The Acting Mayor made public comments on May 14, 2021, and subsequently, that, recklessly and falsely confirmed the purported veracity of the domestic violence allegations against Mr. White.  She also falsely communicated that Mr. White failed to cooperate with the investigator and intimidated witnesses while the investigation was being conducted.  The Acting Mayor, in essence, publicly charged him with (i) having committed serious crimes of domestic violence, (ii) lying about his past acts of domestic violence, and (iii) acting to perpetuate a corrupt police department because of his alleged role in the BPD's alleged lack of cooperation in the investigation.  The statements were made in conjunction with the Acting Mayor's decision to remove Mr. White from his position as Commissioner.

137.    Mr. White requested a public, name-clearing hearing on several occasions which Defendants denied. Ultimately, the Defendants conducted a closed hearing for twenty minutes in which the Acting Mayor did not ask questions and did not allow Mr. White to present witnesses or cross examine witnesses, thereby purposefully foreclosing the opportunity for Mr. White to clear his name in a meaningful manner.

138.    By their actions, Defendants destroyed Mr. White's ability to obtain other comparable employment in his chosen field as a police commander or consultant as these false allegations saturated the media.

139.    Defendants subjected Mr. White, or caused him to be subjected, to the deprivation of rights, privileges, and immunities secured by the Constitution and laws of the United States and Massachusetts.  More specifically, they violated Mr. White's procedural rights under the Fifth and Fourteenth Amendments of the Constitution of the United States and under the Massachusetts Constitution when the Acting Mayor released the investigator's report and refused his demand for an evidentiary name-clearing hearing.

140.    The City and Acting Mayor Janey were deliberately indifferent to Mr. White's federally protected rights when engaging in the conduct alleged above, and they violated 42 U.S.C. § 1983.

141.    As a direct and proximate result of Defendants' actions, Mr. White has suffered significant damages, including, without limitation, economic damages, damages to his personal and professional reputations, and emotional distress.  His harm includes, without limitation, reputational harm of the most severe nature which now prevents him from obtaining employment in his chosen profession.  Because the City and the Acting Mayor have violated this statute, Mr. White is entitled to recover his damages, punitive damages, and his attorney's fees.

<u>COUNT II</u>
Violation of 42 U.S.C. § 1983- Equal Protection
(Against the City of Boston and the Acting Mayor )

142.     Plaintiff repeats the allegations set forth above as if fully contained herein.

143.    The Fourteenth Amendment to the United States Constitution, as well as the Massachusetts Declaration of Rights, further guarantee that Mr. White be afforded the equal protection of the laws, which prohibit the Acting Mayor and the City from treating Mr. White differently than similarly situated persons and entities absent a substantial relation to an important or significant government purpose or a rational basis.

144.    As a result of Mr. White's gender, the Acting Mayor and the City treated Mr. White in a discriminatory manner based on his sex, making adverse assumptions concerning victims in heterosexual domestic violence.  The Acting Mayor's gender-based prejudices that a man could not be a victim of domestic violence in this matter, resulted in the Acting Mayor's erroneous dismissal and rejection of the sworn statements demonstrating that Mr. White was the victim, not the perpetrator, of domestic violence.

145.    Further, the Acting Mayor's gender-based prejudices led her to disregard the substantial evidence that Sybil Mason's allegations of domestic abuse are false.  For example, she ignored (i) Ms. Mason's own statement  in 1999 that she did not suffer physical abuse during her relationship with Mr. White, (ii) the sworn statements by Ms. Mason's eldest daughter and sister stating that Ms. Mason was the aggressor and abuser and that Mr. White did not abuse Ms. Mason, (iii) Ms. Mason's involvement in a significant overtime fraud scheme in her unit at the BPD, and (iv) other significant evidence available to the Acting Mayor and investigator that severely contradicted and undermined Ms. Mason's story that Mr. White beat his ex-wife.

146.    The Acting Mayor's refusal to entertain any contrary evidence or allow Mr. White to present witnesses or cross examine witnesses at a public name-clearing hearing further demonstrates the discriminatory nature of Mr. White's termination and treatment.

147.    The Acting Mayor expressly stated her gender-based prejudice against Mr. White. As reported in the June 7, 2021 edition of The New York Times, the Acting Mayor stated, "…I will not turn a blind eye to domestic violence against Black women, or any women, for that matter" notwithstanding the fact that there was significant sworn testimony and other evidence that Mr. White, a Black man, was innocent of the charges against him and was in fact the victim of domestic violence.

