THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DENNIS WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 21-CV-10952-LTS |
| THE CITY OF BOSTON, and ACTING MAYOR | ) | |
| KIM JANEY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF DENNIS WHITE'S REPLY TO DEFENDANTS' OPPOSITION
TO PLAINTIFF'S MOTION TO AMEND HIS COMPLAINT**

## TABLE OF CONTENTS

Table of Contents ...................................................................................................... i

Table of Authorities ................................................................................................ iii

A.      Standard of Review ............................................................................... 1

B.      Count I:  Violation of 42 U.S.C. § 1983 - Stigma Plus ............................ 2

C.      Counts II & III:  Violation of 42 U.S.C. § 1983 - Equal Protection ........... 3

     1.   Mr. White has viable federal employment discrimination claims .............. 3

     2.   The Acting Mayor is not immune from liability ........................................ 6

         a.   The Acting Mayor is liable in her official capacity to the same extent as the City ................................................................................................. 6

         b.   The Acting Mayor is not protected by qualified immunity in her individual capacity .......................................................................................... 6

            (1) Mr. White has alleged clearly established constitutional violations ...................................................................................... 7

            (2) The Court should not weigh evidence as to Defendants' intent at this stage ........................................................................................ 8

D.      Count IV:  Massachusetts Civil Rights Act ............................................ 8

     1.   Mr. White has a viable MCRA claim against the Acting Mayor ................ 8

     2.   Mr. White has adequately pled a violation of the MCRA .......................... 9

E.      Count V:  Defamation ........................................................................ 11

     1.   The Acting Mayor is not insulated by a "conditional privilege" .............. 11

     2.   Defendants defamed Mr. White with actual malice ................................ 13

F.      Count VI:  Violation of the Removal Statute .......................................... 16

G.      Count VII:  Implied Contract ................................................................ 17

     1.   Termination for "cause" requires, at minimum, a substantive basis

    relating to the appointed official's substandard performance....................18

2.  Defendants lacked cause to terminate Mr. White because his performance was not substandard................................................................19

    a.  The allegations of domestic violence in 1993 and 1999 were known to the City when Mr. White was appointed and the allegations are false 20

    b.   Mr. White cooperated in the investigation.........................................21

    c.  Mr. White's few visits to his BPD office were appropriate................21

    d.  Mr. White remained appropriately silent during the investigation, and his not speaking publicly about matters relating to his status or the investigation is not a basis to remove him................22

H.    Count VIII:  Breach of Implied Covenant of Good Faith and Fair Dealing.........................................................................................................23

I.    Count IX:  Privacy Act, G.L. c. 214, § 1B.................................................25

J.    Counts X-XV:  Chapter 151B...................................................................30

## TABLE OF AUTHORITIES

*Abramian v. Pres. and Fellows of Harvard Coll.*, 432 Mass. 107, 116 (2000)...............30

*Alston v. Town of Brookline*, 997 F.3d 23, 50 (1st Cir. 2021)...............................7

*Alston v. Town of Brookline*, 308 F. Supp. 3d 509, 560 (D. Mass. 2018) ........................8

*Arroyo v. City of Boston,* 2021 WL 2338879 (D. Mass. 2021) ...................................15, 24

*Ayash v. Dana-Farber Cancer Inst,* 443 Mass. 367, 385 (2005)...................................27

*Bally v. Northeastern Univ.*, 403 Mass. 713, 719 (1989) ...........................................10

*Barrigas v. United States,* 2018 WL 1244780 (D. Mass. 2018)...................................28

*Beitzell v. Jeffrey,* 643 F.2d 870, 877-878 (1st Cir. 1981)...................................2, 3

*Blank v. Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407–08 (1995)...............................23

*Board of Regents v. Roth*, 408 U.S. 564 (1972).....................................................2

*Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 353 (D. Mass. 2011) ...............25

*Bratt v. International Business Machs. Corp.,* 392 Mass. 508 (1984) ...........................27

*Breuder v. Bd. of Trustees of Cmty. Coll. Dist. No. 502*, 888 F.3d 266, 270 (7th Cir. 2018)7

*Broderick v. Roache*, 803 F. Supp. 480, 485-87 (D. Mass. 1992)...................................11

*Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646-48 (2003)...................................9

*Cannon v. Vill. of Bald Head Island, N. Carolina*, 891 F.3d 498, 506 (4th Cir. 2018)........7

*Commonwealth v. Wiseman*, 356 Mass. 251 (1969).....................................................27

*Connolly v. Shaw's Supermarkets*, 355 F. Supp. 3d 9, 15 (D. Mass. 2018) .......................4

*Costa v. Bd. of Selectmen of Billerica*, 377 Mass. 853 (1979) .................................19

*Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004)...........................................7

*Dobelle v. Flynn,* 12 F. Supp.3d 274, 291 (D. Mass. 2014) .....................................3

*Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1110 & n.27 (1st Cir. 1985) ...........3

*Draghetti v. Chimeliewski,* 416 Mass. 808, 813-814 & n.7 (1994) ...........................11, 12

*Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 66-67
 (1st Cir. 2004) .....................................................................................3

*Evans v. Staples,* 375 F. 3d 1117, 121 (2019)...................................................1

*Fabiano v. Hopkins*, 352 F.3d 447, 452 (1st Cir. 2003) .........................................1

*Farzinpour v. Berklee College of Music*, 515 F. Supp.3d 33, 40 (2021).........................30

*Flagg v. AliMed, Inc.*, 466 Mass. 23, 33 (2013) ..............................................30

*Flomenbaum v. Commonwealth*, 451 Mass. 740, 747-748 (2008) ...................................18

*Florida Star v. B.J.F.,* 491 U.S. 524 (1989) .................................................28

*Foley v. Polaroid Corp.,* 400 Mass. 82 (1987) ................................................12

*Fontana v. Comm'r of Metropolitan Dist. Comm'n*, 34 Mass. App. Ct. 63, 67 (1993) ......3

*Garayalde-Rios v. Municipality of Carolina,* 747 F.3d 15, 23 (2014) .............................1

*Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) ..............................................23

*Gauthier v. Police Commissioner of Boston,* 408 Mass. 335, 338 (1990 ...................27, 29

*Green v. Wyman-Gordon Co.*, 422 Mass. 551, 555, 557 (1996) ...................................9

*Greenless v. Almond*, 277 F.3d 601, 607 (1st Cir. 2002)........................................6

*Griffiths v. Powers*, 216 Mass. 169, 169 (1913) ..............................................17

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)...............................................6, 7

*Hastings and Sons Publ'g Co. v. City Treasurer of Lynn*, 374 Mass. 812, 814 (1978) ....28

*Haufler v. Zotos*, 446 Mass. 489, 505 (2006) .................................................9

*Hayes v. State of R.I. Dept of Bus. Regulation*, 70 F.3d 1253 (1st Cir. 1995)......................7

*Hogan v. Collins*, 183 Mass. 43, 46 (1903) ........................................................................18

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ............................................................................7

*Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 594 (2001) ...............................8, 10

*Kennie v. Nat. Res. Dep't of Dennis*, 451 Mass. 754, 764 (2008........................................9

*Kertnikova v. Trustees of Emerson Coll.*, 725 F. Supp. 73, 77-78 (D. Mass. 1989) ..........9

*Landry v. Mier*, 921 F. Supp. 880, 888 (D. Mass. 1996)....................................................13

*Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 68 (1st Cir. 2000)............................1

*Lipchitz v. Raytheon Co.*, 434 Mass. 493, 503 n.16 (2001) ................................................5

*Loffredo v. Center for Addictive Behaviors*, 426 Mass. 541 (1998) ...........................16, 17

*Madison v. Cruz*, 390 F. Supp. 3d 191, 197-98 (D. Mass. 2019) ........................................6

*Maldonado v. Fontanes*, 568 F.3d 263, 267-72 (1st Cir. 2009) ..........................................8

*Manning v. Healthx, Inc.*, No. CV 15-11936, 2015 WL 4497982, at *2-*3
(D. Mass. July 23, 2015)...............................................................................................24, 25

*Martinez v. New England Med. Ctr*, 307 F.Supp.2d 257 (D. Mass. 2004).......................27

*Mason v. Cent. Mass. Transit Mgmt./Worcester Reg'l Transit Auth.*, 394 F. Supp. 3d
166 (D. Mass. 2019)........................................................................................................11

*McCue v. City of Bangor, Maine*, 838 F.3d 55, 61-62 (1st Cir. 2016) ...............................8

*McDonald v. Wise*, 769 F.3d 1202, 1215 (10th Cir. 2014)..................................................7

*McGinn v. Exec. Off. of Energy & Env't Affs.*, 496 F. Supp.3d 541, 545, 553
(D. Mass. 2020)...............................................................................................................10

*McMath v. City of Gary, Ind.*, 976 F.2d 1026, 1032 (7th Cir. 1992)...................................7

*McSweeney v. Town Manager of Lexington*, 379 Mass. 794, 798 & n. 8 (1980)........18, 19

