UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DENNIS WHITE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 21-10952-LTS |
| THE CITY OF BOSTON and ACTING MAYOR KIM JANEY, | ) ) ) ) | |
| Defendants. | ) ) | |

ORDER ON MOTIONS TO AMEND AND FOR
JUDGMENT ON THE PLEADINGS (DOC. NOS. 11, 37)

March 29, 2022

SOROKIN, J.

Former Boston Police Commissioner Dennis White seeks to amend his complaint to add a raft of claims against the defendants arising from his June 2021 termination. Doc. No. 37.[1] Also pending is a motion by the defendants for judgment on the pleadings, as they existed before the proposed amendment. Doc. No. 11. For reasons explained below, White's request to amend is ALLOWED in part, and the defendants' motion for judgment on the earlier pleadings is DENIED as moot.

I. **BACKGROUND**[2]

White became an officer in the Boston Police Department ("BPD") in 1987. Former Boston mayor Martin Walsh promoted White to the BPD Command Staff as a Deputy

---

[1] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docketing system, and pincites are to the page numbers in the ECF header.
[2] The Court recounts those facts necessary to resolve the issues before it, and only insofar as the proposed federal claims are concerned. The facts recited herein are gleaned from the proposed

Superintendent in 2014, then made him a Superintendent and Chief of Staff to then-Commissioner William Gross in 2018.  Gross resigned in late January 2021.  On February 1,[3] only days after Gross announced he was stepping down, Walsh appointed White to replace Gross as Commissioner of the BPD.  The Boston Globe promptly reported that White's ex-wife—also an officer in the BPD—had accused White of domestic violence in 1999 when the two were married.  Only two days after having appointed him Commissioner, Walsh placed White on administrative leave pending an investigation into the domestic violence allegations.

      The City hired a lawyer from a Boston law firm to conduct an independent investigation into the allegations publicized by the Globe.  The investigator, engaged on February 12, "was instructed by" the City's Corporation Counsel "to conduct vetting of Commissioner White for the position of Police Commissioner to the fullest extent possible."  Doc. No. 39-2 at 2.  She began collecting necessary information and predicted she would conclude her work by the end of March, but the City's First Assistant Corporation Counsel directed her on February 19 to end the investigation on February 24.  Id. at 2-3.  On March 1, the investigator was instructed to resume her work.  Id. at 3.  The reasons for the suspension and resumption of the investigation by the Walsh administration are not apparent from the record.

      On March 23, six weeks after Walsh suspended White and with the independent investigation well underway, Kim Janey became Boston's Acting Mayor.  Though the investigator sought help in early April from the City and Gregory Long, the Acting Commissioner of the BPD, in facilitating interviews with current and former BPD officers, Long, according to the investigator, "declined to provide assistance."  Id. at 3-4.  White, having

---

Second Amended Complaint and documents attached thereto and/or incorporated therein.  Doc. No. 37-1.

[3] Unless otherwise noted in the text, dates referenced were in 2021.

retained counsel, acquiesced to some of the investigator's requests, but not all of them. On April 9, the City's Corporation Counsel directed the investigator to reduce the scope of her work "to information contained in and related to Commissioner White's personnel records and Internal Affairs files, court documents related to the Internal Affairs files and the CORI check, and to information from witness interviews, including an interview with Commissioner White relating to the revised scope of the investigation." Id. at 4. The reason for narrowing the investigation's focus, a directive issued during Janey's administration, is not apparent from the record.

The investigator completed her work and produced to the City on April 29 a nineteen-page memorandum ("the Report") recounting the information she had gathered, including in an interview she had conducted of White via zoom and from a written statement White had submitted after the interview. In addition to the domestic violence allegations covered by the Globe, the Report described a 1993 incident involving White and his niece that was documented in White's IA file. It also outlined concerns the investigator developed concerning general BPD resistance to her requests for information. The Report made no findings regarding any misconduct by White. It offered no assessment of the credibility of witnesses interviewed during the investigation. And, it conveyed no recommendations regarding any future course of action, including White's termination or reinstatement. Rather, it summarized information gleaned from documents, interviews with witnesses who accused White of misconduct, and information from White and others disputing those accusations. The Report was not provided to White at the time it was completed and submitted to the defendants.

