UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DENNIS WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 21-10952-LTS |
| | ) | |
| THE CITY OF BOSTON and | ) | |
| ACTING MAYOR KIM JANEY, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER

July 12, 2022

SOROKIN, J.

This case arises from events that began in February 2021, when former Boston Mayor Martin Walsh appointed Dennis White Commissioner of the Boston Police Department, only to suspend him two days later in response to media inquiries regarding domestic violence allegations from White's past. An independent investigation followed, as did Walsh's departure and his replacement by Acting Mayor Kim Janey. At the conclusion of the investigation, White filed a complaint in state court, where he unsuccessfully sought to enjoin Janey from removing him from his post. Meanwhile, Janey released a report produced by the independent investigator, an outside attorney, summarizing the information the investigator had gathered. The papers before the Court reveal that significant media coverage accompanied each of these events and continued through Janey's June 2021 announcement of her decision to fire White.

After White's termination, the defendants removed the state-court action to this Court, and White sought to amend—and substantially expand—his complaint.[1]  Doc. Nos. 1, 37.[2]  This Court previously denied White's request to add federal Equal Protection claims to his suit against the City and Janey, finding he had not plausibly alleged discrimination based on race or gender.  Doc. No. 49 at 14-17.  Now, having considered supplemental submissions from both parties regarding White's third federal claim, clarified the record, and determined it is appropriate to resolve the defendants' challenges to White's various state-law claims now,[3]  Doc. Nos. 51, 52, 53, 55, 56, the Court ALLOWS White's remaining federal claim to proceed but DISMISSES most of his proposed state-law claims for the reasons explained herein.

I.      THE RECORD

Before turning to assess White's proposed claims, the Court addresses the parties' positions regarding what information may be considered as it engages in that task at this stage of the proceedings.  As the Court noted in a previous Order, the record contains or expressly incorporates several news articles, which the parties agree the Court can consider in evaluating whether White's claims withstand the defendants' challenges.  See Doc. No. 53 at 2 (listing articles quoted, submitted, or otherwise incorporated by White in his papers).  White's

---

[1] White amended his original complaint once in state court, before the action was removed to this Court.  At issue now are claims contained in the Second Amended Complaint and Jury Demand ("SAC") attached to White's motion to amend.  Doc. No. 37-1.

[2] Citations to "Doc. No. ___ at ___" reference items appearing on the court's electronic docketing system, and pincites are to the page numbers in the ECF header.

[3] In its original order addressing White's motion to amend, the Court provisionally allowed the motion insofar as the proposed state-law claims were concerned, expressly noting the ruling was without prejudice to the renewal of arguments the defendants had advanced challenging the legal sufficiency of those claims.  Doc. No. 49 at 18.  The Court neither addressed nor resolved such challenges at that time.  Upon review of the supplemental briefs the Court had invited regarding the sole remaining federal claim, the Court "conclude[d] that judicial economy and principles governing adjudication of civil cases" favored assessing the viability of White's state-law claims now.  Doc. No. 53 at 1.  The Court now does so in this Memorandum and Order.

allegations, as well as internal references and links appearing within the news reports he submitted, further demonstrate that the events at issue here were the subject of substantially broader reporting by various media outlets.  Id. at 3; see, e.g., Doc. No. 37-1 ¶ 108 (alleging the domestic violence allegations were "broadcast . . . widely," including by "[n]early every local news station and newspaper across Massachusetts" and "major news sources nationally"); Doc. No. 40 at 19-20 (same); Doc. No. 40-1 (referencing and linking to report of recent interview of White's ex-wife, and appending links at the end of the article to other related "coverage" regarding White).

In light of these references to widespread news coverage, and because the nature and extent of such coverage potentially bears on the plausibility and/or the ultimate success of certain of White's claims,[4] the Court sought the parties' views on whether it could take judicial notice of the existence of additional media reporting on the relevant events.  Doc. No. 53.  The Court's Order included a list identifying additional articles the Court might consider.  Id. at 3 n.5.  It required the parties to provide the basis for any objection they wished to make "to the Court's consideration of the fact that additional articles . . . have been published," and invited the parties to identify "any other articles, media reports, or other materials" they believed the Court should "consider as it adjudicates the challenges advanced by the defendants to the remaining federal claim and the state-law claims."  Id. at 4.

The parties separately responded to the Order on June 15, 2022.  The defendants asserted no objection, agreed the Court could "consider the fact that such news articles were published,"

---

[4] One such example is that the extent to which public reporting about the domestic violence allegations against White occurred before Janey published the independent investigator's report potentially impacts White's remaining federal claim, his defamation claim, and his claim that his right to privacy under state law was violated.  See Sections III, IV(B), and IV(E), infra.

and submitted seventeen additional articles it asked the Court to consider.  See generally Doc.