148.    The Acting Mayor made public statements that communicated that Mr. White was dishonest and had in fact committed the alleged domestic violence that he was accused of. Further, the Acting Mayor criticized Mr. White for even seeking to defend himself as a deplorable effort to attack his ex-wife's character, rather than simply an effort to prove his innocence.

149.    As further evidence of the Acting Mayor's gender bias, the Acting Mayor decided to replace Mr. White with Superintendent Nora Baston on May 12, 2021, with virtually no vetting even though the Acting Mayor decried Mr. White's allegedly inadequate vetting.

150.    The Acting Mayor was willing to protect a domestic batterer, Ms. Mason, while publicly destroying the personal and professional reputation of Mr. White – simply because she is a woman.

151.    The Acting Mayor terminated Mr. White from his position as Commissioner and as a Boston Police officer, while she took no action against Ms. Mason, also an active Boston Police officer even though multiple witnesses provided the Acting Mayor with sworn testimony and other evidence that Ms. Mason committed domestic violence against Mr. White and many others, committed child abuse against her daughter Tiffany White, and is implicated as a co-conspirator in a long-running overtime fraud scheme perpetrated by the Evidence Control Unit where she works stealing hundreds of thousands of dollars in taxpayer funds.

152.    There is no rational basis, and certainly no important or significant state interest, that can justify the Acting Mayor's discriminatory actions as described above, which led to her unlawful removal of Mr. White as Commissioner and outrageous treatment of him.

153.    The Acting Mayor in this action has, with discriminatory intent or purpose, adopted, implemented, enforced, condoned, sanctioned, and encouraged a pattern, practice or custom of violating the clearly established equal protection rights of Mr. White.

154.    The Acting Mayor's conduct demonstrates her deliberate indifference to the violation of Mr. White's constitutional right to equal protection and violates 42 U.S.C. §1983.

155.    As a direct and proximate result of the Acting Mayor's unlawful conduct, Mr.

White has suffered significant damages, including, without limitation, economic damages, damages to his personal and professional reputations, and emotional distress.  Because the City and the Acting Mayor have violated this statute, Mr. White is entitled to recover his damages, punitive damages, and his attorney's fees.

<u>COUNT III</u>[5]
Violation of 42 U.S.C. § 1983- Equal Protection
(Against the City of Boston)

156.    Plaintiff repeats the allegations set forth above as if fully contained herein.

157.    The Fourteenth Amendment to the United States Constitution, as well as the Massachusetts Declaration of Rights, further guarantee that Mr. White be afforded the equal protection of the laws, which prohibit the City from treating Mr. White, differently than similarly situated persons and entities absent a compelling state interest, or even a substantial relation to an important or significant government purpose or a rational basis.

158.    As a Black man, Mr. White is a member of a protected class. As a result of Mr. White's race, the City treated Mr. White in a manner which it has never treated a white Commissioner.  The City has never subjected any other similarly situated Commissioner to the type of scrutiny and investigation that Mr. White endured.

159.    The City treated Mr. White disparately by saying he was not properly vetted when the process for his vetting was the same as other white Commissioners who were promoted from within the BPD.

160.    The City also asserted that a decades old, unproven (and false) allegation of misconduct for which Mr. White was never disciplined was sufficient to terminate him.  On

---

[5] Plaintiff will amend his complaint to add his M.G.L. c. 151B claims for race and gender discrimination after he has satisfied the requirements of 804 CMR 1.04, ¶12., which require that he first file such state law discrimination claim with the Massachusetts Commission Against Discrimination prior to filing with the trial court.

information and belief, other Commissioners had prior allegations of misconduct but were not terminated or otherwise subjected to the treatment that the City subjected Mr. White to. The City has, with discriminatory intent or purpose, adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a policy, pattern practice or custom of violating the clearly established equal protection rights of Mr. White.

161.    The City's conduct demonstrates its deliberate indifference to the violation of Mr. White's constitutional rights to equal protection. The City has thereby violated 42 U.S.C. § 1983.

162.    The City's discriminatory actions were not narrowly tailored to achieve a compelling government interest nor were its actions narrowly tailored.

163.    As a direct and proximate result of the City's unlawful conduct, Mr. White has suffered significant damages, including, without limitation, economic damages, damages to his personal and professional reputations, and emotional distress. Because the City has violated this statute, Mr. White is entitled to recover his damages, punitive damages, and his attorney's fees.

## COUNT IV
### Violation of the Massachusetts Civil Rights Act -- M.G.L. c. 12, §11I
### (Against the City of Boston and the Acting Mayor)

164.    Plaintiff repeats the allegations set forth above as if fully contained herein.

165.    Defendants interfered by threats, intimidation, or coercion, or attempted to interfere by threats, intimidation, or coercion, with Mr. White's exercise or enjoyment of clearly established rights secured by the constitution or laws of the United States or of rights secured by the constitution or laws of the Commonwealth, including his procedural and substantive due process rights and his right to equal protection of the laws.