*Mihos v. Swift*, 358 F.3d 91, 107 (1st Cir. 2004)..................................................................6

*Monell v. Dep't of Social Servs. Of City of New York*, 436 U.S. 658, 690 n.55 (1978) ......6

*Mulgrew v. City of Taunton*, 410 Mass. 631, 635 (1991) ..................................................12

*Nelson v. Salem State Coll.*, 445 Mass. 525, 534-535 (2003)............................................28

*O'Brien v. Deutsche Bank Nat'l Tr. Co.*, 948 F.3d 31, 32-33 (1st Cir. 2020)....................13

*O'Malley v. Sheriff of Worcester County*, 415 Mass. 132, 141 & n. 13 (1993) .................8

*Opalenik v. LaBrie*, 945 F. Supp. 2d 168, 180 (D. Mass. 2013).........................................6

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009 ..................................................................6

*Peckham v. Boston Herald, Inc.*, 48 Mass. App. Ct. 282 (1999)......................................28

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972)................................................................23

*Pisano v. Ambrosino*, No. CV 13-11409, 2016 WL 3093372, at *3
(D. Mass. June 1, 2016) ...................................................................................................6

*Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474, cert. denied,
513 U.S. 868 (1994)..........................................................................................................9

*Putnam v. Keller*, 332 F.3d 541, 547 (8th Cir. 2003) .........................................................7

*Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 95 (1987) .......................10

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 7 (1st Cir. 2005)..........6

*Rendek v. Sheriff of Bristol County*, 440 Mass. 1017, 1017-1018 (2003) ........................17

*Reproductive Rights Network v. President of the University of Massachusetts*,
45 Mass. App. Ct. 495, 509 (1998)................................................................................8, 9

*Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 51 (1st Cir. 2021) ...........4

*Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796–97 (1988)....................................................................................................................22, 23

*Rodrigues-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013)..............................4

*Rodriguez de Quinones v. Perez*, 596 F.2d 486, 490-491 (1st Cir. 1979) ..........................2

*Sebunya v. Cty. of Cumberland*, 201 F.3d 428 (1st Cir. 1999)..............................................8

*Shabazz v. Cole*, 69 F. Supp. 2d 177, 202 (D. Mass. 1999).................................................11

*Shephard v. Bay Windows, Inc.*, 16 Mass. L. Rptr. 726 (2003)...........................................28

*Sindi v. El-Moslimani*, 896 F.3d 1, 16 (1st Cir. 2018).........................................................15

*Soni v. Wespiser*, 239 F. Supp.3d 373, 385 (2017).............................................................5

*Stetson v. Bd. of Selectmen of Carlisle*, 369 Mass. 755, 764 n.14 (1976) ..........................3

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002),.................................................3, 4

*Taylor v. Swartwout*, 445 F. Supp. 2d 98, 103 (D. Mass. 2006).......................................28

*Thomas v. Harrington*, 909 F.3d 483, 493 (1st Cir. 2018) ................................................10

*Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 276, 310 (D. Mass. 2017)...................11

*Thomas v. Town of Salisbury*, 134 F. Supp.3d 633, 649 (D. Mass. 2015) .........................3

*Treasurer and Receiver General v. Sheehan*, 288 Mass. 468, 470-471 (1934)................17

*Velasquez v. City of Colorado Springs*, No. 77-C-38, 1980 WL 244, at *5 (D. Colo. Apr. 21, 1980) ....................................................................................................20

*Wakefield Teachers Association v. School Committee of Wakefield,* 431 Mass. 792, 800 (2000) ......................................................................................................................26, 29

*Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008), ..........................................................1

*White v. Univ. of Mass. of Boston*, 410 Mass. 553, 557 (1991).......................................30

*Williams v. B & K Med. Sys., Inc.*, 49 Mass. App. Ct. 563, 568-69 (2000)......................24

*Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 103 (1st Cir. 2002) ............2

*Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ................................................................23

## **STATUTES**

Fed. R. Civ. P. 8(a)(2 ............................................................................................................3

M.G.L. c. 4, § 7, Twenty-sixth (c) ......................................................................................26

M.G.L. c. 4, § 52C ..............................................................................................................25

M.G.L. c. 66, § 10 ...............................................................................................................26

M.G.L. c. 149, § 52C ..........................................................................................................25

M.G.L. c. 214, § 1B ............................................................................................................25

42 U.S.C. § 1983..................................................................................................................1

**A.**     <u>**Standard of Review**</u>

In evaluating a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 68 (1st Cir. 2000).  Plaintiff must allege only sufficient factual matter to state a claim to relief that is plausible on its face.  *Garayalde-Rios v. Municipality of Carolina,* 747 F.3d 15, 23 (1st Cir. 2014).  A court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable."  *See Evans v. Staples,* 375 F. Supp. 3d  117, 121 (D. Mass. 2019), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

**B.**     <u>**Count I:  Violation of 42 U.S.C. § 1983 - Stigma Plus**</u>

Mr. White's "stigma plus" claim is not futile.  Defendants misstate the law in arguing that the City cannot be liable on Mr. White's § 1983 claim because "a single incident of misconduct cannot provide the basis for municipal liability under § 1983," citing *Fabiano v. Hopkins*, 352 F.3d 447, 452 (1st Cir. 2003).  The First Circuit has expressly held that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008), quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  "[W]here the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered," municipal liability attaches.  *Id.*, quoting *Pembaur*, 475 U.S. at 481, and distinguishing *Fabiano, supra*.

Here, there is no dispute that the Acting Mayor had the final decision-making authority in deciding to terminate Mr. White.  She did so in a manner that ruinously stigmatized him.  As alleged in the Second Amended Complaint ("SAC" or "Complaint"), "The Acting Mayor made public comments on May 14, 2021, and subsequently, that, recklessly and falsely confirmed the

1

purported veracity of the domestic violence allegations against Mr. White.  She also falsely communicated that Mr. White failed to cooperate with the investigator and intimidated witnesses while the investigation was being conducted.  The Acting Mayor, in essence, publicly charged him with (i) having committed serious crimes of domestic violence, (ii) lying about his past acts of domestic violence, and (iii) acting to perpetuate a corrupt police department because of his alleged role in the BPD's alleged lack of cooperation in the investigation.  The statements were made in conjunction with the Acting Mayor's decision to remove Mr. White from his position as Commissioner." SAC, ¶ 136.

A person has "a core interest in reputation which is protected from interference by individualized government action" pursuant to the Fourteenth Amendment, and procedural protections are constitutionally required "where (1) government action threatens [a person's reputation], (2) with unusually serious harm, (3) as evidenced by the fact that employment … is affected."  *See Beitzell v. Jeffrey,* 643 F.2d 870, 877-878 (1st Cir. 1981), citing Board of Regents v. Roth, 408 U.S. 564, 573 (1972).  The constitutional right to a name-clearing hearing arises under these circumstances because the employer "impose[s] on [the employee] a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573.  *See also Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 103 (1st Cir. 2002).  "[T]o be deprived not only of present government employment but of future opportunity . . . is no small injury." *Id.* at 574.[1]

"The employer's failure to provide an adequate name-clearing forum is actionable under § 1983." *Wojcik,* 300 F.3d at 103.  *See also Rodriguez de Quinonez v. Perez*, 596 F.2d 486, 490-

---

[1]  In the present case, the Single Justice of the Massachusetts Appeals Court also signaled that Mr. White has a right to a name-clearing hearing.  *See* Docket No. 1-1, p. 410 ("nothing in this order should be construed as constraining the Commissioner from seeking a prompt name-clearing hearing before the City in accordance with constitutional requirements.").

491 (1ˢᵗ Cir. 1979); *Dobelle v. Flynn,* 12 F. Supp.3d 274, 291 (D. Mass. 2014).  The name-clearing hearing that Mr. White was entitled to includes the right to present witness and cross-examine adverse witnesses with the assistance of counsel.  *See Beitzell*, 643 F.2d at 879; *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1110 & n.27 (1ˢᵗ Cir. 1985); *Thomas v. Town of Salisbury*, 134 F. Supp.3d 633, 649 (D. Mass. 2015); *Stetson v. Bd. of Selectmen of Carlisle*, 369 Mass. 755, 764 n.14 (1976); *Fontana v. Comm'r of Metropolitan Dist. Comm'n*, 34 Mass. App. Ct. 63, 67 (1993) (recommending a hearing that conforms to the *Stetson* hearing protocols).

Here, Mr. White was denied his constitutional right to a name-clearing hearing for which the City is liable.  Accordingly, Defendants' argument that his "stigma plus" claim (Count I) is futile should be rejected.