On the morning of May 14, Janey called White, said she was troubled by the contents of the Report, and asked him to resign or retire. White refused. Janey informed him there would be a hearing later that day. She followed the phone call with a letter informing White in writing of

her intent to dismiss him from his position and identifying the conduct she believed provided cause for his removal. A copy of the Report accompanied the May 14 letter. The letter instructed White to appear that afternoon for a hearing via zoom and informed him he could be represented by counsel. No hearing occurred on May 14 because White filed a lawsuit in state court after receiving Janey's letter and sought a preliminary injunction preventing his removal. Later the same day, the City released the Report to the public.

      The state court denied White's request for an injunction on May 25, and White's petition for review of that decision was denied two days thereafter. The zoom hearing before Janey was rescheduled and occurred on June 2. White was permitted to speak on his own behalf at that time, though Janey asked no questions and no other live witness testimony was allowed. In the days leading up to the hearing, White apparently had collected and provided to the defendants sworn and videotaped statements of at least two witnesses on his behalf. Nothing in the record suggests the defendants in any way limited the information White could provide to the investigator or to Janey, besides the proviso that no live testimony by anyone other than White would be received during the hearing. On June 7, Janey issued a letter to White terminating him and explaining her reasons for doing so. The same day, the defendants removed White's lawsuit to this Court, invoking federal jurisdiction based on White's allegation that his due process rights under the United States Constitution had been violated. Shortly thereafter, the defendants moved for judgment on the pleadings. Doc. Nos. 11, 12. In response, White sought leave to amend his complaint. Doc. Nos. 15, 37.

Whereas his complaint in state court, filed before his termination, had contained only two counts expressed in five pages,[4] the amended pleading White now proposes ("the PSAC") spans more than fifty pages and includes sixteen counts. He seeks to assert claims ranging from violations of his federal constitutional rights brought under 42 U.S.C. § 1983 to violations of Massachusetts statutes protecting individual privacy rights and prohibiting employment discrimination. The defendants have opposed White's motion, the parties have submitted additional briefing at the Court's request, and the Court heard the parties on March 21, 2022.

## II.   MOTION TO AMEND

The Court observes at the outset that this case is sui generis. At the heart of this action is a disagreement about one local executive's authority to remove the leader of her municipality's police department pursuant to the terms of a state statute that uniquely governs the relationship between those two officeholders. 1962 Mass. Acts 156-57 (Chap. 322, § 7). It makes sense, then, that the bulk of White's claims arise under state law. Moreover, those claims raise novel questions of Massachusetts law. For example, White contends that the state statute governing the removal of Boston's Police Commissioner narrowly circumscribes the mayor's authority, precluding removal for cause based on, *inter alia*: new information discovered after appointment about the Commissioner's background involving events that pre-date his appointment; a new view or perspective on previously disclosed information; or conduct undertaken by the Commissioner while on administrative leave pending an ongoing investigation into allegations against him. The City disagrees, viewing the mayor's discretion under the same statute as

---

[4] White's original claims sought: declarations that he was entitled to a judicial hearing to determine whether there was cause for his removal, and that he was entitled to an evidentiary name-clearing hearing where he could call and confront witnesses in light of the public release of the Report; and an injunction preventing his removal until an evidentiary hearing with live witnesses was conducted. Doc. No. 1-1 at 124.

sweeping far more broadly. This dispute involves application of a law enacted in 1962 by the Massachusetts General Court to specifically and exclusively govern removal the Boston Police Commissioner—a law which, as far as this Court is aware, has not been the subject of any judicial decision by any Massachusetts court prior to the events involving White. Given these circumstances, the Court trains its attention for present purposes on the trio of proposed federal claims, which provide the only jurisdictional basis for this Court to resolve an otherwise local dispute.