Nos. 56, 56-1.  White, however, lodged what might be described as a conditional objection—one

which depends on the "purpose for considering [the] articles."[5]  Doc. No. 55 at 2.  In essence, he

welcomes consideration of the articles if they lead the Court to allow his claims to proceed, but

he objects if they would cause the Court to conclude otherwise.  See id. at 2-3 (stating White

does "not object" if the Court "use[s] the articles for the purpose of concluding that [they] were

destructive to his reputation," but does object if the Court "use[s] the articles for the conclusion

that White already had an unofficial name-clearing hearing").

White's position is both specious and wholly untethered to law or reason.  To the extent

White implies the Court has not adequately "inform[ed] the parties of the purpose for

considering articles beyond those referenced in the parties' pleadings," id. at 2, he is wrong.  In

bringing this issue to the parties' attention, the Court described the context in which it arose and

explained that the existence of other articles might "bear on the Court's determination as to the

viability of the plaintiff's remaining claims."[6]  Doc. No. 53 at 3; see also id. at 2 (seeking "to

---

[5] The Court limited the parties' submissions on this subject to five pages in length.  Doc. No. 53 at 4.  White spent less than one-and-a-half pages addressing the questions the Court posed, then devoted the remainder of his five pages to addressing the merits of his state-law discrimination claims.  See generally Doc. No. 55.  That argument was uninvited by the Court, as the defendants note.  To the extent it implicitly asks the Court to reconsider its prior ruling denying White's request to add a pair of Equal Protection claims to this action, that request is denied.  See id. at 3 & n.2.  To the extent it warrants consideration, the Court will address it in the appropriate discussion section.

[6] That the Court's Order adequately informed the parties of its purpose in considering such articles is evidenced by the defendants' submission, which offered additional articles accompanied by a brief and cogent explanation of how the defendants believed such articles impacted the viability of specific claims.  Doc. No. 56.  What White appears to mean is that the Court has not informed the parties what conclusions it will draw from the additional press reports.  But, of course, the Court is not obligated to provide a preview of its rulings, and it could not draw any conclusions until it received the parties' responses, clarified the scope of the record, and analyzed the parties arguments in light of that record.

clarify the record . . . so that the Court may proceed to address all remaining claims and determine their viability"); id. at 3 (citing White's concession that certain articles could be considered by the Court in "assess[ing] the sufficiency and plausibility of his claims"); id. at 4 (inviting submission of any other materials the Court should "consider as it adjudicates the challenges advanced by the defendants" to White's remaining claims).  Moreover, in suggesting that consideration of additional articles would involve the Court "in independent fact investigations" by "selecting and relying on articles . . . without input from White," Doc. No. 53 at 2, White inexplicably ignores the fact that the Court expressly solicited his input.  The Court's Order identified materials that might be considered, instructed him to object to any such materials White believed the Court should not consider, and invited him to select and submit any additional materials he believed relevant.  It was White's choice not to fully avail himself of that opportunity.[7]  The Court did nothing to curtail his ability to respond to the question raised as to the appropriate scope of the record.

Though White's stated basis for his objection is unfounded and overruled for the reasons just explained, the Court is conscious of the limitations imposed on it by the standard governing its review at this juncture.  It is further cognizant of the fact that this lawsuit involves questions of process.  In these circumstances, the Court will not consider at this time any news articles besides those identified in its prior order as referenced and/or incorporated in White's submissions.  Doc. No. 53 at 2.  This course does not suggest that other media reports, such as those previously identified by the Court and those submitted by the defendants, are not relevant

---

[7] Not only did White elect not to submit any additional materials or to articulate a principled objection to the question posed by the Court; he also opted not to seek clarification of the Court's Order (if he did not understand what it sought) or leave to file additional pages at a later date (if he felt he required more space or time to address the issue raised by the Court).

to assessing the merits of White's claims.  They may well be relevant.  They simply are not part
of the record for purposes of evaluating the plausibility of White's claims.  It is neither necessary
nor possible for the Court to resolve now the scope of materials that will be properly before it in
the event of future motion practice.

Thus, at this time, the Court considers only the SAC and the articles that White has
placed in the record either as exhibits or by reference in his pleadings.

II.    STANDARD OF REVIEW

The Court's evaluation of the defendants' challenges to the claims White has endeavored
to add in the SAC is governed by the familiar Rule 12(b)(6) standard and the cases refining and
applying it.  White rightly points out that there is no "heightened pleading requirements for
discrimination claims," and that the law does not require him to plead all components of a prima
facia case in order to withstand a challenge under Rule 12(b)(6).  Doc. No. 55 at 4; accord Doc.
No. 40 at 9-10.  The Supreme Court has made clear, however, that White is required to offer
more than "labels and conclusions, and a formulaic recitation of the elements" of his claims.
Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  He must supply factual allegations
that elevate "a right to relief above the speculative level," id., making his claims "facially
plausib[le]" and permitting the Court "to draw the reasonable inference that the defendant[s]
[are] liabile for the misconduct alleged," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Thus,
though none of White's specific claims are subject to a "heightened pleading requirement,"
Twombly and Iqbal clarified and enhanced the pleading requirement applicable to all civil
claims, including those White seeks to pursue here.  See Woods v. City of Greensboro, 855 F.3d
639, 647 (4th Cir. 2017).