166.    Defendants' conduct also interfered with Mr. White's exercise or enjoyment

of other clearly established federal and state rights as alleged in this Complaint.

167.    Mr. White has a constitutionally protected property and liberty interest in his position as Commissioner and in his reputation.

168.    At all relevant times, the Acting Mayor was acting within the scope of her position with the City of Boston.

169.    Prior to providing Mr. White a copy of the investigative report, the Acting Mayor called Mr. White and asked that he resign or retire as the Commissioner.  Upon declining her request, she then stated her intent to terminate him from his position.  Shortly after this conversation with the Acting Mayor, Defendants released the scandalous investigator's report to the media that communicated Mr. White was responsible for false and heinous acts of domestic violence, corruption and witness intimidation.

170.    Defendants validated and perpetuated the false allegations through the Acting Mayor's actions and statements following the release of the report and through Mr. White's unlawful termination.

171.    Defendants' actions and statements, including the release of the report, constituted extreme moral and economic coercion.

172.    As a result, Mr. White was locally and nationally shamed and humiliated.

173.    By Defendants' actions and statements, they threatened, intimidated, and coerced, or attempted to threaten, intimidate and coerce, Mr. White in a manner that interfered with his constitutional rights and liberties.

174.    As a direct and proximate result of Defendants' violation of the Massachusetts Civil Rights Act, Mr. White has suffered significant damages, including, without limitation, economic damages, damages to his personal and professional reputations, and emotional

distress.  Because the City and the Acting Mayor have violated this statute, Mr. White is entitled to recover his damages as well as his attorney's fees.

COUNT V
Defamation
(Against the Acting Mayor)

175.    Plaintiff repeats the allegations set forth above as if fully contained herein.

176.    The Acting Mayor published the investigator's report to the media and general public.

177.    The report includes defamatory and false information that communicates Mr. White committed acts of domestic violence more than twenty years ago against his then wife, Sybil Mason, and his niece by marriage.

178.    The report also communicates falsely that Mr. White assisted in a corrupt attempt by the BPD not to cooperate with the investigator by, among other things, witness intimidation.

179.    In connection with releasing the report, the Acting Mayor made statements and ultimately terminated Mr. White, all of which communicated to the public that Mr. White (i) committed serious crimes of domestic violence, (ii) lied about his past acts of domestic violence, and (iii) acted to perpetuate a corrupt police department because of his alleged role in the BPD's alleged lack of cooperation in the investigation.

180.    The Acting Mayor communicated these false messages, which were of a factual nature, with actual malice because she acted knowing that the messages were false or with reckless disregard to whether they were false.

181.    As a direct and proximate result of the Acting Mayor's defamatory statements, Mr. White has suffered significant damages, including, without limitation, economic damages, damages to his personal and professional reputations, and emotional distress.

42

<u>COUNT VI</u>
Violation of the Removal Statute -- Chapter 322, Section 7, of the Acts of 1962
(Against the City of Boston and the Acting Mayor)

182.    Plaintiff repeats the allegations set forth above as if fully contained herein.

183.    Chapter 322, Section 7, of the Acts of 1962 (the "Removal Statute") provides that the Mayor of Boston may only remove the Commissioner of the Boston Police Department for cause.

184.    The Acting Mayor lacked cause to remove Mr. White as Commissioner.

185.    The Acting Mayor cited four reasons for terminating Mr. White as BPD Commissioner.

186.    First, the allegations of domestic violence in 1993 and 1999 were known to the City when Mr. White was appointed and thus cannot be "cause" to terminate him, and the allegations are demonstrably unreliable and false.

187.    Second, Mr. White cooperated in the City's recent investigation.  Mr. White sat for a full interview by the investigator.  He answered all the investigator's appropriate questions truthfully and the interview ended when she exhausted her questions.  He was willing to answer follow-up questions.  He provided the documents that the City required him to provide.  Defendants did not require that he do more or even tell him that he should do more.

188.    Mr. White visited his office four times during his four-month administrative leave.  Each visit was appropriate and only to respond to requests by Defendants, the investigator or, on two occasions, the BPD Command Staff which needed information from his computer.  Defendants never told Mr. White he could or should not visit his office.

189.    Mr. White appropriately maintained public silence about the investigation and the

allegations of domestic violence while that investigation was taking place, and he had a First Amendment right to maintain that public silence.

190.    By terminating Mr. White without cause, Mr. White has suffered significant damages, including, without limitation, economic damages, damages to his personal and professional reputations, and emotional distress.