**C.**     **Counts II & III:  Violation of 42 U.S.C. § 1983 - Equal Protection**

**1.**     **Mr. White has viable federal employment discrimination claims.**

Mr. White's federal employment discrimination claims are properly pled and not futile. The First Circuit and other courts have made it clear that a civil rights plaintiff only needs to plead "fair notice of what the plaintiff's claim is and the ground upon which it rests" in order to satisfy Fed. R. Civ. P. 8(a)(2).  *See Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 66-67 (1ˢᵗ Cir. 2004).  Following the Supreme Court's decision in *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002), the First Circuit decisively rejected any heightened pleading standard for civil rights cases including federal employment discrimination claims.  *Id.,* at 66-67.  The First Circuit held that to satisfy the pleading standard in a federal employment discrimination claim, the plaintiff must only "set forth minimal facts as to who did what to whom, when, where, and why—although why, when why means the actor's state of mind, can be averred generally."  *Id.* at 68.  The plaintiff bringing such a claim is not required to plead

"specific facts establishing a prima facie case of discrimination."  *Id.,* at 65, citing *Swierkiewicz* 534 U.S. at 508; *see also Rodrigues-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1ˢᵗ Cir. 2013) ("no need to set forth a detailed evidentiary proffer in a complaint"); *Connolly v. Shaw's Supermarkets*, 355 F. Supp. 3d 9, 15 (D. Mass. 2018) (prima facie case not required at pleading stage).  Mr. White has met this notice pleading standard.  Although not necessary at this stage, Mr. White has even alleged sufficient facts to prove his gender discrimination claim because the Acting Mayor explicitly and directly discriminated against him based on his gender.  "Direct evidence is evidence which, in and of itself, shows a discriminatory animus.... [and] consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision."  *See Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 51 (1ˢᵗ Cir. 2021).  Such direct evidence alone is sufficient to defeat summary judgment.  *See id.* at 52 (an employer's stated desire to "rejuvenate" the management was found to be direct evidence of age discrimination).  Direct evidence is not necessary to defeat a motion to dismiss but clearly would also suffice.

Here, the Acting Mayor expressly stated her gender-based prejudice against Mr. White in connection with terminating him.  When the Acting Mayor terminated Mr. White, she publicly stated: "…I will not turn a blind eye to domestic violence against Black *women*, or any *women*, for that matter." *See* SAC, ¶ 147.  Instead, due to his gender, she wrongfully disregarded the significant sworn testimony and other evidence that Mr. White, a Black *man*, was innocent of the charges against him and was in fact the victim of domestic violence.[2]  *See* SAC, ¶ 151.  She terminated him in a highly destructive way; by contrast, despite the mountain of sworn testimony that Ms. Mason was the aggressor against Mr. White, her daughter and many others, and her

---

[2] Notably, Ms. Mason, when she reported the alleged shooting threat in 1999, told law enforcement there was "no physical abuse in the relationship."  *See* SAC, ¶ 109, 146.

participation in an overtime fraud scheme (SAC, ¶ 109), the Acting Mayor has allowed Ms.

Mason to continue to serve as a BPD police officer without even a word of reproach.  This type

of gender-based stereotyping and discrimination is impermissible.  *See Lipchitz v. Raytheon*

*Co.,* 434 Mass. 493, 503 n.16 (2001) ("Employment decisions that are made because of

stereotypical thinking about a protected characteristic or members of a protected class, whether

conscious or unconscious, are actionable" under federal and state discrimination laws) (citing

cases).

      Mr. White has also adequately pled his claim for unlawful race discrimination against the

City, which initiated an unprecedented investigation of a sitting police commissioner based on

twenty-year old domestic violence allegations the City was aware of and had already

investigated and resolved as unsustained, placed him on administrative leave without any

guidelines, but then punished him for his benign conduct during the leave, and ultimately

terminated him in a ruinous manner without any regard for his reputation and welfare.  As

alleged in the Complaint, the City never treated any of the prior white Commissioners in this

manner despite known issues in their backgrounds.[3]  *See* SAC, ¶ 158.  While a plaintiff is not

required to establish a prima facie case at this stage,[4] the allegations in the Complaint suffice

especially because the burden to present a discriminatory animus, conscious or unconscious, is

light at the outset.  *See Soni v. Wespiser*, 239 F. Supp.3d 373, 385 (2017) ("the requirements for

adequately pleading the discriminatory motivation element are modest… [g]iven the difficulty of

---

[3] The City's racially discriminatory actions here began prior to the Acting Mayor's tenure. The notion that the City
no longer can conduct itself in a racist manner because the Acting Mayor is Black, *see* Opp. at 1, cannot be
supported legally or factually.
[4] *See Swierkiewicz*, 534 U.S. at 511-512 (no requirement to plead prima facie case in complaint because
"incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may
ultimately need to succeed on the merits if direct evidence of discrimination is discovered").

establishing the truth without proceeding").[5]  Mr. White has satisfied his notice pleading

requirement to support his federal race discrimination claim.

### 2.     The Acting Mayor is not immune from liability.

#### a.     The Acting Mayor is liable in her official capacity to the same extent as the City.

"Municipal officials acting in their official capacities qualify as 'persons' subject to suit

under § 1983 in cases in which the municipality would be 'suable in its own name.'"  *Pisano v.*

*Ambrosino*, No. CV 13-11409, 2016 WL 3093372, at *3 (D. Mass. June 1, 2016), quoting

*Monell v. Dep't of Social Servs. Of City of New York*, 436 U.S. 658, 690 n.55 (1978).  Because

Mr. White has viable § 1983 claims against the City, the Acting Mayor is liable too in her

official capacity, though admittedly it is redundant of the claim against the City.[6]  *See Opalenik*

*v. LaBrie*, 945 F. Supp. 2d 168, 180 (D. Mass. 2013).

#### b.     The Acting Mayor is not protected by qualified immunity in her individual capacity.

The Acting Mayor is not entitled to qualified immunity for her actions in depriving Mr.

White of a constitutionally mandated name-clearing hearing, and her discriminating against him

on the basis of sex and race, all in violation of 42 U.S.C. § 1983.  "The doctrine of qualified

immunity protects government officials 'from liability for civil damages insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), quoting *Harlow v.*

---

[5] Contrary to Defendants' argument, Mr. White is not required to allege the existence of a discriminatory policy or practice, because Mayor Walsh and the Acting Mayor were the "final decisionmakers" and deprived Mr. White of his constitutional rights in the adverse employment decisions they made.  *See Welch,* 542 F.3d at 942.

[6] In addition, "injunctive relief against official-capacity defendants" is available.  *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 7 (1st Cir. 2005).  "The purpose is "to prevent continuing violations of federal law." *Madison v. Cruz*, 390 F. Supp. 3d 191, 197-98 (D. Mass. 2019), quoting *Greenless v. Almond*, 277 F.3d 601, 607 (1st Cir. 2002).  Thus, to the extent Mr. White seeks injunctive relief in Count XVI of the SAC, the Acting Mayor is not entitled to qualified immunity.

*Fitzgerald*, 457 U.S. 800, 818 (1982).  This involves a "two-step pavane": (i) whether plaintiff has alleged a violation of a protected right, and (ii) whether the right was "clearly established." *Alston v. Town of Brookline*, 997 F.3d 23, 50 (1ˢᵗ Cir. 2021).  Because qualified immunity is an affirmative defense, Defendants have the burden to prove its applicability as a defense.  *Id.*

**(1)    Mr. White has alleged clearly established constitutional violations.**

As discussed herein, Mr. White satisfies the first step as he has adequately alleged violations of § 1983.  Mr. White also meets the second because "the state of the law . . . gave [the Acting Mayor] fair warning that [her] alleged treatment of [Mr. White] was unconstitutional." *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  It is clearly established that stigmatizing a public employee in connection with his termination without providing a name-clearing hearing is a violation of § 1983, with courts routinely denying claims of qualified immunity in similar cases. *See Cannon v. Vill. of Bald Head Island, N. Carolina*, 891 F.3d 498, 506 (4ᵗʰ Cir. 2018); *Breuder v. Bd. of Trustees of Cmty. Coll. Dist. No. 502*, 888 F.3d 266, 270 (7ᵗʰ Cir. 2018); *McDonald v. Wise*, 769 F.3d 1202, 1215 (10ᵗʰ Cir. 2014); *Cox v. Roskelley*, 359 F.3d 1105, 1112 (9ᵗʰ Cir. 2004); *Putnam v. Keller*, 332 F.3d 541, 547 (8ᵗʰ Cir. 2003); *McMath v. City of Gary, Ind.*, 976 F.2d 1026, 1032 (7ᵗʰ Cir. 1992).  It also clearly established that an employee has a right not to be discriminated against based on sex or race, and an official who violates that right loses qualified immunity.  *See, e.g., Hayes v. State of R.I. Dept of Bus. Regulation*, 70 F.3d 1253 (1ˢᵗ Cir. 1995) (no qualified immunity for sex discrimination); *Alston v. Town of Brookline*, 308 F. Supp. 3d 509, 560 (D. Mass. 2018) (no qualified immunity for race discrimination).