### A. Stigma-Plus Due Process (Count I)

The lead-off count in White's proposed amended complaint is a procedural due process claim brought under 42 U.S.C. § 1983. Doc. No. 37-1 at 34-37. In essence, White asserts that the defendants deprived him of a constitutionally protected liberty interest when they released the Report and publicly commented on it, because he alleges the Report contained false and stigmatizing charges that the defendants tied to his removal as Commissioner of the BPD. In these circumstances, White alleges, he was entitled to a "public" and "evidentiary name-clearing hearing," which the defendants failed to provide. Id. at 36.

As a general rule, "defamation, even from the lips of a government actor, does not in and of itself transgress constitutionally assured rights." Pendleton v. Haverhill, 156 F.3d 57, 62-63 (1st Cir. 1998). "[W]here a public-sector employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge," however, "the Constitution's due process protections require the employer to provide the employee with an opportunity to dispute the defamatory allegations." Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 103 (1st Cir. 2002). A plaintiff wishing to challenge their

6

employer's failure to provide such an opportunity may sue under 42 U.S.C. § 1983 if they can plausibly allege five elements:

> First, the alleged statements must level a charge against the employee that might seriously damage his standing and associations in his community and place his good name, reputation, honor, or integrity at stake. Statements merely indicating the employee's improper or inadequate performance, incompetence, or neglect of duty are not sufficiently serious to trigger the liberty interest protected by the Constitution. Second, the employee must dispute the charges made against him as false. Third, the stigmatizing statements or charges must have been intentionally publicized by the government. That is, the defamatory charges must have been aired in a formal setting (and not merely the result of unauthorized leaks). Fourth, the stigmatizing statements must have been made in conjunction with an alteration of the employee's legal status, such as the termination of his employment. Finally, the government must have failed to comply with the employee's request for an adequate name-clearing opportunity.

Wojcik, 300 F.3d at 103 (cleaned up). A claim such as this is often called a "stigma plus" claim: the "stigma" is the false and seriously damaging statement, and the "plus" is the government actor's public connection of the statement to the decision to terminate or alter the plaintiff's employment status.[5]

In their papers, the defendants cited three—and only three—reasons they believe an amendment adding a stigma-plus claim would be futile: 1) the lack of any alleged policy or custom giving rise to the alleged deprivations; 2) immunity from suit; and 3) White's failure to

---

[5] Though stigma-plus claims are not novel, the precise parameters of the name-clearing opportunity that must be provided are context dependent and, thus, are not firmly defined. See, e.g., Wojcik, 300 F.3d at 103 ("The purpose of the hearing is only to allow the employee to clear his name of the false charges; compliance with formal procedures is not necessarily required."); Baden v. Koch, 799 F.2d 825, 831 (2d Cir. 1986) (explaining due process "requires flexible procedures" depending on the context, including consideration of "the probable value, if any, of requested additional procedures and the [government employer's] interest in providing (or not providing) those procedures"); Campbell v. Pierce Cty., 741 F.2d 1342, 1345 (11th Cir. 1984) (noting "substantial flexibility" in how name-clearing hearings are structured, with courts generally requiring notice and "an opportunity to refute, by cross-examination or independent evidence, the allegations which gave rise to the reputational injury" (emphasis added)); see also Graham v. City of Phila., 402 F.3d 139, 145 (3d Cir. 2005) (providing that name-clearing hearings may be "obviated" by prior hearings in other settings).

allege that he requested a name-clearing hearing <u>after</u> his termination.[6]  At the motion hearing, the defendants withdrew the first and second of these reasons, rightly acknowledging that they were wrong as a matter of longstanding settled law.  See <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 & n.55 (1978) (holding local government units and local officials can be sued for money damages under § 1983); <u>Welch v. Ciampa</u>, 542 F.3d 927, 942 (1st Cir. 2008) (explaining municipal liability under § 1983 can arise from the act of one policymaker where that person is the municipal decisionmaker with final authority as to the relevant question).[7]

      The only remaining challenge the defendants advance with respect to Count I concerns the timing of White's requests for a name-clearing hearing.  They urge that White's proposed amendment fails to assert a stigma-plus claim because it does not plausibly allege that White requested a name-clearing hearing <u>after</u> Janey terminated him.  Doc. No. 44 at 1-6.  Not so.  Assuming the law requires a plaintiff in White's circumstances to make (or repeat) such a request at the time described by the defendants,[8] White has plainly and plausibly alleged that he

---

[6] These reasons were explored at the motion hearing, where counsel for the defendants confirmed he was advancing no other issues and said that the three identified challenges "exhausted" the analysis as to the stigma-plus claim at this juncture.