Iqbal is especially instructive as to several of White's proposed claims, because it involved a close analysis of the sufficiency of allegations aimed at showing the discriminatory purpose of certain defendants.  Finding Iqbal's allegations insufficient to push his claims "of invidious discrimination across the line from conceivable to plausible," the Supreme Court rejected as "conclusory" an allegation that the relevant defendants had engaged in certain conduct "solely on account of" Iqbal's "religion, race, and/or national origin and for no legitimate penological interest."  556 U.S. at 680.  Considering the remainder of the allegations, the Supreme Court concluded that Iqbal had not plausibly alleged that the defendants acted with discriminatory purpose, reasoning, in part, that the record pointed to an "obvious alternative explanation" for the conduct at issue, rendering implausible "the purposeful . . . discrimination" Iqbal urged the Court "to infer."  Id. at 682.

Finally, though White is not obligated at this stage to "plead facts sufficient to establish a prima facie case," the First Circuit has explained that "the elements of a prima facie case are a part of the background against which a plausibility determination should be made," and they "may be used as a prism to shed light upon the plausibility of" his claims.  Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 54 (1st Cir 2013).  In Rodriguez-Reyes, the Court of Appeals determined that the "cumulative effect" of several non-conclusory factual allegations in the complaint plausibly supported an inference of discriminatory political animus, noting that (unlike in Iqbal) the "record contain[ed] no nondiscriminatory explanation" for the conduct at issue.  711 F.3d at 55-56.

It was with these guiding principles in mind that the Court previously rejected White's proposed Equal Protection claims, and it is against the same backdrop that the Court evaluates each of his remaining claims.

III.   <u>STIGMA-PLUS CLAIM (COUNT I)</u>

In a previous Order, the Court rejected a trio of challenges the defendants originally leveled against White's claim that they violated rights guaranteed to him by the Due Process Clause.  Doc. No. 49 at 6-9.  This "stigma-plus" claim, expressed in Count I of the SAC, alleges that the defendants failed to provide White a "public" and "evidentiary name-clearing hearing" after they published what he characterizes as false and stigmatizing information that impugned his reputation and impaired his ability to obtain other employment.  Doc. No. 37-1 ¶¶ 129-41.  Though the defendants' challenges failed, the Court's review of the law defining such a claim raised for the Court "concerns about the viability of" this claim, which it described in some detail.  <u>See</u> Doc. No. 49 at 9-13 (discussing <u>Baden v. Koch</u>, 799 F.2d 825 (2d Cir. 1986), and questioning the "utility of a formal name-clearing hearing" in the circumstances presented).  The Court then provided the parties time "to consider and respond to the questions and concerns" it had flagged.  <u>Id.</u> at 13.

In response, White urged that <u>Baden</u> is materially distinguishable in certain ways from the events at issue here, and that he has plausibly alleged both the requisite elements of a stigma-plus claim and entitlement to damages arising from such a claim.  <u>See generally</u> Doc. No. 51.  The defendants emphasized that the amount of process the Constitution requires is a fact-specific determination and urged that White already has received "all the process that he was due" in these circumstances.  <u>See generally</u> Doc. No. 52.

After careful deliberation, and in light of the present record, the Court finds that Count I plausibly alleges a stigma-plus claim.  As the Court has noted and the defendants argue, due process is a flexible concept, including when applied to claims like White's.  <u>See</u> Doc. No. 49 at 7 n.5; Doc. No. 52 at 1-2.  The fact-specific nature of such a claim means that the defendants'

various arguments are not now capable of resolution.  These arguments include: that the process suffered under the circumstances; that some or substantially all of the stigmatizing information was public before the release of the investigator's report; and that White's version of events already has received a public airing in the media, thereby reducing or eliminating the probable value of any further name-clearing opportunity.  See generally Doc. Nos. 52, 56.

Accordingly, Count I will proceed against both defendants.[8]

IV.   STATE-LAW CLAIMS

A.  Massachusetts Civil Rights Act (Count IV)

White's first state-law claim alleges a violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I, by both the City and Janey.  This claim suffers from several flaws.