191.    Further, Defendants terminated him as a Lieutenant Detective, barring him from returning in any capacity as a BPD employee, which caused him further economic and other harm.

<u>COUNT VII</u>
Breach of Implied Contract
(Against the City of Boston and the Acting Mayor)

192.    Plaintiff repeats the allegations set forth above as if fully contained herein.

193.    Defendants entered into binding and enforceable implied contract with Mr. White that he would be employed for a term of five years as BPD Commissioner.

194.    Mr. White performed and was ready, willing and able to continue to perform all obligations as Commissioner.

195.    Defendants breached the contract by terminating him without cause, by barring him from returning in any capacity as a BPD employee, and by failing to pay him certain compensation he was owed.

196.    As a direct and proximate result of Defendants' breach of contract, Mr. White has suffered significant damages, including, without limitation, economic damages, damages to his personal and professional reputations, and emotional distress.

<u>COUNT VIII</u>
Breach of Implied Covenant of Good Faith and Fair Dealing
(Against the City of Boston and the Acting Mayor)

197.    Plaintiff repeats the allegations set forth above as if fully contained herein.

198.     The contract between the City and Mr. White included an implied covenant of good faith and fair dealing.

199.     Defendants breached the implied covenant of good faith and fair dealing by terminating him without cause, by treating him in the defamatory and outrageous manner they did, by barring him from returning in any capacity as a BPD employee, and by failing to pay him certain compensation he was owed.

200.     As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Mr. White has suffered significant damages, including, without limitation, economic damages, damages to his personal and professional reputations, and emotional distress.

COUNT IX
Violation of Mr. White's Right of Privacy -- G.L. c. 214, § 1B
(Against the City of Boston and the Acting Mayor)

201.     Plaintiff repeats the allegations set forth above as if fully contained herein.

202.     Defendants violated Mr. White's right to be free from unreasonable, substantial, or serious interference with his privacy.

203.     In violation of that right, Defendants disclosed and disseminated the investigator's report, which constituted part of Mr. White's personnel records as it was generated specifically to assist the Acting Mayor and City in their decision whether to terminate him from employment with the BPD, including as Commissioner.  *See* M.G.L. c. 149, § 52A.

204.     The Acting Mayor made statements about the investigator's report and the personnel information in it.

205.     The information that the Acting Mayor and the City disclosed consisted of

confidential and extremely personal information relating to allegations of domestic violence involving himself and his family.

206.     Such personal information in a personnel record enjoys an absolute exemption from disclosure, even upon a public record's request, as the Legislature has determined that for privacy reasons and the proper functioning of government such personal information in a personnel record should never be disclosed to the public.  *See* M.G.L. c. 66, § 10 and M.G.L. c. 4, § 7, Twenty-sixth (c).  *See also Wakefield Teachers Association v. School Committee of Wakefield,* 431 Mass. 792 (2000) (discipline report deemed confidential and exempt from public record law).

207.     Mr. White had a reasonable expectation that the Acting Mayor and City would respect the confidentiality of this information.  *See* G.L. c. 214, § IB.

208.     As a direct and proximate result of Defendants' violation of G.L. c. 214, § IB, Mr. White has suffered significant damages, including economic damages, damages to his personal and professional reputations, and emotional distress.  Because the City and the Acting Mayor have violated this statute, Mr. White is entitled to recover his damages as well as his attorney's fees.

COUNT X[6]
Equitable Injunctive Relief
(Against the City of Boston and the Acting Mayor)

209.     Plaintiff repeats the allegations set forth above as if fully contained herein.

210.     Mr. White seeks an injunction to require the City and the Acting Mayor to

---

[6] Mr. White agrees to voluntarily dismiss his prior declaratory judgment claim.

provide a constitutionally required evidentiary name-clearing hearing at which he may meaningfully present and cross-examine witnesses.

WHEREFORE, Plaintiff Dennis White requests that this Court:

A. Find in his favor on Counts I-X of this Second Amended Complaint;

B. Award him damages as proven at trial, as well as punitive damages and his reasonable attorney's fees;

C. Order the City and the Acting Mayor to provide a constitutionally required name-clearing hearing;

D. Order the City and the Acting Mayor to reinstate him as Commissioner of the Boston Police Department; and,

E. Order all further relief that the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Dennis White hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

DENNIS WHITE,

By his attorneys,

Nicholas B. Carter (BBO No. 561147)
Tara D. Dunn (BBO No. 699329)
TODD & WELD, LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel:    (617) 720-2626
Email:  ncarter@toddweld.com
        tdunn@toddweld.com

Dated:  June 30, 2021