**(2)    The Court should not weigh evidence as to Defendants' intent at this stage.**

Defendants argue that the Acting Mayor was not motivated by discriminatory animus in terminating Mr. White.  Opp., at 10.  Putting aside the lack of merit in their argument, the Court should not delve into the Acting Mayor's motivations and related factual determinations on a motion to dismiss.  *See Mihos v. Swift*, 358 F.3d 91, 107 (1st Cir. 2004) ("on a motion to dismiss we must accept as true the allegations in [plaintiff's] complaint about [the defendant's] motivation"); *Alston*, 308 F. Supp. 3d at 560 (D. Mass. 2018) ("Factual disputes preclude dismissal based on qualified immunity."), citing *McCue v. City of Bangor, Maine*, 838 F.3d 55, 61-62 (1st Cir. 2016); *Maldonado v. Fontanes*, 568 F.3d 263, 267-72 (1st Cir. 2009); *Sebunya v. Cty. of Cumberland*, 201 F.3d 428 (1st Cir. 1999).  Accordingly, because of factual issues surrounding the Acting Mayor's termination of Mr. White, the Court should not dismiss her from individual liability based on qualified immunity at this early stage.

**D.    Count IV:  Massachusetts Civil Rights Act**

**1.    Mr. White has a viable MCRA claim against the Acting Mayor.**

Mr. White has asserted a viable MCRA claim for injunctive relief against the Acting Mayor in her official capacity and for damages against the Acting Mayor in her individual capacity based on her infringing Mr. White's state and federal constitutional rights and his statutory rights.  *See Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 592-93 (2001), citing *O'Malley v. Sheriff of Worcester County*, 415 Mass. 132, 141 & n. 13 (1993) ("If a state official is sued in his official capacity, then the plaintiffs' recovery is limited to equitable relief only")[7]; *Reproductive Rights Network v. President of the University of Massachusetts,* 45 Mass. App. Ct.

---

[7] Mr. White concedes that he cannot assert an MCRA claim for damages against the City or the Acting Mayor in her official capacity.  *See Howcroft,* 51 Mass. App. Ct. at 592-93.

495, 509 (1998) (injunction against president of state university system affirmed to prevent further violation of MCRA).  Specifically, Mr. White was wrongfully terminated in a stigmatizing manner without due process (as discussed in section B, *supra*), and his statutory right to his tenured position as Commissioner was also violated (as discussed in section F, *infra*). Because Mr. White's MCRA claim is separate from his employment discrimination claims, the MCRA claim is not preempted by G.L. c. 151B.  *See Green v. Wyman-Gordon Co.,* 422 Mass. 551, 555, 557 (1996) (finding that G.L. c. 151B is exclusive remedy under state law for employment discrimination claims).

   **2.     Mr. White has adequately pled a violation of the MCRA.**

Mr. White's MCRA claim is not futile as he has adequately pled that Defendants applied non-physical coercion in their effort to purge Mr. White as Commissioner.  Defendants' primary argument is that there were no threats, intimidation or coercion because Defendants, by stating that Mr. White should "resign or retire," merely presented him with potential options.  This is a mischaracterization of Mr. White's allegations as the Complaint clearly implicates far more egregious conduct than merely offering Mr. White options.

While "threats and intimidation often rely on an element of actual or threatened physical force," "coercion is a broader category that may rely on physical, moral, or economic coercion." *Kennie v. Nat. Res. Dep't of Dennis*, 451 Mass. 754, 764 (2008).  *See Kertnikova v. Trustees of Emerson Coll.*, 725 F. Supp. 73, 77-78 (D. Mass. 1989) (cancellation of a future economic relationship is sufficient to constitute coercion); *Haufler v. Zotos*, 446 Mass. 489, 505 (2006) (scope of coercion not limited to physical force); *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646-48 (2003) ("[E]conomic coercion, standing alone, may be actionable under the act."); *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474, cert. denied, 513 U.S.

9

868 (1994) (moral coercion sufficient); *Bally v. Northeastern Univ.*, 403 Mass. 713, 719 (1989)

(cancellation of a contract, if it has the "effect, intended or otherwise, desired or not, of coercing

[the plaintiff] not to exercise her First Amendment rights" violates the MCRA), citing *Redgrave*

*v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 95 (1987).  Where non-physical coercion is

at issue, some courts have required a showing of "a pattern of harassment and intimidation."

*Thomas v. Harrington*, 909 F.3d 483, 493 (1st Cir. 2018) (dicta), quoting *Howcroft v. City of*

*Peabody*, 51 Mass. App. Ct. 573, 594 (2001).

      Here, the Complaint more than adequately alleges actionable harassment and coercion.

The City commenced a harassing and unprecedented investigation into decades-old allegations

that the City had already investigated and resolved.  Once the investigative report was complete,

the Acting Mayor refused to provide a copy to Mr. White despite his repeated requests for two

weeks.  SAC, ¶ 101.  She finally telephoned Mr. White, stated that the undisclosed report's

contents troubled her, and asked whether he would resign or retire.  SAC, ¶ 102. When Mr.

White refused, the Acting Mayor sent him a Notice of Intent to Dismiss and a copy of the report.

SAC, ¶ 103.  Without even offering Mr. White a meaningful termination hearing (the Acting

Mayor had already chosen his replacement) (SAC, ¶ 104), the Acting Mayor published the

highly confidential and defamatory report to force Mr. White's resignation through the inevitable

public outcry against him following its release.  SAC, ¶¶ 106-111.  Disregarding the biased,

unreliable and false nature of the report, the Acting Mayor also took steps that (improperly)

legitimized the report.  SAC, ¶¶ 107-108, 111-112.

      Taken singly or as a pattern, these actions constitute harassment and coercion in violation

of the MCRA.  *See McGinn v. Exec. Off. of Energy & Env't Affs.*, 496 F. Supp.3d 541, 545, 553

(D. Mass. 2020) (motion to dismiss MCRA claim denied where defendants initiated investigation

against police officer, urged him to resign, then "leaked" the investigation to the media and terminated him when he continued to refuse to resign); *Shabazz v. Cole*, 69 F. Supp. 2d 177, 202 (D. Mass. 1999) (allegations that defendant asserted false disciplinary charges as means of coercion sufficient to overcome motion to dismiss MCRA claim); *Broderick v. Roache*, 803 F. Supp. 480, 485-87 (D. Mass. 1992) (allegations of false disciplinary charges against police officer to curb his speech rights sufficient to overcome summary judgment on MCRA claim); *Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 276, 310 (D. Mass. 2017) (teachers' ridiculing plaintiff in front of other students for having "snitched" to police considered moral coercion for MCRA purposes as it would have plausibly intimidated him from continuing to speak up about future incidents of harassment).[8]

## E.    Count V:  Defamation

### 1.    The Acting Mayor is not insulated by a "conditional privilege."

The Acting Mayor did not enjoy a "conditional privilege" to defame Mr. White. Contrary to Defendants' misstatement of the law, a public official does not generally have a privilege to make defamatory statements to the media, and any "conditional privilege" that an official might have is limited to communications the official makes (i) to those with a legitimate need to know, and (ii) to whom the official has a public duty to communicate the information. *See Draghetti v. Chimeliewski,* 416 Mass. 808, 813-814 & n.7 (1994).  In *Draghetti,* a case

---

[8]  The cases relied on by Defendants are distinguishable.  In *Thomas v. Harrington*, plaintiff alleged that defendant forced him to leave the Salisbury Police Department in part by disseminating an investigative report to a local newspaper.  909 F.3d at 493.  This action, however, was not coercive because, unlike here, the disclosure was pursuant to a FOIA request, and not at defendant's own initiative.  *Id.*  Defendants cite *Mason v. Cent. Mass. Transit Mgmt./Worcester Reg'l Transit Auth.*, for the proposition that it is not coercive to present plaintiff with the option of resigning or being fired.  394 F. Supp. 3d 166 (D. Mass. 2019).  In *Mason*, however, the employer presented this option in response to a clearly terminable offense—plaintiff's undisputed use of a personal electronic device while on duty—such that "plaintiff's own conduct provided independent grounds for the employer to terminate its bargained-for obligations to . . . plaintiff."  *Id.* at 169, 174, quoting *Buster*, 438 Mass. at 263.  Here, in contrast, defendants lacked cause to terminate Mr. White, as discussed *infra*, and undertook a series of other coercive actions, including especially the public campaign of humiliation launched with the release of the report.