[7] Insofar as Janey is sued in her individual capacity, a point on which White's counsel expressed some uncertainty at the motion hearing, the defendants urge that she is entitled to qualified immunity.  Doc. No. 44 at 6-7.  They support this position by discussing a case that involved an entirely different legal claim and dictates no particular result here.  See <u>id.</u> (discussing <u>Eves v. LePage</u>, 927 F.3d 575 (1st Cir. 2019), in which the First Circuit found a state governor was immune from a claim of political-affiliation discrimination where the "policymaker exception" to such a claim was implicated).  Beyond that, they incorporate their third reason, addressed in the next paragraph of the text above, and argue Janey could not have known she was violating any clearly established right.  Doc. No. 44 at 7.  For the same reason that specific contention does not warrant a finding that the stigma-plus claim is futile, it cannot support granting qualified immunity to Janey now.  <u>Cf.</u> Doc. No. 40 at 13 (listing cases in which officials facing stigma-plus claims were denied qualified immunity on the pleadings or at summary judgment).

[8] In arguing this point, the defendants do not engage with a complexity presented by the facts at issue here.  In many cases, a government employer makes a termination decision and, in announcing it, publicizes the allegedly stigmatizing information.  Such a scenario allows for a straightforward assessment of when a request comes "before" or "after" the critical moment for

did make such a request. See Doc. No. 37-1 ¶¶ 114, 117 (alleging in general terms that White "repeatedly demanded an evidentiary name-clearing hearing" and that the defendants "disregarded every single one of Mr. White's requests"); see also Doc. No. 15 at 4 (certifying that White's counsel conferred with defense counsel on June 21 about his proposed amendment, before he sought leave to file it, and that no agreement narrowing the issues was achieved); Doc. No. 46 at 6 (describing the June 21 conferral as "including White's request for a name-clearing hearing").[9]

Because the defendants advance no other arguments challenging the sufficiency of the stigma-plus claim at this juncture, White's Motion to Amend is ALLOWED insofar as proposed Count I is concerned.

Nevertheless, the Court has concerns about the viability of White's stigma-plus claim arising from its own review of the exceptionally detailed allegations in the PSAC, considered against the backdrop of other cases in which courts have analyzed stigma-plus claims. One analogous and persuasively reasoned decision, which no party addressed in their papers but which the First Circuit noted when it outlined the elements of a stigma-plus claim in Wojcik,

---

stigma-plus purposes. White, however, alleges that the City: suspended him in February (a decision that was publicly linked to the domestic violence allegations); released the allegedly stigmatizing Report in May (with the Report publicly linked to his suspension, the same allegations, and an intent to terminate him); and then proceeded with the final hearing and termination in June. The Court need not, for present purposes, definitively resolve when White was obligated to request a name-clearing hearing in these circumstances.

[9] The Court has not overlooked the defendants' assertion, sensible and supported by caselaw, that a civil complaint alleging a stigma-plus claim does not satisfy the requirement that a plaintiff must request and be denied a name-clearing hearing as a prerequisite to such a claim. See Winskowski v. City of Stephen, 442 F.3d 1107, 1111-12 (8th Cir. 2006); cf. Kando v. R.I. State Bd. of Elections, 880 F.3d 53, 63 (1st Cir. 2018). Here, however, the record supports an inference that White (through counsel) reiterated his pre-termination request for such a hearing shortly after his termination and before he filed in this Court any motions or pleadings including a stigma-plus claim.