At the outset, White acknowledges he cannot sue the City for violating the MCRA, Doc. No. 40 at 14 n.7, a concession compelled by settled law explaining that municipalities are not "persons" subject to suit under the MCRA.  See Radfar v. City of Revere, No. 20-cv-10178-IT, 2021 WL 4121493, at *10 (D. Mass. Sept. 9, 2021) (relying on Howcroft v. City of Peabody, 747 N.E.2d 729 (Mass. App. Ct. 2001)).  White cannot avoid this conclusion and salvage his MCRA claim by asserting it against Janey in her official capacity.  Howcroft, 747 N.E.2d at 74; see Wilson v. Town of Fairhaven, No. 18-cv-11099-PBS, 2019 WL 1757780, at *15 (D. Mass. Mar. 4, 2019) (dismissing MCRA claims against individual defendants in their official capacity,

---

[8] This conclusion grounds the Court's continued exercise of jurisdiction, including supplemental jurisdiction over state-law claims, in this case.  The Court's determination that Count I will continue is subject to one caveat.  Previously, the Court rejected Count I insofar as it asserts an entitlement by White to any further hearing "to clear his name with his employer (i.e., the City and Janey).  Doc. No. 49 at 10-11.  That ruling stands for the reasons previously stated.

reasoning they were also "claim[s] against the municipality").  So, to the extent Count IV is asserted against the City and against Janey in her official capacity, it cannot proceed.[9]

White argues his MCRA claim should survive against Janey in her individual capacity, Doc. No. 40 at 14, notwithstanding a paragraph within Count IV of the SAC that appears to expressly limit the claim to one against Janey in her official capacity, see Doc. No. 37-1 ¶ 168 (alleging for purposes of MCRA claim that "[a]t all relevant times" Janey "was acting within the scope of her position with the City of Boston").  In the face of that unambiguous assertion, the SAC cannot reasonably be viewed as containing an individual-capacity claim against Janey under the MCRA.

Even if White had advanced this claim against Janey in her individual capacity, he has not plausibly alleged the sort of conduct required to state an MCRA claim.  Such a claim requires "threats, intimidation or coercion" that interfered with White's federal or state constitutional rights.  Thomas v. Harrington, 909 F.3d 483, 492 (1st Cir. 2018).  "It is rare for a MCRA claim to involve no physical threat of harm."  Id.  Though "purely economic pressures" can rise to the level of actionable coercion under the MCRA, only a "narrow" category of non-physical coercion—that which involves "a pattern of harassment and intimidation"—will support such a claim.  Id. at 492-93; cf. McGinn v. Exec. Office of Energy & Envtl. Affairs, 496 F. Supp. 3d 541, 553 (D. Mass. 2020) (finding MCRA claim plausibly alleged where complaint described

---

[9] White suggests he may bring a claim against Janey in her official capacity under the MCRA, so long as he seeks only injunctive relief.  Doc. No. 40 at 14.  However, cases such as those cited above, in which official-capacity MCRA claims against municipal officeholders were rejected, have neither discussed nor endorsed such a distinction.  In any event, White's MCRA claim arises from actions that occurred in the past and have concluded—not ongoing threats or misconduct.  See Doc. No. 37-1 ¶¶ 169-74.  He has not described any conduct by Janey (who is no longer the Acting Mayor) that continued beyond her announcement of his termination.  Thus, White has not plausibly alleged a claim entitling him to prospective injunctive relief.

pattern of at least three distinct threats, including a threat to refer the plaintiff for criminal prosecution, aimed at coercing the plaintiff's resignation and silencing his whistleblower complaints).  White has not cited any "threats" or "intimidation," as those terms are defined in the context of an MCRA claim, nor has he plausibly alleged a pattern of harassment (by Janey or anyone else) necessary to support an MCRA claim arising entirely from non-physical coercion.

Accordingly, Count IV is DISMISSED.

B.  Defamation (Count V)

White's second state-law count is a defamation claim against Janey.  Doc. No. 37-1 ¶¶ 175-81.  He cites her release "to the media and general public" of the independent investigator's report, which he alleges contained "defamatory and false information."  Id. ¶¶ 176-77.  He further alleges that when Janey released the report and later terminated White, she "made statements . . . communicat[ing] to the public" that he: had "committed serious crimes of domestic violence," had "lied about" those "past acts," and had "acted to perpetuate a corrupt police department because of his alleged role in the [department's] alleged lack of cooperation in the investigation" (including via "witness intimidation").  Id. ¶¶ 178-79.

Janey has asserted three challenges to White's defamation claim, none of which provide avenues to dismissal of the claim at this time.[10]  First, she asserts that any public statements she made about the events at issue here are protected by a conditional privilege, as she was always performing official duties and speaking on a matter of public importance.  Doc. No. 39 at 22-23. Application of this privilege, however, requires the Court to balance White's interest in protecting his reputation against any interest Janey and/or the public have in circulating the

_____

[10] Janey has not argued that White's defamation claim fails to satisfy the applicable pleading standard or suggested it provides insufficient notice of the statements that form the basis for the claim.

information at issue.  Burke v. Town of Walpole, 405 F.3d 66, 94 (1st Cir. 2005).  The Court cannot engage in that evaluation under the legal standard that governs the pending motion.  For example, the strength of White's interest in preserving his reputation depends, at least in part, on the extent to which similarly damaging information already was in the public sphere.  And, Janey's interest in releasing and commenting on the investigator's report cannot be evaluated without information illuminating the reasons that led her to take those steps when and how she did.  The Court presently lacks such information.