Defendants cite, a police chief made false statements to a newspaper that suggested a police officer had engaged in criminal "double-dipping."  Rejecting the defendants' summary judgment motion, the Supreme Judicial Court held that the police chief's statements to a newspaper of general circulation were not privileged: "In those cases in which we have held that an employer has a conditional privilege to make defamatory statements, the statements were published to a narrow group who shared an interest in the communication.  In none of the cases did the employer publish the defamatory statements to a newspaper of general circulation."  *Id.*, at 813-814 & n.7, citing *Bratt v. International Business Machs. Corp.*, 392 Mass. 508 (1984) (memorandum sent from director of personnel to other supervisors regarding employee's mental health), and *Foley v. Polaroid Corp.*, 400 Mass. 82 (1987) (statements made by Polaroid executives to other executives and an employee representative).  The Supreme Judicial Court also found that "a police chief has no official duty to report internal investigations to the press." *Draghetti*, 416 Mass. at 814.  Finally, the SJC rejected that the public shared an interest in the information: "Such a distortion of the meaning of the 'common interest' privilege would create a privilege for virtually all newsworthy statements."  *Id.*

While the Acting Mayor may have had a conditional privilege to communicate with those at City Hall about the investigative report as it related to Mr. White's employment status, she did not have a privilege to speak to the press about it.  She had no official duty to disseminate the report to the press, and while the public might have had an interest, that does not mean that the Acting Mayor is privileged to disseminate the false and defamatory information that accuses Mr. White of serious and repeated criminal activity.[9]

---

[9]  The other cases cited by Defendants are consistent with *Draghetti*, namely, a public official only has a conditional privilege to communicate information to those other governmental officials with a need to know.  *See, e.g., Mulgrew v. City of Taunton,* 410 Mass. 631, 635 (1991) (police chief had conditional privilege to make statements about problematic tenure of plaintiff police officer to respond to special city committee who requested and needed chief's

### 2.      Defendants defamed Mr. White with actual malice.

The Acting Mayor defamed Mr. White.  She "improperly published the extremely

defamatory report by the City's investigator …, which was replete with false allegations …

regarding alleged domestic violence by Mr. White.  The Acting Mayor … simultaneously made

statements and took actions which communicated that these ruinous allegations were true."  *See*

SAC, ¶1.  Specifically, the Acting Mayor terminated Mr. White as Commissioner and barred him

from returning to service at his civil service rank of Lieutenant Detective; the Acting Mayor did

not criticize or take any action against Ms. Mason.  *See* SAC, ¶¶ 2-3, 5-6, 35, 151.  The Acting

Mayor simultaneously stated to the press: "I will not turn a blind eye to domestic violence

against Black women, or any women, for that matter."  *See* SAC, ¶ 6.  She also stated publicly as

she terminated him, "His return to the commissioner post would send a chilling message to

domestic violence victims and reinforce a 'blue wall of silence' within the department."  *See*

Boston Globe, "Janey fires Dennis White as Boston police commissioner," June 7, 2021,

attached hereto at Exhibit A.[10]

The media and the public understood that message and, in turn, broadcast it widely.  As

alleged in the Complaint, "Nearly every local news station and newspaper across Massachusetts

---

advice to make reinstatement decision regarding officer); *Landry v. Mier,* 921 F. Supp. 880, 888 (D. Mass. 1996) (summary judgment entered for Select Board member who had conditional privilege to "communicat[e] to other elected officials about a matter of public concern"). The First Circuit's decision in *Burke v. Town of Walpole*, 405 F.3d 66 (1st Cir. 2005), is distinguishable.  There, the Court made its "best guess" that the Supreme Judicial Court would extend conditional privilege to a police chief because he reported only to a small citizens group, who were extremely concerned a killer was still at large in the community, that the police had "the right man." *Id.,* at 93-94. Notably, the disclosure in *Burke* was not intended for the general media, and the decision has not been followed or cited by any Massachusetts state court.

[10]  In evaluating a rule 12(b)(6) motion, a court "may consider matters of public record and facts susceptible to judicial notice." *O'Brien v. Deutsche Bank Nat'l Tr. Co.*, 948 F.3d 31, 32-33 (1st Cir. 2020); *see also United States ex rel. Winkelman v. CVS Caremark Corp.,* 827 F.3d 201, 207-208 (1st Cir. 2016) (press release and news articles may be considered); *Schaer v. Brandeis University,* 432 Mass. 474, 477 (2000), citing 5A C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1357, at 299 & n.1 (1990) ("items appearing in the record of the case" may also be considered).
.

immediately splashed the statements in the investigator's report that Mr. White had committed heinous acts of domestic violence.  These false accusations reached major news sources nationally, including headlines in the New York Times characterizing Mr. White as a violent abuser."  *See* SAC, ¶ 108.

The Acting Mayor's distribution of the investigative report and statements to the press, combined with her nearly simultaneous termination of Mr. White, "conveyed the (false) message that Mr. White in fact committed these crimes as stated by the unidentified witnesses" in the report.  *See* SAC, ¶ 107.  The Boston Globe ran a full front-page story about the investigator's report, including a summary which the paper captioned, "11 disturbing revelations in the investigative report on suspended BPD Commissioner Dennis White."  That article leads with: "An independent investigator's report on past allegations of domestic violence against Dennis White … uncovered more graphic and startling details than earlier reports."  *See* Boston Globe article, May 14, 2021, attached hereto at Exhibit B.

One of the lead "revelations" from the report was: "The domestic violence allegations against White were repeated and brutal, according to accounts provided by four witnesses who provided information.  The victim had said he'd burned her hair; put her face to the stove and tried to turn it on; thrown a TV at her; put his hands on her neck and started to strangle her; stepped on her face; and stomped on her legs when she crawled under the bed to escape his kicking.  The victim kept a diary that documented her experiences and shared notes with a relative for safekeeping, stating, 'if anything happens to me, I want you to have this diary…. If anything happens to me, it would be Dennis.'"[11]  *See* Boston Globe article, May 14, 2021, attached hereto at Exhibit B.

---

[11]  It is suspicious that the alleged diary recently went missing before any neutral investigator could determine its existence and contents.  *See* Opp., Ex. 2, at 16 n.6.

Defendants' reliance on *Arroyo v. City of Boston,* 2021 WL 2338879 (D. Mass. 2021), is misplaced because Mayor Walsh's statements reflected only "the administration's approach regarding sexual harassment claims in his administration (e.g., …'I don't think we have fundamental issues with people [being] afraid to come forward with any type of ... sexual harassment [complaint],') which do not address Arroyo or the allegations against him specifically." *Id.*, *7.  These statements "do not contain any objectively verifiable facts" concerning the allegations against Arroyo. *Id.*, at *7.

Acting Mayor Janey's statements were qualitatively different and communicated that Mr. White committed serious crimes of domestic violence and then lied about his actions and participated in a police cover-up (which she described on June 7 as the "Blue wall of silence"). *See* SAC, ¶ 215; *see also* Boston Globe article, Exhibit A.  Indeed, she stated at the press conference at which she terminated Dennis White:  "The residents of Boston must have confidence that the officers charged with enforcing laws are themselves people of integrity."  *See* Boston Globe article, Exhibit A.  A statement that communicates someone has committed crimes or is a dishonest person is classic defamation.

Further, the Acting Mayor defamed Mr. White with actual malice, *i.e.*, knowing the allegations were not true or with reckless disregard for the truth, because her statements were based on unnamed, unsworn witnesses in the report and those statements were directly contradicted by substantiated sworn testimony from numerous reliable witnesses, including Mr. White, Tiffany White (Sybil Mason's adult daughter) and Connie Owens (Sybil Mason's sister), that Mr. White was in fact *not* the perpetrator, but the victim (along with others) of Ms. Mason's domestic violence.  *See* SAC, ¶¶ 6, 35, 68-76, 93-97.  *See Sindi v. El-Moslimani*, 896 F.3d 1, 16 (1st Cir. 2018) ("Since 'direct evidence of actual malice is rare,' we have permitted actual malice

to be proved through inference and circumstantial evidence alone…. For example, actual malice 'may be found where a publisher … relies on a source where there is an obvious reason to doubt its veracity, or deliberately ignores evidence that calls into question his published statements.'"), quoting *Levesque v. Doocy*, 896 F.3d 1, 16 (1st Cir. 2009).  There is also sworn testimony from Jamiel Howard that Ms. Mason admitted to fabricating allegations of domestic violence during a difficult divorce to gain leverage against Mr. White.  *See* SAC, ¶¶ 78-87.  Further, Ms. Mason is an utterly unreliable witness because she participated in fraud with others in her police unit that bilked the City of hundreds of thousands of dollars in unearned overtime pay.  SAC, ¶¶ 98-100. Because of her participation in that felony fraud scheme, for which most of her unit has been indicted, Ms. Mason likely could never even testify on behalf of the BPD.  SAC, ¶ 99.  Yet the Acting Mayor rushed to judgment in terminating Mr. White, and recklessly communicated the allegations against him were true despite the flaws in the investigative report, the substantial sworn evidence contradicting the unsworn, unidentified witnesses against him, and her own doubts about the truth of the allegations.[12]  That constitutes actual malice.