raises substantial questions about whether White has stated a plausible due process claim here. That case is Baden v. Koch, 799 F.2d 825 (2d Cir. 1986).  There, New York City's Chief Medical Examiner ("CME") sued the City's mayor after his removal, bringing a due process claim based on the mayor's public release of reports containing critical and allegedly stigmatizing information that had led the mayor to demote the plaintiff.  Id. at 826-27.  The mayor also had published the plaintiff's written responses to the reports and had offered him a chance to speak publicly about his removal as CME before the mayor announced it—an offer the plaintiff chose to decline.  Id.  In that context, and given the CME's status as a public figure capable of invoking the press in his own defense, the Second Circuit concluded the plaintiff had "received all the process that was due him" and rejected his stigma-plus claim.  Id. at 831.

As the Second Circuit explained, the constitutionally protected interest at issue in a claim such as this is not a property interest in keeping one's job, but a liberty interest in one's reputation, good name, and ability to secure other employment opportunities.  Id. at 829.  To protect that interest, courts recognize that the Due Process Clause guarantees a person notice and a meaningful opportunity to refute a stigmatizing charge publicized by his employer.  Codd v. Velger, 429 U.S. 624, 627 (1977).  It does not, however, compel a government employer to change its mind and believe or endorse the person's refutation of the stigmatizing information. Nor does it guarantee the person their job back.  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 573 n.12 (1972).

There appear to be two aspects to consider in determining whether a person has been given a constitutionally adequate name-clearing opportunity.  First, courts assess whether the person was afforded a chance to clear their name in a proceeding before "the same actor who diminished" their reputation.  Limerick v. Greenwald, 666 F.2d 733, 735 (1st Cir. 1981).  Here,

White's own allegations demonstrate Janey and the City permitted him multiple opportunities to do so.[10]  White was interviewed by the independent investigator and submitted evidence to her; the substance of his responses to her questions as well as his written statement submitted to her after the interview were included in the Report;[11] at least one witness statement he submitted to the investigator was summarized in the Report, along with further information the investigator gleaned from an interview conducted with that witness; he collected and submitted to the defendants in advance of his termination hearing sworn and videotaped statements of witnesses who spoke on his behalf regarding the stigmatizing charges; he was represented by counsel throughout the process; and he was permitted to speak during the termination hearing when it did occur.  In these circumstances, the PSAC does not support a plausible inference that White was denied an opportunity to clear his name with his employer (i.e., the City and Janey).

The second question posed by a claim such as White's, and the primary focus of the stigma-plus claim articulated in the PSAC, is whether and to what extent a public and/or trial-like name-clearing opportunity is constitutionally mandated.  Accepting White's allegations, the private video hearing held by Janey in June was not such a proceeding.  White, however, has cited no authority holding that a person in his position is entitled to a public, formal, trial-like proceeding facilitated and presided over by his government employer.[12]  Indeed, the Second Circuit found no such entitlement in Baden.  799 F.2d at 832.  Explaining this conclusion, that

---

[10] As the First Circuit has explained: "Pre-termination and post-termination proceedings are not evaluated for constitutional adequacy in isolation from each other; a reviewing court studies the totality of the process received in light of the factual record to determine if the procedural due process was sufficient."  Senra v. Town of Smithfield, 715 F.3d 34, 39 (1st Cir. 2013).
[11] Thus, like the plaintiff in Baden, White responded to the allegedly stigmatizing information throughout the investigation, and his statements were included in the published Report.
[12] Nor has White cited authority suggesting the City could compel witnesses to attend such a proceeding, so that White might cross-examine them.