Second, Janey argues White has not alleged she acted with actual malice, and that his status as a public figure obligates him to do so.  Doc. No. 39 at 23-25.  White does not appear to dispute that actual malice is required in these circumstances.  However, the SAC does allege actual malice, along with factual allegations that might plausibly support such a finding.[11]  See Doc. No. 37-1 ¶¶ 9, 101-07, 109-10, 180.  Nothing further is required at this stage.  Finally, Janey suggests the statements underlying White's defamation claim "are not actionable," characterizing them as "pure opinion."  Doc. No. 39 at 25-26.  Though Janey is correct that the categorization of a statement as conveying verifiable fact (actionable) or subjective opinion (not actionable) ordinarily is a legal question the Court can resolve, it is not amenable to resolution now in this case.  The Court does not read the SAC, alone or as illuminated by White's papers, as specifically and exhaustively identifying the statements underlying his defamation claim.[12]  To

---

[11] For example, the SAC alleges releasing the report violated state laws governing disclosure of personnel records (about which Janey knew or should have known), and suggests the report was released in retaliation for White seeking to prevent his removal by filing a lawsuit in state court. Such assertions inform the allegation of actual malice and counsel against rejecting it as conclusory for present purposes.

[12] To be sure, the pleadings and briefs point to a handful of such statements—primarily things Janey said in a press conference that coincided with her firing of White—but they also allude more broadly to other public statements she made "[i]n connection with releasing the report."

assess the nature of the statements giving rise to White's defamation claim, the Court must have before it the universe of allegedly defamatory statements, as well as "the totality of circumstances in which the statement(s) were uttered or published."  Arroyo v. City of Bos., No. 20-cv-12082, 2021 WL 2338879, at *7 (D. Mass. June 8, 2021).

For these reasons, Janey's challenges cannot defeat White's motion to amend with respect to the defamation claim.  Count V will proceed.

### C.  Removal Statute (Count VI)

White next alleges that the defendants violated a 1962 Massachusetts law enacted to govern the appointment and removal of the Boston Police Commissioner.  That law ("the Removal Statute"), provides:

> There shall be in the city of Boston a department, known as the police department, which shall be under the charge of an officer, known as the police commissioner, appointed by the mayor for a term of five years commencing on May first of the year in which he is appointed, except that any vacancy in said office shall be filled for the balance of the unexpired term.  Such officer . . . may, after notice and hearing, be removed by the mayor of said city for cause.

1962 Mass. Acts 156-57 (Chap. 322, § 7).  For present purposes, the Court will assume without deciding that White may pursue a private action against the defendants arising from the Removal Statute.[13]  But see Doc. No. 39 at 26 (arguing that no such right of action exists).

---

Doc. No. 37-1 ¶ 179.  Such statements (if they exist) would have predated the June 2021 press conference and are not presently in the record.

[13] A private action under the Removal Statute is not necessarily the only mechanism available to a Boston Police Commissioner seeking to challenge their removal.  Besides the implied contract claim White alternatively asserts and the Court addresses below, Chapter 249 section 4 of the Massachusetts General Laws also appears potentially available to such a person, allowing them to seek certiorari in state court "to correct errors [of law] in proceedings" where the outcome is "not otherwise reviewable by motion or by appeal."  See Frawley v. Police Comm'r of Cambridge, 46 N.E.3d 504, 513 (Mass. 2016) (describing actions brought pursuant to this provision and the elements required to obtain such review).  White did not attempt to invoke that avenue to relief, the defendants have not cited it, and so the Court need not now consider whether state law allowed (or obligated) him to do so.

White's Removal Statute claim is necessarily limited to an allegation that Janey lacked cause to remove him.[14]  Though it appears no court has yet addressed such a claim under the Removal Statute, the parties have identified decisions in which the SJC has considered the "for cause" requirements of other similar state statutes.  In light of those cases, the detailed allegations in the SAC, and the documents in the record reflecting the reasons given for Janey's decision here, White's claim that the defendants lacked the "cause" required by the Removal Statute is implausible as a matter of law.