## F.      Count VI:  Violation of the Removal Statute

The Complaint properly alleges that Mr. White was terminated without cause in violation of Chapter 322, Section 7, of the Acts of 1962 (the "Removal Statute").  Defendants incorrectly argue that because the Removal Statute does not expressly provide for a private right of action, Mr. White has no claim.  In *Loffredo v. Center for Addictive Behaviors*, 426 Mass. 541 (1998), a case cited by Defendants, the Supreme Judicial Court stated: "Where a statutory right is conferred upon a class of individuals as distinguished from the public at large but no remedy is

---

[12]  The Acting Mayor acknowledged in her private termination letter to Mr. White the "discrepancies" and "the cloud of uncertainty" as to the truth of the allegations against him.  *See* Opp., Exhibit 4.  That admission of doubt is the rare direct evidence that supports a finding of actual malice.  *See Edwards v. Commonwealth*, 477 Mass. 254, 264 (2017).

provided by the statute for the enforcement of the right, the right may be asserted *by any appropriate common law remedy that is available.*  Otherwise, the right would be useless and illusory." *Id.,* at 544 n.1 (emphasis in original*).*  The Court in *Loffredo* also reaffirmed: "It is a general rule of statutory interpretation that a violation of a duty created by statute, resulting in damage to one of the class for whose benefit the duty was established, confers a right of action upon the injured person."  *Id.* at 492.  The Removal Statute is designed expressly to protect the Commissioner in his tenured position of employment.  Mr. White, therefore, has a claim arising from the Removal Statute.[13]

## G.    Count VII:  Implied Contract

Even if Mr. White does not have a direct claim for violation of the Removal Statute, his wrongful termination claim survives, at minimum, as a claim for breach of implied contract. Where a statute provides one or more essential terms of employment, the employee has, in the event of a breach, a claim for contract or quasi-contract arising from the terms of the statute.  *See Rendek v. Sheriff of Bristol County*, 440 Mass. 1017, 1017-1018 (2003), citing *Treasurer and Receiver General v. Sheehan*, 288 Mass. 468, 470-471 (1934) (mental hospital has claim against inmate's estate because statute obligated the inmate to pay a certain sum for the state's services, which claim was "properly an action of contract"), and *Griffiths v. Powers*, 216 Mass. 169, 169 (1913) (where statute requires attorney to pay five times the ordinary rate of interest for failure to return monies owed to client, the client has action in contract to recover such sum).  Here, the Removal Statute supplied at least two key terms of Mr. White's employment: (i) a term of up to

---

[13] The other case Defendants rely on is distinguishable.  In *Anzalone v. Administrative Office of Trial Court*, 457 Mass. 647 (2010), the Supreme Judicial Court held that an applicant for a job as a probation officer could not sue the state court when he was not hired as a probation officer because the Legislature had not waived the state's sovereign immunity in connection with a tort claim like the one brought by the plaintiff in that case and the statute did not protect applicants.  *See Anzalone,* 457 Mass. at 654.  Here, there is no sovereign immunity on a quasi-contract claim and the Removal Statute expressly protects the police commissioner's tenured job.

five years, and (ii) termination only "for cause."  Thus, Mr. White thereby has an implied

contract claim because Defendants did not have "cause" to terminate Mr. White.

1.      **Termination for "cause" requires, at minimum, a substantive basis relating to the appointed official's substandard performance.**

Despite a dearth of cases in Massachusetts interpreting the factual basis necessary for an

executive to terminate a tenured public official "for cause," the existing case law requires some

evidence that the official performed in a demonstrably "substandard" manner.  *See Flomenbaum*

*v. Commonwealth*, 451 Mass. 740, 747-748 (2008).  Otherwise, the "for cause" requirement

would be meaningless.  Unlike Mr. White who was placed on administrative leave within 24

hours of his appointment, the plaintiff in *Flomenbaum* had an actual track record by which to

measure his performance because he had served in his position for two and a half years.  *See id.*,

at 743-744.  As the Court found there, the Governor made his decision to terminate the Chief

Medical Examiner based on an established, substandard record which demonstrated "serious

problems" in the Chief Medical Examiner's performance of his duties.  *Id.*, at 747-750.  *See also*

*Hogan v. Collins*, 183 Mass. 43, 46 (1903) (affirming "for cause" removal based on evidence

that election official "was politically disqualified, and was drunk for at least an appreciable

period of time while engaged in the performance of his duties").

It is also instructive to consider the standard the Supreme Judicial Court applies when

"cause" is required to terminate a nontenured public official.  In *McSweeney v. Town Manager of*

*Lexington*, on which Defendants rely, the Supreme Judicial Court affirmed the Town Manager's

removal of the untenured Superintendent of Public Works "because of [his] inadequate

performance of [his] duties as Director of Public Works and [the Town Manager's] lack of

confidence in [his] execution of those duties.  Specifically, [the Town Manager did] not have

confidence in the credibility of [his] work and [his] ability to supervise and review work of

18

subordinates." *See McSweeney*, 379 Mass. 794, 798 & n. 8 (1980).  In its opinion upholding the termination decision, the Court noted the existence of an evidentiary record of "poor supervision" and "poor performance."  *See id.*  (Town Manager "cite[d] five specific examples of poor review and supervision and three specific examples of poor performance.").

Similarly, in *Costa v. Bd. of Selectmen of Billerica*, 377 Mass. 853 (1979), the Supreme Judicial Court held that the hiring authority had to provide some particularized grounds for terminating nontenured employees 'for cause,' and that reciting formulaic reasons, such as "unbecoming conduct" or "for the good of" the organization, is inadequate as a matter of law. *See id.*, at 861.  It is reasonable to infer that the standard for terminating a tenured official for 'cause' is higher than that for a nontenured official.  Thus, there can be no doubt that terminating a tenured official for 'cause' requires at least a demonstrated record of poor performance or supervision of subordinates.

> **2.     Defendants lacked cause to terminate Mr. White because his performance was not substandard.**

Mr. White served actively as Commissioner for just two days.  He was placed on administrative leave immediately after twenty-year-old domestic abuse allegations that had already been investigated, and not substantiated, surfaced in the media.  *See* Opp., Ex. 1; SAC, ¶¶ 25-26.  During his two days of duty as police commissioner, he did nothing to warrant termination.

Instead, the Acting Mayor based her decision on the City's investigation and Mr. White's conduct while on administrative leave.  Specifically, the Acting Mayor cited four reasons to terminate Mr. White in her letter of May 14, 2021.  *See* SAC, ¶¶ 120-122.  She incorporated those reasons into the final termination letter, dated June 7, 2021.  *See id.*  As discussed below, there was no actual wrongdoing or violation of any rule or policy by Mr. White.  The allegations

of the Complaint must be construed in his favor at this stage.  Accordingly, the Court should

allow Mr. White to proceed with his claims for wrongful termination (Counts VI and VII).

> ### a. The allegations of domestic violence in 1993 and 1999 were known to the City when Mr. White was appointed and the allegations are false.

The Acting Mayor's first reason for terminating Mr. White resulted from "the

information contained in the independent investigation regarding complaints of domestic

violence and abuse filed in 1993 involving [his] then-niece-by-marriage and in 1999 involving

[his] then-wife, and [his] responses thereto."  SAC, ¶ 122.  This reason is facially deficient.  Mr.

White was appointed Commissioner by Mayor Martin Walsh and the City on February 1, 2021.

The City and Mayor were aware of Mr. White's Internal Affairs records and therefore knew of

the allegations of domestic violence made against him in 1993 and 1999.  SAC, ¶ 123.  The City

cannot claim cause to terminate the Commissioner when the underlying facts were known to the

City when the City appointed him and the City determined he was qualified and that these

allegations from 1993 and 1999 did not disqualify him.  The City cannot now claim the opposite.

*See* SAC, ¶ 123; *see also Velasquez v. City of Colorado Springs*, No. 77-C-38, 1980 WL 244, at

*5 (D. Colo. Apr. 21, 1980) (in wrongful termination action, court rejected police department's

"irrational and inconsistent" rationale to terminate officer for lack of "moral character" due to

prior criminal record because plaintiff was hired despite his known record).  Moreover, as

alleged in the Complaint, the allegations that Mr. White assaulted or threatened to assault anyone

are false.[14]  SAC, ¶¶ 66-99, 123.  And the falsity of the domestic violence allegations is at the

---

[14]  Defendants base the removal in part on Mr. White's alleged admission that he engaged in 'heated fisticuffs' with his niece, but as he has stated, he acted in appropriate self-defense against her attack.  SAC, ¶¶93-97.  Defendants also argue that he and his wife "pushed each other," but he explained it was only "a push to get away" from her.  *See* Opp., Ex. 2*, at* 17.  He never harmed her or abused or threatened to abuse her.  SAC, ¶35.

core of several of Mr. White's claims, including the wrongful termination claims. That issue should be resolved by the trier of fact, not on a motion to dismiss.[15]

    **b.**    **Mr. White cooperated in the investigation.**

The Acting Mayor's second reason to terminate Mr. White was his alleged "lack of cooperation and judgment during [the City's] investigation." SAC, ¶122. However, Mr. White in fact cooperated in that investigation. *See* SAC, ¶¶ 28-31, 33-44, 124. Defendants did not provide any directives to Mr. White regarding his conduct during the administrative leave, until after they had already decided to terminate him on or about May 14, 2021. They finally did provide guidelines on May 27, 2021, telling him, among other things, he could not visit police property during his leave. *See* Letter from Acting Mayor Janey, May 27, 2021, attached hereto at Exhibit C.[16] Defendants cannot blame Mr. White, nor terminate him for "cause," for allegedly violating directives that were never provided until after their decision to terminate him.