Court emphasized a municipality's "interest . . . in the ability of its executive officer to respond promptly and effectively to complaints about a high level official who is serving at the executive's discretion," and "the strong policy [in favor] of maintaining an informed electorate" by encouraging public officials to explain their personnel decisions.[13]  Id. at 831, 833.  The Second Circuit also questioned "[t]he utility of a formal name-clearing hearing" where the plaintiff's written statement already was public and the plaintiff was a "public figure" with a "high degree of access to the news media," providing him other avenues for publicly explaining his conduct or responding to the allegations he said were false.  Id. at 832; see Moody v. Cty. of Santa Clara, No. 15-cv-4378, 2018 WL 2267662, at *5 (N.D. Cal. May 17, 2018) (adopting Baden's reasoning and dismissing amended complaint for failure to state stigma-plus claim where plaintiff had received private hearing and was a public figure with access to other means of clearing his name on a larger scale).

Many of the same considerations articulated by the Second Circuit are squarely implicated here and appear to support a determination that White—admittedly also a public figure with access to the media[14]—received all the process the Constitution requires under the circumstances.  This appears especially so where: at least some of the allegedly stigmatizing information was public before Janey's release of the Report, e.g., Doc. No. 39-1 (reproducing Globe article from February 2021 referencing "allegations that the commissioner pushed and

---

[13] White, in contrast the CME in Baden, did not serve at the complete "discretion" of the Acting Mayor.  See 1962 Mass. Acts 157 (requiring "cause," "notice and hearing" before removal of the Commissioner).  The policy favoring transparency cited in Baden, however, appears implicated irrespective of any limitation on the executive's discretion.

[14] This is underscored by exhibits before the Court which demonstrate that White, through his counsel, has availed himself of such access in connection with the events at issue here.  See, e.g., Doc. No. 40-1.  And, in the context of his defamation claim, White has conceded he is a public figure.  See Doc. No. 40 at 19-22 (arguing White has alleged "actual malice," the standard applicable to defamation claims by public figures).

threatened to shoot his former wife"); White concededly chose to limit his cooperation with aspects of the independent investigation (e.g., by refusing a follow-up interview), Doc. No. 37-1 ¶ 40; Doc. No. 39-2 at 5-6; and White's version of events and the statements of the witnesses he identifies in the PSAC already have been publicly aired in some fashion, e.g., Doc. No. 40-1 (reproducing Globe article published the day White was terminated which quotes a statement released by White's counsel describing him as "falsely accused," describes "White's efforts to defend himself against the domestic violence allegations," and notes testimony by White and others that his "violent" ex-wife "was the aggressor").[15]

These facts, and the convincing reasoning of Baden, create questions regarding the viability of Count I and, in light of the Court's dismissal below of the other federal claims, § II.B, infra, this Court's jurisdiction over the lawsuit. However, the defendants did not advance this challenge in their quest for dismissal under Rule 12(b)(6). Thus, White has not addressed these questions, and the Court lacks the benefit of the parties' insights and arguments. In these circumstances, dismissal of Count I at this juncture would be ill-considered and unfair to the parties. Accordingly, the Court will provide White fourteen days to consider and respond to the questions and concerns regarding his stigma-plus claim identified herein, and to show cause why Count I should not be dismissed for failure to state a claim. The defendants may file a response to White's submission within seven days of its docketing.

---

[15] Though not before the Court presently, the June 7 Globe article submitted by White along with his reply brief includes links at the end to "More coverage," including a column entitled "Dennis White's scorched-earth strategy," suggesting White's version of events received additional media attention.

B.     Equal Protection (Counts II and III)

The other two federal claims White seeks to add also arise under § 1983.  In Count II, White alleges the City and Janey violated the Fourteenth Amendment's guarantee of Equal Protection because they terminated him "based on his sex."  Doc. No. 37-1 ¶ 144.  He accuses Janey of having acted based on "adverse assumptions concerning victims in heterosexual domestic violence," and cites as "further evidence" of Janey's alleged "gender bias" her intent to replace White with a female Superintendent and her failure to take "action against" White's ex-wife based on accusations that she had perpetrated violence in their home and participated in an overtime fraud scheme.  Id. ¶¶ 144-51.  Count III asserts a separate Equal Protection violation, against the City only, alleging White was terminated "[a]s a result of [his] race."  Id. ¶ 158.  In support of this allegation, White claims he was treated "in a manner which [the City] has never treated a white Commissioner."  Id.