When reviewing claims arising from a governor's removal "for cause" of the chief medical examiner, the SJC applied a broad standard encompassing any "legitimate reason for an employee's discharge" and cited the following examples:  "any grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business," "a dispute over policy about which there may be an honest difference of opinion," a determination "that the interests of the public require the removal of the public officer," and "less than complete confidence in a public official's competency and efficiency."  Flomenbaum v. Massachusetts, 889 N.E.2d 423, 428-29 (Mass. 2008) (quotation marks omitted).  The SJC went on to emphasize the "great deference" that "must be accorded" to the executive's termination decision in such a case, specifying that the decision is reviewed only "to determine whether it was arbitrary or capricious."  Id. at 429.  This analysis echoed an earlier SJC decision in a case involving a former town engineer's challenge to the town manager's decision to fire him "for cause."  See McSweeney v. Town Manager of Lexington, 401 N.E.2d 113, 116 (Mass. 1980) (finding "cause"

---

[14] Any claim that White was not provided the notice and hearing required by the Removal Statute is foreclosed by the state court decisions in this case finding otherwise—reasoned decisions this Court finds persuasive.  See Doc. No. 1-1 at 345-52, 409-10 (reflecting conclusions by state trial and appellate courts that White was provided the notice and hearing required by the Removal Statute).

included "any ground asserted in good faith which is not arbitrary, irrational, unreasonable, or irrelevant" to the public official's job). In short, the SJC accords deference to chief executives at the Commonwealth and municipal levels alike.

Janey memorialized the reasons for her decision to terminate White in a June 7, 2021 letter, which is part of the record before this Court.[15] Doc. No. 39-4 at 2-3; see Doc. No. 40 at 27 n.16 (agreeing the Court can consider a "party's undisputed communication"). As that explanation is central to this claim, the Court reproduces it here:

> A focus of your comments at your hearing and the information [that you and your lawyer have] provided centers on your contention that the allegations of domestic violence are false. Although I credit the report of the independent investigator, I do not believe it is necessary for me to resolve the discrepancies between that report and the evidence that you have provided. At the very least, the allegations and evidence create a cloud of uncertainty about the events and as a result, your fitness to lead the BPD.
>
> Further, I specifically raised with you in my May 14 letter concerns that you had failed to demonstrate an appreciation of the public concern around domestic violence or how those charges might affect the public's perception of your ability to lead the BPD. Although you have repeatedly suggested that you did not address the issue of domestic violence because you were never instructed to do so and/or you did not want to interfere with an on-going investigation, your hearing was your opportunity to give me your ideas and demonstrate your understanding of the serious and important issues and implications for the BPD and the community. Instead, you continued your campaign to make your former wife (who would be a police officer under your command) a villain and you a victim, entirely missing the point and continuing a pattern of ignoring the larger issues of leadership and judgment.
>
> Similarly, you attempted to excuse your lack of cooperation and judgment during the investigation by placing the blame on the City for failing to instruct you regarding what to do. As the Commissioner, you are expected to have the judgment and ability to act without having to be instructed at every turn. Your repeated responses that you were "never told what to do" make it clear that you lack the

---

[15] In the SAC and his papers, White identifies and takes issue with other reasons for his termination, including specific allegations contained in the investigator's report and concerns Janey identified in an earlier letter expressing her belief that there was cause for White's removal and notifying him of her intent to hold a hearing. E.g., Doc. No. 40 at 25-29 (addressing the "four reasons" Janey cited in a May 14, 2021 letter). He largely ignores the communication in which Janey actually terminated him and explained why she was doing so.

insight and leadership qualities essential for making the changes that must be made
in the department and how each police officer must approach police work going
forward.  You stated repeatedly that you needed to be told to cooperate with an
investigation, that "[n]o one told [you that] you had to sit in person for a follow up
interview" and that you "did not receive any guidance form City Hall about what
to do or not to do."  These comments illustrate a total lack of insight, leadership
and judgment required.  As the Commissioner, you are expected to lead by example
and know that you should cooperate with an investigation, that you should not be
in police headquarters when on administrative leave, that you should tell the truth,
and use good judgment.  I do not believe that you are the person who can lead the
BPD in a different, more effective direction.

In sum, rather than a 20-year old complaint from which you should have learned
and grown, the domestic violence allegations are now at the forefront of the public's
attention, in part due to your own actions.  Your conduct summarized above leads
me to the inescapable conclusion that it is not in the best interest of the BPD, its
employees or the citizens of Boston for you to remain as Commissioner . . . .

Doc. No. 39-4 at 2-3.