    **c.**    **Mr. White's few visits to his BPD office were appropriate.**

The Acting Mayor's third reason to terminate Mr. White stems from his appearing at his office while on administrative leave for the Zoom interview with the investigator and "at other times." SAC, ¶122. However, Defendants did not tell Mr. White he could not visit the office while on administrative leave and even spoke to him by Zoom in early April while he was in his office. SAC, ¶ 188. He was given no rules for the administrative leave until after the Acting Mayor gave him notice of her intent to dismiss him. At that point the Acting Mayor and City first told Mr. White that he should not visit police property. *See* Exhibit C. In any event, Mr.

---

[15] The Acting Mayor has unfairly and inappropriately blamed Mr. White for seeking to defend himself against the domestic violence allegations against him. *See* Opp., Exhibit 4. But the entire reason for the investigation was to determine if the allegations of domestic violence against him were reliable and true. Defending his innocence against allegations of significant wrongdoing – crimes of domestic violence – cannot be a reasonable basis to terminate or fault him and in fact demonstrates actual malice – a hostility to the truth.

[16] The Court may consider party's undisputed communication in considering a motion to dismiss. *See O'Brien*, 948 F.3d at 32-33.

White only visited his office four times during the more than 100 days he was on administrative leave, and each visit had an appropriate purpose, as alleged in the Complaint.  SAC, ¶¶ 125, 188. It would be arbitrary and capricious for Defendants to terminate Mr. White for using his office when they did not tell him not to use it until after they decided to terminate him, and Defendants provided other benefits to him, like a police vehicle and round the clock security detail, that Defendants knew he was using.  SAC, ¶ 125 and Exhibit C.

> **d.    Mr. White remained appropriately silent during the investigation, and his not speaking publicly about matters relating to his status or the investigation is not a basis to remove him.**

As a fourth reason for termination, the Acting Mayor stated: "At no time during the investigation into the earlier domestic violence allegations did [Mr. White] express any appreciation for the importance of domestic violence concerns to the public or how it might affect the public's perception of how it might affect the ability of the BPD to respond to incidents of domestic violence…."  SAC, ¶ 122.  Mr. White was on administrative leave during the investigation and did not believe he had authority to speak publicly on the matters under investigation or that it would be appropriate to do so.  *Id.*, ¶ 126.  He certainly was unaware that the Acting Mayor expected him to speak publicly on this issue or any matter concerning the investigation.  *Id.*  It would be arbitrary and capricious to terminate him for not speaking out, while simultaneously terminating him for visiting the office on a few occasions.  If the Acting Mayor believes visiting the office could cause confusion and intimidate, it is fair to imagine if he had spoken out publicly about issues relating to the investigation he might be criticized even more harshly for causing confusion and seeking to intimidate witnesses.

Significantly too, Mr. White had a legal right under the First Amendment not to speak on public issues and cannot be terminated for his decision to remain silent.  *See Riley v. National*

*Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796–97 (1988) ("the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (same).

The Supreme Court has recognized that a citizen who is employed by the government is still a citizen and afforded some First Amendment rights in their capacity as private citizens. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). Thus, it was well within Mr. White's First Amendment right to decide not to speak about the public issue of domestic violence during the City's investigation, and it would be unlawful to terminate him for not doing so.

**H.     Count VIII:  Breach of Implied Covenant of Good Faith and Fair Dealing**

Mr. White's claim for breach of the covenant of good faith and fair dealing is not futile because he has adequately alleged that he has an implied contract with the City of Boston, and that the City—via the Acting Mayor—acted in bad faith in denying him the benefits of the contract and terminating his employment without cause and in a defamatory manner. *See Blank v. Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407–08 (1995) (employment contract contains implied covenant of good faith and fair dealing, and termination not made in good faith may constitute breach of the contract). The circumstances of plaintiff's termination, including the improper investigation into discredited allegations of which the City was aware when it hired Mr. White, Defendants' ignoring countervailing evidence, and the subsequent defamation which destroyed Mr. White's reputation and career, without providing him a constitutionally

guaranteed name-clearing hearing, are more than adequate to state a claim for breach of the implied covenant of good faith and fair dealing.

The Massachusetts Appeals Court affirmed a trial verdict in favor of a former employee on his implied covenant of good faith and fair dealing claims in a case where the employer demanded plaintiff's resignation without providing him with the opportunity to respond to allegations and threatened to ruin his career if he did not resign. *See Williams v. B & K Med. Sys., Inc.*, 49 Mass. App. Ct. 563, 568-69 (2000). The termination was deemed arbitrary and capricious because "the employer did nothing to attempt to discern" whether the allegations of misconduct were accurate and there was prior history where the conduct had not been objected to. *Id.* at 568. *See also Arroyo*, 2021 WL 2338879, at *4 (at-will employee "sufficiently plead a claim for breach of the implied covenant of good faith and fair dealing" where he alleged that "he was terminated for his refusal to admit to wrongful acts that he did not commit"); *Manning v. Healthx, Inc.*, No. CV 15-11936, 2015 WL 4497982, at *2-*3 (D. Mass. July 23, 2015) (denying motion to dismiss where plaintiff alleged that in terminating him defendant failed to conduct "due diligence" and failed to provide him with a meaningful opportunity to respond to the allegations of misconduct).

The circumstances here are, in fact, more egregious and evince a greater degree of bad faith than in *Williams*. Defendants used the previously investigated and resolved domestic violence allegations to launch a biased and flawed investigation, and then used the ruinous and false investigative report to try to coerce him to resign. When he refused to resign, they published the defamatory allegations, foreclosing any further prospects of a career in law enforcement or security (which was worse than in *Williams*, where the threat of ruining plaintiff's career did not come to fruition). At this stage of the litigation, Mr. White's allegations

are more than adequate to withstand a motion to dismiss, and he is entitled to discovery

concerning Defendants' actions and state of mind.  *See Manning*, 2015 WL 4497982, at *2

(Court "do[es] not agree that, given the deferential view to which Manning's allegations [are]

entitled, Healthx's good faith can be established as a matter of law."); *Bosque v. Wells Fargo*

*Bank, N.A.*, 762 F. Supp. 2d 342, 353 (D. Mass. 2011) ("Resolution of the contours of the breach

[of the implied covenant], if any, is best left to a later stage of the proceeding.").

## I.   <u>Count IX:  Privacy Act, G.L. c. 214, § 1B</u>

G.L. c. 214, § 1B, protects against the unreasonable, substantial, or serious interference

with one's privacy.  In violation of that right, Defendants disclosed and disseminated the

investigator's report, which constituted part of Mr. White's personnel records because it was

generated specifically to assist Defendants in their decision whether to terminate Mr. White.  *See*

M.G.L. c. 149, § 52C (defining "personnel record").[17]  The Acting Mayor nearly simultaneously

terminated Mr. White and made public statements about the investigator's report that conveyed

the accusations in the report were true.

The information that the Acting Mayor and the City disclosed consisted of

confidential and extremely personal information relating to allegations of domestic violence

involving himself and his family.  Such personal information in a personnel record enjoys an

absolute exemption from disclosure, even upon a public record request, as the Legislature has

determined that for privacy reasons and the proper functioning of government such personal

---

[17]  A copy of the investigator's report (unredacted) was placed in Mr. White's personnel file, along with the May 14, 2021 "notice of intent to dismiss" letter from the Acting Mayor and the June 7, 2021 "employment termination" letter from the Acting Mayor.  *See* Opp., Exhibits. 2, 3 and 4.

information should never be disclosed to the public.  *See Wakefield Teachers Association v. School Committee of Wakefield,* 431 Mass. 792, 800 (2000) (investigative and discipline report deemed confidential and "absolutely exempt from disclosure"), citing M.G.L. c. 66, § 10 and M.G.L. c. 4, § 7, Twenty-sixth (c).

    *Wakefield* is an important case.  There, a seventh-grade teacher had written allegedly inappropriate notes to two of his female students.  The superintendent conducted an investigation and wrote a report, which led to the suspension of the teacher for four weeks.  The public and newspapers sought to obtain the report.  The Supreme Judicial Court held that the report could not be disclosed despite the public interest because it constitutes part of the teacher's personnel file and contains information of a personal nature that relates to a particular individual.  *See id*. For the same reasons, the investigative report which led to the termination of Mr. White was the kind of private personnel record that Defendants were not allowed to disclose.[18]

    Contrary to Defendants' argument, the protections of the privacy statute do not yield to a "newsworthiness" exception.  In some cases that do not involve highly personal information, some private information may be disclosed, but only in limited and necessary circumstances. However, wholesale publication of private information to the public at large through a press release or other broadly disseminated public statement is not permitted.  *See id*.