To state an equal protection claim, a plaintiff must allege: "(1) that he was selected for adverse treatment compared with others similarly situated, and (2) that the selection for adverse treatment was based on an impermissible consideration, such as his race" or gender.  Fincher v. Town of Brookline, No. 21-1281, 2022 WL 500094, at *4 (1st Cir. Feb. 18, 2022); accord Alston v. Town of Brookline, 997 F.3d 23, 41 (1st Cir. 2021).  To plausibly allege the latter element, absent a direct showing of discriminatory animus, "a plaintiff's task is to identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently."  Alston, 997 F.3d at 41 (cleaned up).  "The standard for determining whether individuals are similarly situated is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."  Pollard v. Georgetown Sch. Dist., 132 F. Supp. 3d 208, 223 (D. Mass. 2015).

Neither of White's proposed Equal Protection claims plausibly alleges that any similarly situated individual of another race or gender was treated differently in roughly equivalent circumstances. Taking White's gender-based claim first, the only possible non-male comparators identified in the PSAC are White's ex-wife and a female Superintendent Janey allegedly considered naming as White's replacement. Doc. No. 37-1 ¶¶ 104, 145, 149-51. But White's allegations do not plausibly establish that either of those women are similar to White "in all relevant aspects." White's ex-wife, though a police officer, was not the Commissioner. She is not alleged to have held or been under consideration for any high-level rank or position within the BPD. She cannot, then, constitute a similarly situated comparator to White, the appointed commander of the entire BPD. As far as the female Superintendent is concerned, White does not allege that her personnel or IA file contained any complaints at all, let alone anything similar in nature to the allegations at issue against White. Indeed, the PSAC includes no facts to support a finding that she was similarly situated for purposes of a gender-based Equal Protection claim.

The PSAC contains even less as far as Count III and comparators of other races are concerned. Besides conclusory statements that "other white Commissioners" were not "subjected to the treatment" White alleges he experienced, id. ¶¶ 158-60, White makes no effort to identify any similarly situated comparator of another race. More is required to plausibly state an Equal Protection claim. See Pollard, 132 F. Supp. 3d at 223 (dismissing Equal Protection claim against school district where student generally alleged he received "a lower level of protection compared to 'other students'" who did not share his cited characteristics but provided no "facts to establish that these students were similarly situated"). This conclusion flows, in part, from the highly detailed factual allegations White has chosen to include in his PSAC. Cf. Jones v. Bank of N.Y, 542 F. Supp. 3d 44, 52 (D. Mass. 2012) ("Although uncommon, a plaintiff may

plead herself out of court by attaching documents to the complaint that indicate that . . . she is not entitled to judgment." (cleaned up)).  His fulsome allegations identify many specific "relevant aspects" defining his own circumstances,[16] underscoring the absence of allegations showing that there is any "protagonist[] similarly situated" for purposes of Count II or III, Pollard, 132 F. Supp. 3d at 223.

Nor does White plausibly allege any facts supporting an inference that Janey (or the City) directly exhibited discriminatory animus and targeted White based on his race or his gender.  See Fincher, 2022 WL 500094, at *4 (suggesting such evidence might make out claim absent identified comparators).  Nothing in the PSAC remotely suggests a direct expression of racial animus by anyone acting on behalf of the City.  White argues that a statement Janey made in a press conference following his termination "expressly stated her gender-based prejudice against" him.  Doc. No. 40 at 10.  That statement, as reported by The New York Times and quoted in the PSAC, was:

> The disparate treatment of Black people in our country is a genuine concern, but let's be clear: Racism is a burden carried by both men and women of color, and I will not turn a blind eye to domestic violence against Black women, or any women, for that matter.

Doc. No. 37-1 ¶ 111.  As the quoted article makes clear in the sentences immediately preceding the excerpt White identifies, Janey made this statement in response to an "argument" White advanced publicly at the time that "the allegations against him" were "tainted by racism."[17]

---

[16] Certain aspects of White's circumstances described in the PSAC make it especially unusual. For example: White was promoted and promptly suspended by one mayor, but then terminated by that mayor's (acting) successor who had inherited the investigation midstream; the allegations against White and the manner in which BPD responded to them were the focus of intense media and public attention in a time when such issues were at the forefront nationally; and the allegations against White involved his ex-wife, also a BPD officer who was under his command.