This explanation of Janey's decision is plainly and squarely in line with the sort of

"cause" the SJC has upheld in the face of challenges by those dismissed for similar reasons from

public positions governed by similar statutes.[16]  White has not plausibly alleged the explanation

provided in this letter was pretext for other reasons motivating his termination.  And, the

explanation notes valid policy considerations, invokes the public's interest, and explains the

basis for Janey having lost confidence in White's ability to lead the BPD.  Each of the reasons

---

[16] Neither in her termination letter nor in her earlier letter to White did Janey state that she was
finding cause based on a determination that every (or any) witness statement attributing a
particular violent act to White was true.  She did not credit the witnesses known to the
investigator but unnamed in the report, nor did she discredit the witness statements offered by
White.  She wrote that she credited the report itself, which simply conveyed the accounts that
various witnesses (including White and at least one other person identified by him) had provided,
and that she had considered White's evidence, too.  The investigator's report expressed no
findings as to witness credibility or misconduct by White, nor did it make any recommendations
regarding his continued employment.  Indeed, Janey was not adjudicating domestic violence
allegations, but deciding whether there was cause to remove White.  It was not unreasonable, and
certainly not arbitrary, for Janey to find that the circumstances described in the report combined
to "create a cloud of uncertainty about the events and [White's] fitness to lead the BPD,"
regardless which version of the decades-old events was true, and that the totality of information
before her justified his termination for the reasons stated in her June 2021 letter.

cited provide "cause," as a matter of law, in line with the SJC's interpretation of that requirement in analogous situations.  In the face of the record evidence stating and supporting those reasons, White's allegation that his termination was without cause is simply implausible.[17]  See Iqbal, 556 U.S. at 682.

        For these reasons, Count VI is DISMISSED.

        D.   Implied Contract Claims (Counts VII and VIII)

        In Count VII, White claims that, by firing him, the defendants breached an implied contract, the terms of which are defined by the Removal Statute.  Doc. No. 37-1 ¶¶ 192-96.  This count essentially expresses the same claim White articulated in Count VI—an asserted violation of the Removal Statute—and it fails for the same reasons identified above.  See Section IV(C), supra.  The defendants provided White the required "notice and a hearing," and the record establishes that Janey had ample "cause" to remove him from his position.  White simply has not alleged facts that render any other conclusion plausible.

        White's second implied contract claim accuses the defendants of breaching the covenant of good faith and fair dealing he argues would arise by virtue of the implied employment contract he believes the Removal Statute created.  Doc. No. 37-1 ¶¶ 197-200.  As an initial matter, any such contract would bind only the City; Counts VII and VIII cannot be asserted against Janey, as she was not individually a party to any contract with White.  Beyond that, assuming an implied contract existed, it is well settled that the covenant of good faith and fair dealing is not a tool plaintiffs may use to add terms, enforce rights, or impose obligations that are

---

[17] The Court rejects (and the SJC cases cited above do not support) White's argument that the Removal Statute (or any other source of law) precludes a mayor from revisiting or reconsidering conduct previously known but reasonably viewed in a different light now due to the passage of time, a change in policy or public priorities, or another similar reason.

not included in the contract itself.  McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 301 (1st Cir. 2004).

Any implied contract here would arise from the Removal Statute, the relevant terms of which address only the notice, hearing, and grounds required to remove a Boston Police Commissioner.  White cannot invoke the covenant of good faith and fair dealing in order to protest the defendants' decision to terminate him entirely, rather than permitting him to remain in the civil service rank he previously held, or to assert a claim to additional and unspecified compensation, as he has not explained how either of those issues are addressed by the Removal Statute (and, by extension, the terms of an implied contract arising therefrom).  To the extent he repeats in this claim arguments that he was defamed by Janey or that he did not have an adequate opportunity to respond to the reasons he was terminated, such questions will be resolved in the context of his stigma-plus and defamation claims.  They do not support a plausible claim that the defendants acted in bad faith or otherwise breached an implied covenant of any contract in the circumstances presented here.  Cf., e.g., Manning v. Healthx, Inc., No. 15-cv-11936-RGS, 2015 WL 4497982, * (D. Mass. July 23, 2015) (explaining such a claim might arise where an employee was provided no opportunity to respond to employer's reasons for denying severance guaranteed by employment contract).

Counts VII and VII are DISMISSED.

E.  Right to Privacy (Count IX)

In Count IX, White alleges that the release of the investigator's report violated his right to privacy under Massachusetts law.  Doc. No. 37-1 ¶¶ 201-08.  Such a claim requires White to show that the defendants gathered and intentionally disseminated private information that "resulted in an unreasonable, substantial or serious interference" with his privacy.  See Barrigas

v. United States, No. 17-cv-10232-ADB, 2018 WL 1244780, at *7 (D. Mass. Mar. 9, 2018) (listing elements and explaining that the relevant state statute "appears to protect against intentionally tortious invasions of privacy" (quotation marks omitted)).  The defendants' challenges to this claim turn largely on the extent to which the contents of the investigator's report either were already in the public domain or were of public concern.  Doc. No. 39 at 33-35. These factors, which cannot be assessed now, plainly impact whether Janey disclosed "private" information when she released the report, and whether that disclosure unreasonably or substantially interfered with White's privacy right.[18]  On the present record, White's invasion of privacy claim is plausible.

Count IX will proceed.

F.   Violations of Chapter 151B (Counts X through XV)

The next six claims listed in the SAC arise under Chapter 151B of the Massachusetts General Laws.  Doc. No. 37-1 at 209-47.  Two of them (Counts XI and XIV) do not require consideration, as White has elected to withdraw them.  See Doc. No. 40 at 36 n.20 (describing a § 4(3) claim as duplicative of other Chapter 151B claims); cf. Doc. No. 39 at 37-38 (noting "there is little case law interpreting" § 4(3), and that another session of this Court has read the provision in a manner that suggests it is inapplicable here).  The four remaining Chapter 151B claims allege discrimination and retaliation against White based on his gender and his race, largely echoing the proposed Equal Protection claims expressed in Counts II and III of the SAC which the Court previously rejected.

_____

[18] In support of this claim, White points to a separate state statute that prohibits the disclosure of certain information by employers.  See Doc. No. 40 at 31-35.  Whether the report qualifies for protection as a "personnel record" for purposes of that statute does not control whether its release violated White's rights under the privacy law, though it likely would be a relevant consideration in assessing the merits of Count IX.

The Court need not linger long over the Chapter 151B claims.  To the extent they allege race or gender discrimination under state law, the SAC fails to plausibly allege that the defendants acted with the requisite discriminatory animus.  See Soni v. Wespiser, 239 F. Supp. 3d 373, 385 (D. Mass. 2017) (discussing SJC's articulation of elements of Chapter 151B claim, including "discriminatory animus").  This is so for the same reasons the Court found White had not plausibly stated an Equal Protection claim.  See Doc. No. 49 at 14-17; see also Iqbal, 556 U.S. at 680.  And, to the extent White's Chapter 151B claims allege retaliation, they similarly fail based on the absence of any plausible allegations that his termination (or any other adverse employment action) was causally linked to discriminatory animus or any protected activity. Nowhere does the SAC reference, specifically or in generic terms, protected activity undertaken by White.[19]  Even assuming White had alleged that he engaged in protected activity, as explained already, the record establishes valid reasons for Janey's decision to terminate White for cause that render implausible White's conclusory assertions that her decision was motivated by gender stereotyping, discrimination, or retaliation.  See McBride v. Mass. Comm'n Against Discrimination, 677 F. Supp. 2d 357, 362 (D. Mass. 2009).

Accordingly, the state-law discrimination and retaliation claims asserted in Counts X through XV are DISMISSED.

G.  Equitable Injunctive Relief (Count XVI)

The final count in the SAC "seeks an injunction to require the City and the Acting Mayor to provide a constitutionally required evidentiary name-clearing hearing at which he may

---

[19] Though the SAC alleges the investigation was undertaken in a "grossly negligent" and "deeply flawed" fashion and that the investigator "displayed serious bias," Doc. No. 37-1 ¶¶ 27-45, it does not describe any protected activity White undertook during the relevant time period that would give rise to a retaliation claim.

meaningfully present and cross-examine witnesses." Doc. No. 37-1 ¶ 249. Neither the title nor the text of the count refers to any statute or other source of law. Thus, the Court reads Count XVI not as an independent legal claim, but rather as a request for a specific form of relief tied to White's remaining Due Process claim. See Comley v. Town of Rowley, 296 F. Supp. 3d 327, 332 (D. Mass. 2017). It remains in the case only as a prayer for relief in the event White prevails on Count I.[20]

## V.    CONCLUSION

Accordingly, Counts IV, VI, VII, VIII, X, XI, XII, XIII, XIV, XV, and XVI fail to state plausible claims and are DISMISSED.

Count I (Due Process, against the City and Janey), Count V (defamation, against Janey), and Count IX (right to privacy, against the City and Janey) remain. The defendants shall answer the SAC, limited to those three claims, within fourteen days of this Order.

The Clerk shall schedule a Rule 16 conference.[21]

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

---

[20] To the extent White intended to assert this as a separate claim, it is DISMISSED. White's supplemental submission pointed to Count XVI when suggesting in a footnote that he had "sued to enforce his due process rights" under the Massachusetts Declaration of Rights, too. Doc. No. 51 at 3 n.2. But White did not invoke the state constitution in that Count or elsewhere in connection with his stigma-plus claim, despite consistently identifying the relevant state law underlying every other Count in the SAC. He has not sought leave to further amend his complaint to add such a claim (via what would be a third amended complaint), and this Court declines to sua sponte direct an amendment to the claim that White has not requested formally, especially after the prior amendments and substantial briefing over the claims.

[21] At the Rule 16 conference, the parties shall be prepared to address whether the Massachusetts Tort Claims Act prevents White from pursuing his invasion of privacy claim (Count IX) against the City. See Luthy v. Proulx, 464 F. Supp. 2d 69, 76 (D. Mass. 2006); Mass. Gen. Laws ch. 258, §§ 2, 10(c).