    The Supreme Judicial Court has established that, in the employment context, both public and private, it may at times be "necessary to balance the employer's legitimate business interest in obtaining *and publishing* the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure" to determine if there is a violation of the

---

[18]  The recent amendment of the public records statute to exclude "a law enforcement misconduct investigation" from protected information, G.L. c. 4, sec. 7, cl. 26th(c), does not apply here because the City's investigation concerned Mr. White's personal life, not alleged police misconduct.

privacy statute.  *See Gauthier v. Police Commissioner of Boston,* 408 Mass. 335, 338 (1990) (emphasis in original) (affirming summary judgment for defendants who disclosed to fellow police cadets that plaintiff had been dismissed because he failed a drug test and noting that the disclosure was not made to general public).

The limitation on the scope of permissible disclosure was articulated in *Commonwealth v. Wiseman*, 356 Mass. 251 (1969).  There, the Supreme Judicial Court prohibited the commercial distribution of a film to the public even though the film discusses an issue of public importance and newsworthiness, because it contained private and potentially humiliating depictions of individuals in a mental hospital who had not given permission for their private information to be released.  *See id.,* at 261-263.  However, the Court found that the film could be shown to a limited audience of people (such as legislators and professionals in the mental health treatment field) because the public interest in improving the conditions at mental hospitals outweighed the private interests of the individuals depicted in the film.  *See id.*

The cases cited by Defendants are factually distinguishable, and virtually all were decided on summary judgment:

> In *Bratt*, the Supreme Judicial Court, answering certified questions from the First Circuit in the context of a summary judgment appeal, concluded "when medical information is necessary reasonably to serve such a substantial and valid interest of the employer, it is not an invasion of privacy, under § 1B, for a [company] physician to disclose such [medical] information to the employer."  *Id.,* at 524.  There was no public disclosure.
>
> In *Ayash v. Dana-Farber Cancer Inst.*, the Supreme Judicial Court on post-trial motions held that the public disclosure of information about an employee-doctor was permissible, because the disclosed information related to the employee's work performance and was not of a personal nature.  *See Ayash,* 443 Mass. 367, 385 (2005).
>
> In *Martinez v. New England Med. Ctr.*, the Court at summary judgment similarly found that it was permissible for an employer to disclose to another prospective employer information about the employee's work-related performance. 307 F.Supp.2d 257 (D. Mass. 2004).  The information was not of a personal nature.

In *Nelson v. Salem State Coll.*, the Supreme Judicial Court, affirming summary judgment, held that a video surveillance tape that inadvertently captured an employee who undressed in a "public" and "open work area," was not private and the plaintiff had "no objectively reasonable expectation of privacy." 445 Mass. 525, 534-535 (2003). The record did not reveal any broad dissemination of the information.

In *Taylor v. Swartwout,* the Court found that the plaintiff's invasion of privacy claim should survive summary judgment because the disclosed materials that concerned his involvement in a sealed grand jury proceeding and a highly privileged letter to co-counsel regarding strategy in representing a criminal defendant were possibly highly personal and private. *See Taylor v. Swartwout*, 445 F. Supp. 2d 98, 103 (D. Mass. 2006).

In *Shephard v. Bay Windows, Inc*., the Massachusetts Superior Court at summary judgment found that the disclosure of the commissions paid to the plaintiff by the nonprofit was not private or intimate information and likely was known to the entire Board of the defendant non-profit which made the disclosure and possibly also to the 1,200 members of the nonprofit which also received the disclosure.[19]  *See* No. Civ.A. 01-0284, 2003 WL 22225764 (Mass. Super. Ct. Sept. 22, 2003).

The one case cited by Defendants on a motion to dismiss is the unreported decision in *Barrigas v. United States*, No. 17-cv-10232, 2018 WL 1244780 (D. Mass. 2018) (Burroughs, M.J.).  There, the Court held that the (inadvertent) public disclosure of a tax delinquency and plaintiff's telephone number, without anything to identify the plaintiff other than the telephone number which she publicly listed, was not a wrongful invasion of her privacy.  *See id.*, *8. While disclosure of tax information might under some circumstances constitute an invasion of privacy, the "level of the intrusion was significantly diminished here."  *See id.*

In *Peckham v. Boston Herald, Inc.*, 48 Mass. App. Ct. 282 (1999), the Court affirmed summary judgment for a newspaper for publishing information that it obtained lawfully concerning a workplace affair and subsequent paternity suit involving a civic leader.  The Appeals Court's analysis focused on the "news" aspect of the information and relied on cases involving media organizations, including the United States Supreme Court decision in *Florida Star v. B.J.F.,* 491 U.S. 524 (1989) which established a standard to determine if news media has violated privacy law in disclosing information of an arguably private nature.  *See Peckham,* 48 Mass. App. Ct., at 289-290 & n.9.  That analysis does not pertain to the disclosure of private personnel records by a public employer.

Finally, Defendants emphasize the decision in *Hastings and Sons Publ'g Co. v. City Treasurer of Lynn*, which was decided based on stipulated facts between the parties at the outset of the case.  374 Mass. 812, 814 (1978).  In that case, the Supreme Judicial Court held, as a matter of law, that compensation information of public employees is a public record pursuant to G.L. c. 66, § 10, and is not private information pursuant to G.L. c. 214,

---

[19]  Defendants distort the significance of the Court's statement in the case: "Where the information is newsworthy, the disclosure is privileged, even if it would otherwise be of a private nature and intimate nature." *See Shephard,* 2003 WL 22225764, at *11.  That statement is dictum in the Court's decision.

§ 1B.  Significantly, the Supreme Judicial Court subsequently limited the reach of its decision in *Hastings*, distinguishing payroll information which is not private from personal information in a personnel file that a public employer uses to make employment decisions about an employee which is "absolutely exempt from disclosure."  *See Wakefield*, 431 Mass. at 800.

In the final analysis, although a public employer may have the right to disclose an employee's compensation information to the public, *see Hastings and Sons*, *supra*, sensitive private information in a personnel file that the public employer uses to make an adverse employment decision is absolutely protected from disclosure.  *See Wakefield*, 431 Mass. at 800. Based on *Wakefield*, it was clearly improper as a matter of law for the Acting Mayor and City to disclose the investigative report to the public.

Even if the Court were to apply a balancing test, weighing the need of the Defendants to obtain and disclose the information against the substantiality of the intrusion into Mr. White's privacy, *see Gauthier*, *supra*, the balance tips strongly in Mr. White's favor.  Defendants had no need to disclose publicly the investigative report or make public statements about its contents.  It concerned the most intimate information about Mr. White's family relationships, including with his ex-wife.  Once the information was obtained, Defendants could have made their decision to terminate him without publicly disclosing the results of the investigation.  The disclosure was undertaken either maliciously or at the very least unnecessarily (and recklessly) and only to serve Defendants' political and public relations interests.  Political calculation is not a legitimate employer interest that offsets the significant privacy interest of an employee.  Even applying a balancing test, Defendants have not, and cannot, demonstrate that their violation of Mr. White's privacy was permissible.

Finally, it would be premature for the Court to find that Mr. White's privacy claim is futile given the still limited factual record about Defendants' actions and intent.

**J.**     **Counts X-XV:  Chapter 151B**

Mr. White has adequately pled his G.L. c. 151B discrimination claims for the same

reasons as support his federal discrimination claims.  *See Flagg v. AliMed, Inc.*, 466 Mass. 23, 33

(2013) ("It is our practice to apply Federal case law construing the Federal anti-discrimination

statutes in interpreting G.L. c. 151B."); *Abramian v. Pres. and Fellows of Harvard Coll.*, 432

Mass. 107, 116 (2000) (as under Federal law, plaintiff need not establish prima facie case of

discrimination where direct evidence is available); *White v. Univ. of Mass. of Boston*, 410 Mass.

553, 557 (1991) ("analysis of a discrimination claim is essentially the same under the State and

Federal statutes").  He also has adequately pled 'protected conduct' to support his retaliation

claim.  Similar to the plaintiff in *Farzinpour v. Berklee College of Music*, Mr. White complained

that the investigation was being conducted with bias and unfairness both in pleadings before his

termination and in even earlier correspondence attached to those pleadings.  *See* 515 F. Supp.3d

33, 40 (2021) (complaints of bias and unfairness in investigation constitutes protected conduct

and supports retaliation claim when followed by termination); *see also* SAC ¶¶27-45 and Docket

No. 1-1, p.1& Exhibits A (p. 11), B (p. 14), and C (p. 17) attached thereto.  Shortly after he

voiced those concerns, he was terminated.[20]     SAC, ¶¶ 120-22.

---

[20]  While Mr. White has stated a claim under Chapter 151B § 4(3) because the Acting Mayor's public statements
"express[ed] directly… discrimination….as to gender," *see supra*, sec. C, Mr. White voluntary dismisses this claim
as it is duplicative of his other discrimination claims.

Respectfully submitted,

DENNIS WHITE,
By his attorneys,

_____
Nicholas B. Carter (BBO No. 561147)
Tara D. Dunn (BBO No. 699329)
TODD & WELD, LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel:    (617) 720-2626
Email: ncarter@toddweld.com
           tdunn@toddweld.com

Dated:  September 10, 2021

### Certificate of Service

I hereby certify that this document has been filed on September 10, 2021 through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/Nicholas B. Carter*_____
Nicholas B. Carter