[17] Consideration of the context of the quote is appropriate because White has expressly quoted, directly cited, and thereby incorporated the relevant news article into his PSAC.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

Ellen Barry, "Boston Police Commissioner Is Fired After Domestic Violence Allegations Emerge," N.Y. Times, June 7, 2021.  Considering the context in which it was made, the statement does not reasonably or plausibly support an inference that Janey acted out of discriminatory animus toward men.

In the totality of circumstances as alleged in the PSAC, the Court finds that White has not alleged facts that would plausibly support an inference that Janey terminated White because of his race or his gender.  Accordingly, White's proffered Equal Protection claims are futile, and his motion to amend is DENIED insofar as proposed Counts II and III are concerned.

### C.   Proposed State Claims

White follows his three proposed federal claims with a dozen state-law claims.[18]  Nine of the claims arise under specified sections of the Massachusetts General Laws.  Doc. No. 37-1 at 41-45, 46-53 (Counts IV, VI, and IX through XV).  The other three assert claims governed by Massachusetts common law.  Id. at 43, 45-46 (Counts V, VII, and VIII).  Though the defendants have challenged, and White has defended, the sufficiency of those claims as well, the Court refrains from considering and passing on these questions of state law at this time.  Given the nature of this dispute—and because the Court's review of the single federal claim that has potentially been plausibly alleged raises serious questions that might be subject to early resolution—the Court will provisionally permit the addition of the state-law claims, but will STAY further proceedings with respect to them until the viability of the sole remaining federal claim is resolved.  See Dietz v. Bouldin, 579 U.S. 40, 47 (2016) (reiterating "that district courts

---

[18] To the extent the last claim in the proposed Second Amended Complaint relates to the stigma-plus claim in Count I, see Doc. No. 37-1 ¶¶ 248-49 (asserting claim for "Equitable Injunctive Relief" requiring a "constitutionally required evidentiary name-clearing hearing"), the Motion to Amend is ALLOWED as to that claim for the same reasons addressed in Section II.A, supra.

have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases").

Accordingly, the Motion to Amend is PROVISIONALLY ALLOWED as to Counts VI through XVI.  This ruling, however, is without prejudice to the defendants filing a future motion for judgment on the pleadings challenging those claims or reviving the arguments already advanced.  If the federal claim is dismissed, then the Court will remand White's state-law claims to the Massachusetts courts, where such issues are best addressed.  Brennan v. Hendrigan, 888 F.2d 189, 196 (1st Cir. 1989) (noting "pretrial termination of plaintiff's federal-law claims, . . . and the absence of any other cognizable basis for federal jurisdiction, leave a federal court no real choice but to dismiss . . . pendent state-law" claims).

### III.     MOTION FOR JUDGMENT ON THE PLEADINGS

In light of the Court's ruling allowing White to amend his complaint, at least in part, the City's request for judgment on pleadings that are no longer operative is moot, and there is no need for further briefing or argument as to that motion.

### IV.     CONCLUSION

Accordingly, the Motion to Amend (Doc. No. 37) is DENIED as to proposed Counts II and III (the Equal Protection claims) and is otherwise ALLOWED.  The Motion for Judgment on the Pleadings (Doc. No. 11) is DENIED as moot.

Within fourteen days of this Order, White shall SHOW CAUSE why his Count I Stigma-Plus Due Process claim is not subject to dismissal in light of the questions and concerns identified herein.  This filing shall be limited to fifteen pages.  The defendants may respond, limited to ten pages, within seven days of White's submission.

The defendants' obligation to answer the PSAC is STAYED, and all further proceedings as to the state-law claims are STAYED, pending the Court's review of White's show-cause submission and entry of an Order in response thereto.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge