**REDACTED COPY FILED ON PUBLIC DOCKET**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                        )
DENNIS WHITE,                                )
                                                        )
                        Plaintiff,              )
                                                        )
            v.                                      )
                                                        )   Civil Action No. 21-CV-10952-LTS
THE CITY OF BOSTON, and ACTING MAYOR  )
KIM JANEY,                                     )
                                                        )
                        Defendants.           )
_____)

**PLAINTIFF DENNIS WHITE'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

REDACTED COPY FILED ON PUBLIC DOCKET

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ...........................................................................................................1

ARGUMENT ...................................................................................................................4

    I.    White is entitled to a trial on his defamation claim ................................................4

        A.    Janey's false statements are not opinion but, rather, state directly or through innuendo that White engaged in violent domestic abuse and obstruction...................................................................................................5

                1.    Janey made categorically false statements that White admitted to abusing his former wife and niece during the investigation and pre-termination meeting..................................................................5

                2.    Janey deliberately communicated the innuendo that White abused members of his household and obstructed a government investigation ...........................................................................................6

        B.    There is clear and convincing evidence that Janey made the defamatory statements with actual malice ..................................................................10

                1.    Janey deliberately misrepresented that White admitted certain abuse ..................................................................................................11

                2.    Janey relied on unknown witnesses ...............................................12

                3.    Janey purposefully avoided contravening evidence ......................14

                4.    Janey's private communications reflected her personal uncertainty................................................................................14

                5.    Janey had an ulterior, political motive for libeling White ............15

    II.    White's due process right to a name clearing hearing has been violated ..............16

        A.    White did not get a name clearing hearing and he was ruinously harmed................................................................................................16

        B.    Defendants' case law is distinguishable ...................................................19

REDACTED COPY FILED ON PUBLIC DOCKET

C.    A meaningful name clearing hearing would have enabled White to clear his name ..................................................................................................22

1.    Janey made her statements without knowing who the unidentified witnesses were ................................................................................22

2.    White will be able to show that Sybil Mason is not credible.........22

3.    Mason's own testimony shows that certain abuse described in the Report never happened ................................................................23

4.    The Report falsely attributed information about abuse to "a witness who was Sybil's friend" ................................................................23

5.    The Report stated that Mason kept a diary which contained descriptions of abuse, yet evidence contradicts that story .............24

6.    The Report conveyed false and highly defamatory information from "a retired BPD officer" ........................................................24

7.    The video deposition of White's niece demonstrates an unreliable witness..............................................................................................25

8.    The investigator never met with any of the witnesses in person or by Zoom other than Dennis White and did not put them under oath..............................................................................................25

III.    Defendants violated White's privacy rights when they made the Report public...26

A.    The Report constitutes private information that the public did not have a right to see ..................................................................................................26

B.    The Massachusetts privacy statute prohibits employers from "gathering and disseminating" private information, which Defendants violated ........27

CONCLUSION..................................................................................................................30

APPENDIX.........................................................................................................................32

REDACTED COPY FILED ON PUBLIC DOCKET

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Albright v. Morton*, 321 F. Supp. 2d 130 (2004) .........................................................................28

*Arroyo v. City of Boston* is distinguishable.  No. 20-CV-12082-DJC, 2021 WL 2338879 (D. Mass. June 8, 2021) .........................................................................................................................9

*Ayash v. Dana-Faber Cancer Inst.*, 443 Mass. 367 (2005) ..................................................28, 29

*Baden v. Koch*, 638 F.2d 486 (2d Cir. 1980) ........................................................................17, 19

*Baden v. Koch*, 799 F.2d 825 (2d Cir. 1986) ...............................................................19, 21, 22

*Beitzell v. Jeffrey*, 643 F.2d 870 (1st Cir. 1981) .........................................................................17

*Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015)........................................................................13

*Broderick v. Police Comm'r of Bos.*, 368 Mass. 33 (1975) ........................................................27

*Brown v. Hearst Corp.*, 54 F.3d 21 (1st Cir. 1995) .......................................................................6

*Cianci v. New Times Pub. Co.*, 639 F.2d 54 (2d Cir. 1980) ..........................................................7

*Dasey v. Anderson*, 304 F.3d 148, (1st Cir. 2002) ................................................................27, 28

*D'Allessandro v. City of Albany*, 2008 WL 544701 (N.D.N.Y. 2008)....................................20, 21

*Doe v. Kerry*, 2016 WL 5339804 (N.D. Cal. 2016).....................................................................21

*Donato v. Plainview-Old Bethpage Cent. School Dist.,* 96 F.3d 623 (2d Cir. 1996) ...................17

*Esposito v. Metro North Commuter Railroad Company*, 856 F. Supp. 799 (S.D.N.Y. 1994) ......21

*Flamm v. American Assoc. of Univ. Women*, 201 F.3d 144 (2d Cir. 2000).....................................8

*Fontana v. Comm'r of Metropolitan Dist. Comm'n*, 34 Mass. App. Ct. 63 (1993) .....................16

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969)............................................................10, 15

*Grimaldi v. New Castle County,* 2018 WL 3435019 (DE 2018) ...................................................20

*Gunasakera v. Irwin,* 551 F.3d 461 (6th Cir. 2009) ....................................................................18

*Haggerty v. Globe Newspaper Co.*, 383 Mass. 406 (1981) .........................................................29

*Harte-Hanks Commn's, Inc. v. Conna*ughton, 491 U.S. 657 (1989)................................13, 14, 15

*Holter v. WLCY T.V., Inc.*, 366 So. 2d 445 (Fla. App. Ct. 1978) .................................................12

*Hopkins v. City of Gloucester*, 817 A.2d 436 (N.J. App. Div. 2003) .....................................13, 15

REDACTED COPY FILED ON PUBLIC DOCKET

*Hostrop v. Bd. Of Junior College Dist. No. 515,* 471 F.2d 488 (1972) .........................................17

*Howell v. Enterprise Pub. Co., LLC,* 72 Mass. App. Ct. 739 (2008) ...........................................28

*Hunt v. Liberty Lobby,* 720 F.3d 631 (11th Cir. 1983) ...............................................................10

*Huntley Community School Bd. Of Brooklyn, N.Y.,* 543 F.2d 979 (2d Cir. 1976) .....................26

*King v. Driscoll,* 424 Mass. 1 (1996)..........................................................................................16

*Kuhn v. Trib.-Republican Pub. Co.,* 637 P.2d 315 (Colo. 1981)................................................13

*LaForgia v. Davis,* 2004 WL 2884524 (S.D.N.Y. 2004) .............................................................21

*Levesque v. Doocy,* 560 F.3d 82 (1st Cir. 2009).........................................................................10

*Liotta v. Borough of Springfield,* 985 F.2d 119 (3rd Cir. 1993).................................................20

*Lyons v. New Mass Media, Inc.,* 390 Mass. 51 (1983) .....................................................10, 13, 14

*Mabardi v. Boston Herald-Traveler Corp.,* 347 Mass 411 (1964) ...........................................6, 7

*Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496 (1991)........................................................11

*McDonald v. Wise,* 769 F.3d 1202 (10th Cir. 2014)....................................................................18

*McGhee v. Draper,* 639 F.2d 639 (10th Cir. 1981) .....................................................................26

*Moody v. County of Santa Clara,* 2018 WL 2267662 (N.D. CA 2018) ......................................22

*Mulgrew v. City of Taunton,* 410 Mass. 631 (1991) ...................................................................28

*Murphy v. Boston Herald, Inc.,* 449 Mass. 42 (2007) ...........................................................11, 13

*Naser Jewelers v. City of Concord, N.H.,* 538 F.3d 17 (1st Cir. 2008) .......................................16

*O'Brien v. DiGrazia,* 544 F.2d 543 (1st Cir. 1976) ....................................................................27

*Patterson v. City of Utica,* 370 F.3d 322 (2004)..............................................................17, 19, 26

*Peterson v. Hopson,* 306 Mass. 597 (1940) ...............................................................................16

*Polay v. McMahon,* 468 Mass. 379 (2014) .................................................................................29

*Reid v. Viacom Int'l Inc.,* No. 1:14-CV-1252-MHC, 2016 WL 11746046, at *16 (N.D. Ga. Sept. 14, 2016) ....................................................................................................................................11

*Reilly v. Associated Press,* 59 Mass. App. Ct. 764 (2003) .......................................................4, 6

*Riley v. Harr,* 292 F.3d 282 (1st Cir. 2002)................................................................................28

*Senra v. Town of Smithfield,* 715 F.3d 34 (1st Cir. 2013)..........................................................21

*Shafir v. Steele,* 431 Mass. 365 (2000) ..................................................................................7, 11

REDACTED COPY FILED ON PUBLIC DOCKET

*Sharon v. Time, Inc.* 599 F. Supp. 538 (F.D.N.Y. 1984) ................................................12

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) ................................................8, 10

*Smith v. Suburban Restaurants, Inc.*, 374 Mass. 528 (1978).........................................9

*St. Amant v. Thomson*, 390 U.S. 727 (1968)................................................................12

*Stanton v. Metro Corp.*, 438 F.3d 119 (1st Cir. 2006).....................................6, 7, 8, 12

*Stanton v. Sentinel Printing Co.,* 324 Mass. 13 (1949).................................................10

*Stetson v. Bd. of Selectmen of Carlisle,* 369 Mass. 755 (1976) ...................................16

*Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633 (D. Mass. 2015) ..........................17

*Tower v. Hirschorn*, 397 Mass. 581 (1986) ............................................................28, 30

*Wakefield Teachers Assoc'n v. School Comte. Of Wakefield*, 431 Mass. 792
(2000)............................................................................................................26, 27, 28, 29

*Westmoreland v. CBS, Inc.*, 596 F. Supp. 1170 (S.D.N.Y. 1984)  ...............................15

*Wojcik v. Mass. State Lottery Commission,* 300 F.3d 92 (1st Cir. 2002) .....................16

*Worcester Telegram & Gazette Corp. v. Chief of Police of Worcester*, 58 Mass. App. Ct. 1
(2003) ......................................................................................................................26, 27, 28

## **Other Authorities**

M.G.L. c. 4, sec. 7.........................................................................................................26

M.G.L. c. 66, sec. 10.....................................................................................................26

R. Smolla, 1 Law of Defamation § 3:52 (2d ed.)..........................................................13

REDACTED COPY FILED ON PUBLIC DOCKET

## Introduction

Plaintiff Dennis White ("White") opposes Defendants City of Boston ("City") and Kim Janey's ("Janey") (collectively "Defendants") motion for summary judgment and cross-moves for summary judgment on his due process and privacy claims (Counts I and IX). Janey and the City destroyed White's reputation in the most complete and profound way imaginable in 2021. At roughly the same time, Janey published the investigative report ("Report") filled with false and defamatory statements about White; falsely communicated that White committed the acts of abuse described in the Report and obstructed the investigation and caused officers at the Boston Police Department ("BPD") not to cooperate; and terminated White from his position as Commissioner of the BPD. These actions were wrongful. White is entitled to summary judgment on his claims for violation of his due process and privacy rights and to a trial on his defamation claim against Janey (Count V). That trial would also serve as a damages trial on his other claims.

The Report was heavily weighted against White, as were Janey's public statements purportedly based on the Report. As for domestic abuse, the Report allegedly presented facts from four underlined witnesses that conveyed White had for years committed brutal acts of domestic abuse against his then wife, Sybil Mason ("Mason"). Pl. SOF ¶ 5. The Report did not include any of the third-party statements discrediting these alleged facts, including from Mason's adult daughter, Tiffany White, and Mason's sister, Connie Owens. *Id.* ¶¶ 11-18. White was not told the Report's contents before its publication and, therefore, not given a chance to have his exculpatory evidence from other witnesses included in the Report. Def. SOF ¶ 18. Janey herself repeatedly made public statements referring to the contents of the Report as "findings," starting with her press statement on May 14, 2021 when she released the Report. Pl. SOF ¶ 6, 31. The

REDACTED COPY FILED ON PUBLIC DOCKET

media conveyed that message from Defendants as well.  The Boston Globe ran a frontpage story immediately after the Report's release announcing in a banner headline:  "11 disturbing <u>revelations</u> in the investigative report on suspended BPD Commissioner Dennis White,"  and called the newly reported abuse "brutal."  Pl. SOF ¶ 8 (emphasis added).

Janey's public statements repeatedly conveyed two key themes.  First, White was an unrepentant domestic abuser who had committed the acts of abuse he was accused of in the Report.  She stated that she "will not turn a blind eye to domestic violence against Black women or any woman for that matter in the Boston Police Department" conveying that White had committed domestic violence against Mason, a Black woman in the BPD.  Pl. SOF ¶ 40.  Underscoring the point that White was guilty, she blamed him for not "expressing … regret … or contrition," and stated that returning him to be Commissioner "would send a chilling message to victims of domestic violence."  *Id.*  At the same time, she announced White's termination, reinforcing the message of his culpability.  *Id.* ¶ 36.

Janey's second theme against White was that he obstructed the investigation and caused officers not to cooperate. She cited as evidence "one retired officer" who, according to the Report, "said he received five phone calls directing him not to cooperate with this investigation." *See* Pl. SOF ¶ 7.  In a subsequent press conference, she stated: "It is clear that Dennis White's return as commissioner would … reinforce a culture of fear and a blue wall of silence in our police department."  Pl. SOF ¶ 44.  Significantly, the unidentified retired officer, whom Janey referenced, denied all the statements attributed to them in the Report, including that (i) they received calls not to cooperate, (ii) Mason "contacted the domestic violence unit multiple times to report allegations of physical abuse by White," when in fact the witness said they never spoke to Mason about any alleged abuse, and (iii) there had been any retaliation over the White case.

REDACTED COPY FILED ON PUBLIC DOCKET

Def. SOF ¶¶ 25-26.  Nonetheless, the media accepted the false information from Janey and in the Report and re-published it spreading Defendants' falsehoods further.[1]  *See* Def. SOF ¶ 12.

Deposition testimony has revealed other undisputed falsehoods in the Report, which significantly harmed White's reputation.  For example, it is now undisputed based on deposition testimony that White never "burned [Mason's] hair" or "stepped on her face," contrary to Defendants' publicizing those falsehoods in the Report.  Pl. SOF ¶¶ 24-25.  The rest of the abuse allegations in the Report are demonstrably false based on White's and other witnesses' testimony, which Defendants did not include in the Report or otherwise disclose to the public.  Pl. SOF ¶ 11-28; Def. SOF ¶ 25-26.

Janey made additional statements with actual malice that vilified White.  Janey knew some of her statements were false and was reckless as to the falsity of others.  Despite evidence of her own uncertainty and doubt, she publicly buried White with definitive statements of his guilt.  Her state of mind is at issue, and whether she acted with actual malice about White committing the alleged abuse and obstructing the investigation is a question for the jury.

---

[1]  In the Boston Globe article concerning the "11 disturbing revelations" from the Report, four of the top six were based on information allegedly obtained from this retired officer.  *See* Def. Ex. 18 at 1.  The Globe identified as Revelation #1 – the "Blue wall of silence" – and highlighted the alleged statement from the retired officer that they had received five calls not to cooperate.  *Id.* at 2.  The Globe identified as Revelation #3 – "White's former wife reported abuse multiple times" – and stated "a witness confirmed to the investigator that White's former wife contacted the domestic violence unit multiple times to report allegations of physical abuse by White." *Id.* at 3-4.  The witness whom the investigator attributed these statements to denied these statements at their deposition.  Def. SOF ¶ 26.  The Globe identified as Revelation #4 – "Disappearing records" – and that this witness said "'reports were made' at the time of the wife's calls" (Def. Ex. 18 at 4), which the witness has also denied (Def. SOF ¶ 26). The Globe identified as Revelation #6 – "Retaliation against domestic violence officers" – and cited the same witness as saying "officers in the domestic violence unit had been 'through hell and back' because of retaliation against them over the White case."  Def. Ex. 18 at 5-6.  At their deposition, this witness denied this fact and denied any retaliation occurred.  Def. SOF ¶ 26.  In fact, they were subsequently promoted to the Command Staff.  *Id.*

White was also entitled to a name clearing hearing, because Janey, through the Report and other public statements, labeled White as an abuser and as having caused others not to cooperate with the investigation, while terminating him.  Even public figures who are terminated and request a name clearing hearing are entitled to one, especially when the stigma concerns alleged criminality and not merely professional incompetence.  Access to the media is not enough in those circumstances.  *See infra,* sec. II.A. and B.

Finally, White is entitled to summary judgment on his privacy claim because Defendants unreasonably and wrongfully disclosed private information about him.  *See, infra,* sec. III.

Defendants' violation of his due process and privacy rights has caused White significant harm.  *See* Pl. SOF ¶ 46; Pl. Ex. 111 Horner Aff. ¶¶ 5-6.

<u>Argument</u>

**I.      White is entitled to a trial on his defamation claim.**

Janey's defamatory statements clearly were about White[2] and are provably false statements[3] of fact that she made with actual malice.  White is, therefore, entitled to a trial on his defamation claim.

---

[2]  Each of the statements challenged by Janey were made to the press specifically addressing either the release of the Report concerning White or his termination.  *See* Doc. No. 143 at 27-28. In that context, the statements are unambiguously "of and concerning" White.  Further, Janey's staff and the public understood these statements to refer to White.  Pl. SOF ¶ 40.  That is sufficient.  *See Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 777 (2003) ("A defamatory comment is made 'of and concerning' the person to whom the reader or recipient, correctly or mistakenly but reasonably, understands it was intended to refer.")

[3] Attached hereto is Plaintiff's Appendix in response to Defendants' Appendix (*see* Doc. No. 143 at 27-28) regarding Janey's defamatory statements.

REDACTED COPY FILED ON PUBLIC DOCKET

### A. Janey's false statements are not opinion but, rather, state directly or through innuendo that White engaged in violent domestic abuse and obstruction.

Janey made numerous false factual statements that directly or through innuendo communicated that White engaged in repeated violent domestic abuse against his family members, as conveyed in the Report, and obstructed the investigation.  *See* Def. SOF ¶ 65.

### 1. Janey made categorically false statements that White admitted abusing his former wife and niece during the investigation and pre-termination meeting.

In her June 7 press conference, Janey, in communicating that White engaged in acts of abuse against his family members, said "he stated in his [June 2] hearing and during the investigation that he has hit and pushed members of his household."[4]  Pl. SOF ¶ 40.  This was false.  While he stated he swatted his niece once with an open hand and pushed Mason (Pl. SOF ¶ 41; Def. SOF ¶¶ 28-31), he did not say he hit **and** pushed members (**plural**) of his household.  Even if a swat were a 'hit,' he did not say he hit multiple members of his household.  Most importantly, he told Janey that he acted in self-defense in these interactions.  *See* Pl. SOF ¶ 41; Def. Ex. 43 at 7:9-14.[5]  Janey went on to say she "will not turn a blind eye to domestic violence against Black women…", and "it is clear that Dennis White's return as commissioner would send a chilling message to victims of domestic violence…"  Pl. SOF ¶ 40.  Many, including her Chief of Staff, understood that, by these words, she was saying White committed domestic abuse against family members.  *Id.*

---

[4]  The June 2 'hearing' was closed to the public despite White's requests to have it open.  Pl. SOF ¶ 35.  Therefore, the public did not know the full context of White's statements during the meeting and would reasonably conclude based on Janey's statement that he admitted guilt.

[5]  White told Janey that he had only pushed Mason in self-defense to gain distance because she attacked him with physical aggression or physically prevented him from leaving the house.  *See* Pl. SOF ¶ 41; Def. SOF ¶ 32.

In a press interview on June 1, Janey also falsely stated that White "admitted" he hit his niece in "a fight around $10." Pl. SOF ¶ 30. White never said or admitted that he hit or swatted this woman over $10 (*id.*), and Janey's portrayal of White as resorting to 'hitting' over something so paltry was doubly libelous. In fact, White repeatedly told Janey he swatted his niece with an open hand <u>in self-defense</u> because she "attacked" him "kicking" his "seriously injured" knee, which injury "nearly cost [him his] police department career." *See* Pl. Ex. 80 (D. White Aff. 5/18/2021) ¶30; Pl. SOF ¶ 41; Def. Ex. 43 at 7:9-14. Another witness confirmed that White responded only after his niece kicked him in his knee. *See* Def. Ex. 17 (Report) at 6. Janey made direct statements that White admitted he committed the crime of assault against multiple family members, which he did not do. That alone is actionable.

### 2. Janey deliberately communicated the innuendo that White abused members of his household and obstructed a government investigation.

Additionally, Janey insinuated, through the simultaneous publication of the Report and terminating White, that he was responsible for all the abuse alleged in the Report and for fostering a climate of intimidation at the BPD and for obstructing the investigation. By repeatedly referring to the Report as "facts" and "findings," she further conveyed the (false) impression that the allegations against White were true. *See* Pl. SOF ¶¶ 6, 31, 42. Defamatory innuendo is actionable. *See Mabardi v. Boston Herald-Traveler Corp.,* 347 Mass. 411, 413 (1964) ("An insinuation may be as actionable as a direct statement."); *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 774 (2003) ("[D]efamation can occur by innuendo as well as by explicit assertion[.]", quoting *Brown v. Hearst Corp.*, 54 F.3d 21, 25 (1st Cir. 1995)).

To determine whether a defendant's statements are defamatory, the court must look at them as a whole and in the context in which they were published. *Stanton v. Metro Corp.*, 438 F.3d 119, 129–30 (1st Cir. 2006). Assessing the totality of the circumstances and the context of

REDACTED COPY FILED ON PUBLIC DOCKET

her remarks, not Janey's statements in isolation, establishes that Janey conveyed that White committed the abuse alleged in the Report and White obstructed a governmental investigation. *See Mabardi v. Boston Herald-Traveler Corp.,* 347 Mass. at 414 ("[W]hile the inference may not be a necessarily rational one, we cannot say that a considerable segment of the community would not make it. … Where this publication is susceptible of both defamatory and harmless meanings, a jury should have the opportunity to decide in what sense the public did understand it."). These accusations are indeed verifiable facts because they infer the crime of assault and obstruction of a government investigation. *See e.g., Shafir v. Steele*, 431 Mass. 365, 373 (2000); *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 62 (2d Cir. 1980) (allegation of obstruction of justice constitutes statement of fact for defamation).

A key aspect of the innuendo Janey created was her referring to the Report as "findings" and "facts" without any qualification as to what those facts or findings were.[6] *See* Pl. SOF ¶¶ 6, 31, 42. In one press interview, Janey said, "The investigation, the report that came out, is pretty clear in terms of what those findings were." *Id.* ¶ 31. Janey did not distinguish these 'facts' and 'findings' from the many egregious allegations of domestic abuse against White in the Report, including the allegations of abuse from the unidentified witnesses in the Report. *Id.* ¶¶ 5, 27; Def. SOF ¶ 35, 38. She thus conveyed the defamatory message that he committed all the abuse alleged in the Report. *See Stanton,* 438 F.3d at 128 (publication of plaintiff's photograph in conjunction with defamatory statement was defamatory, even in absence of express textual connection between photograph and statement and despite disclaimer of no connection).

---

[6] This too was a false statement as the investigator told the City she could not make findings. Def. SOF ¶ 22.

REDACTED COPY FILED ON PUBLIC DOCKET

Janey bolstered the innuendo by referring to White's former wife as a victim of domestic abuse by stating, "I will not turn a blind eye to domestic violence against Black women, or any women, for that matter in the Boston Police Department …"  Pl. SOF ¶ 40.  At the same press conference, Janey added to her message of White's guilt, blaming him because he had failed to "express[] … regret … or contrition."  *Id.*  She also indicated that White had lied about not committing domestic abuse,[7] thereby implicating him and also impugning his integrity.[8]  She simultaneously terminated White, which buttressed the message he was guilty of the abuse alleged in the Report.  Where "the communication is reasonably susceptible of a defamatory meaning," as here, "the ultimate issue" is for the jury even if the communication is also "reasonably susceptible of a … nondefamatory meaning."  *See Stanton,* 438 F.3d at 124-125, 128 (court "cannot say as a matter of law that too few readers … to constitute a considerable and respectable segment of the community" might reasonably draw a defamatory meaning, and thus dismissal reversed).

The other innuendo that Janey created was that White obstructed a governmental investigation.  At her May 14 press conference, Janey stated, "the investigation revealed a culture of fear and silence within the Boston Police Department[,]" and went on to elaborate about officers supposedly "being intimidated into silence for fear of retaliation."  *See Def. Ex. 23 at*

---

[7] Janey stated at the June 7 press conference:  "Dennis White has repeatedly asserted that the domestic violence allegations against him are false.  But he stated in his hearing and during the investigation that he has hit and pushed members of his household….The residents of Boston must have confidence that the officers charged with enforcing laws are themselves people of integrity."  *See* Def. Ex. 51 at 0:30.

[8] That too is actionable.  *See Sindi v. El-Moslimany*, 896 F.3d 1, 17 (1st Cir. 2018) (allegation of lying in professional context actionable); *Flamm v. American Assoc. of Univ. Women*, 201 F.3d 144, 147 (2d Cir. 2000) (describing attorney as unethical "in an otherwise fact-laden" context stated claim for defamation).

REDACTED COPY FILED ON PUBLIC DOCKET

1:37; *see also* Def. Ex. 19.  Then she immediately stated, "Dennis White's *own admitted behavior* does not reflect our values."  *See* Def. Ex. 23 at 1:37; *see also* Def. Ex. 19.  In doing so, she conveyed that White's behavior obstructed the investigation and contributed to this fear and silence.  Janey furthered this innuendo at the June 7 press conference by stating that:

> Dennis White failed to fully cooperate during this investigation and was a reoccurring presence at Police Headquarters while on administrative leave. At best, this behavior created confusion among officers, and at worst, it fostered a climate of intimidation during the investigation and beyond… It is clear that Dennis White's return as commissioner would…reinforce a culture of fear and a blue wall of silence in our police department.

Def. Ex. 51 at 1:57.  This was demonstrably false.  Then-Acting Commissioner Gregory Long testified that White's appearance at BPD headquarters did not intimidate anyone, interfere with the investigation, or cause any police officer not to participate in the investigation.  Pl. SOF ¶ 44.  Notably, Janey did not speak to officers about whether White's actions caused any intimidation or confusion.  *See* Janey Dep. Tr. 85:11-9.

Janey strengthened this charge by citing to the Report, telling the public a retired BPD officer "said he received five phone calls directing him not to cooperate with this investigation."  *See* Pl. SOF ¶ 7.  However, the officer who allegedly made these statements testified that they never received phone calls not to cooperate in the investigation.  Def. SOF ¶¶ 25-26.  These statements conveyed a false factual innuendo that White caused, at least to some degree, the BPD not to cooperate and impugned White's integrity as a law enforcement leader.

Janey's harmful innuendos are provably false and actionable.[9]  *See e.g. Smith v. Suburban Restaurants, Inc.*, 374 Mass. 528, 529–30 (1978) (reversing summary judgment and finding

---

[9]  *Arroyo v. City of Boston* is distinguishable.  No. 20-CV-12082-DJC, 2021 WL 2338879 (D. Mass. June 8, 2021).  In *Arroyo*, the Court held that the statements Mayor Walsh made "do not contain any objectively verifiable facts, but instead offer Mayor Walsh's opinion regarding his administration's response to this type of complaint and the allegations against Arroyo."  *Id.* at *7.

REDACTED COPY FILED ON PUBLIC DOCKET

letter copied to police that plaintiff was no longer welcome at the defendant restaurant because of her (unspecified) actions, was susceptible of defamatory interpretation); *Stanton v. Sentinel Printing Co.,* 324 Mass. 13, 14 (1949) (imputation of crime or bad character sufficient, but not necessary, for defamation).

### B. There is clear and convincing evidence that Janey made the defamatory statements with actual malice.

Viewing the evidence of actual malice in the light most favorable to the non-moving party, as is required on summary judgment, there is also clear evidence that Janey acted with actual malice. *See Lyons v. New Mass Media, Inc.*, 390 Mass. 51, 57 (1983).

> This inquiry is both subjective and time-sensitive, turning on 'the defendant's state of mind at the time of publication.' Since 'direct evidence of actual malice is rare,' *we have permitted actual malice to be proved through inference and circumstantial evidence alone*. For example, actual malice 'may be found where a publisher fabricates an account, … relies on a source where there is an obvious reason to doubt its veracity, or deliberately ignores evidence that calls into question his published statements.

*Sindi,* 896 F.3d at 16 (emphasis added). *See also Levesque v. Doocy*, 560 F.3d 82, 90 (1st Cir. 2009) (actual malice can be found where a defendant "fabricates an account, makes inherently improbable allegations, relies on a source where there is an obvious reason to doubt its veracity, or deliberately ignores evidence that calls into question his published statements"); *see also Hunt v. Liberty Lobby*, 720 F.3d 631, 643 (11th Cir. 1983) (finding actual malice where the investigation was "grossly inadequate" and the neutrality of the source was dubious); *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969) ("evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity").

Evidence of Janey's actual malice is shown by a combination of Janey's: (1) deliberate and material misrepresentation of statements she attributed to White; (2) reliance on unknown

REDACTED COPY FILED ON PUBLIC DOCKET

confidential witnesses; (3) deliberate refusal to consider evidence contradicting the allegations in the Report; (4) private communications that reflect her awareness of "discrepancies" in the abuse allegations against White and "uncertainty" as to what actually occurred; and (5) motivation to present an uncomplicated, unassailable factual basis against White, albeit a false one, to buttress her ongoing campaign for Mayor.

      1. <u>Janey deliberately misrepresented that White admitted certain abuse</u>.  As discussed, Janey misrepresented that White made statements during the June 2 'hearing' and investigation that he hit multiple members of his household and conveyed that he admitted these abuse allegations against him.  *See infra*, sec. I.A.  Janey also stated that White admitted he hit his niece in a fight around $10.  *Id.*  Those statements were knowingly false, as Janey knew that White asserted he was acting in self-defense and did not make these admissions of abuse.  *Id.* These statements alone constitute actual malice.  *See Murphy v. Boston Herald, Inc.,* 449 Mass. 42, 48 (2007) (knowledge of false statement establishes actual malice).  By concealing White's assertion of self-defense, Janey deliberately and materially changed the meaning of his words from the acceptable to the indefensible.  *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517-518 (1991) (falsely attributing words to plaintiff constitutes actual malice if it results in material change in meaning conveyed by plaintiff); *Reid v. Viacom Int'l Inc.*, No. 1:14-CV-1252-MHC, 2016 WL 11746046, at *16 (N.D. Ga. Sept. 14, 2016) (finding that defendants' decision to delete material from movie "was a deliberate effort to convey [an] alternative, more scurrilous representation…which Defendants knew not to be the case").  Based on this evidence alone, Janey is liable for defamation as she alleged White, in essence, admitted to crimes during the 'hearing' and investigation, knowing that he did not.  *See e.g., Shafir*, 431 Mass. at 373 ("imputation of a crime is defamatory per se").

REDACTED COPY FILED ON PUBLIC DOCKET

2. <u>Janey relied on unknown witnesses</u>.  After issuing the Report that described White's extreme and repeated abuse of Mason based on unidentified witnesses, Janey told the public in sweeping terms that he abused his family.  She underscored the message of his wrongdoing by terminating him.  Yet Janey did not know who the unidentified witnesses in the Report were or anything about their credibility.  Pl. SOF ¶ 2; Def. SOF ¶ 43.  Nor did she tell the public that she lacked that knowledge or that she was not basing her conclusions on the allegations from the unidentified witnesses (*see generally* Def. Exs. 19, 23, 37, 51), and thus "a considerable and respectable segment of the community" could conclude that these alleged witnesses were reliable and he did commit the abuse they attributed to him.  *See Stanton,* 438 F.3d at 128.

██████████████████████████████████████████████████████████████
██████████████████████████████████████████ Reliance on anonymous or biased sources is the paradigm case for actual malice.  *See St. Amant v. Thomson*, 390 U.S. 727, 732 (1968) (actual malice may be found where reasons exist "to doubt the veracity" of informant or where "unverified anonymous" source is relied on); *Holter v. WLCY T.V., Inc.*, 366 So. 2d 445, 455 (Fla. App. Ct. 1978) (reliance on anonymous source may constitute recklessness); *Sharon v. Time, Inc.* 599 F. Supp. 538, 583 (S.D.N.Y. 1984) (summary judgment precluded where reporter failed to provide information as to whether confidential sources were reliable, what sources told him, or otherwise established good faith for sources).

Aggravating the harm, Janey did not disclose to the public her lack of knowledge.[10] Instead, she conveyed the Report was reliable, consisting of "facts" and "findings".  Pl. SOF ¶¶

---

[10]  *See generally* Def. Exs. 19, 23, 37, 51.  In addition to Janey not knowing who the unidentified witnesses were, the investigator told Janey's staff and Janey testified she was aware that the investigator was unable to make credibility findings regarding these witnesses.  Def. SOF ¶ 22.

REDACTED COPY FILED ON PUBLIC DOCKET

6, 31, 42.  She thereby recklessly communicated to the public that these unnamed witnesses who alleged White's brutality were reliable and their statements accurate, which was false.  *See Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice"); *Lyons,* 390 Mass. at 57 ("A major basis for inferring actual malice involves examination of the sources used by the reporter," and denying summary judgment because article relied on biased sources in dispute with plaintiff).

Janey's blind reliance on the investigator, who did not even contact Tiffany White (Pl. SOF ¶¶ 3-4), constitutes actual malice when Janey had Tiffany's video affidavit with exculpatory information contradicting Mason's story of abuse (Def. SOF ¶ 61).  *See Harte-Hanks Commn's, Inc. v. Connaughton*, 491 U.S. 657, 689-93 (1989) (finding actual malice where publisher did not contact key witness, did not listen to recording of interview with her, and made no effort to independently interview her, when others had repudiated witness's story).  "[A] failure to pursue the most obvious available sources for corroboration may be clear and convincing evidence of actual malice." *Hopkins v. City of Gloucester*, 817 A.2d 436, 442 (N.J. App. Div. 2003); *see also Murphy*, 449 Mass. at 59 (evidence that reporter did not speak to key witness supported actual malice finding); *id.* at 760 ("When substantial doubts have been raised as to the veracity of a reporter's information, the purposeful failure to investigate known witnesses may be proof of actual malice."); *Kuhn v. Trib.-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981) ("a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth"); R. Smolla, 1 Law of Defamation § 3:52 (2d ed.) ("[F]ailing to contact an obvious source . . . may be probative of actual malice. . . .")

REDACTED COPY FILED ON PUBLIC DOCKET

3. Janey purposefully avoided contravening evidence. Janey purposefully avoided the truth by not considering the exculpatory evidence submitted by White.  Although Janey testified that "her team" reviewed the video statements from Tiffany White, Connie Owens and Dennis White, she does not know if she personally did so or what, if any, information from those sworn statements was provided to her.  Def. SOF ¶ 61.  Even though she had these statements that contradicted the allegations in the Report (Def. SOF ¶ 57, 61; Pl. SOF ¶ 13, 15-20) by witnesses whom she knew were under oath (Pl. SOF ¶ 14), she blindly credited the statements of the "victims and witnesses" in the Report whose identities she did not even know (Def. SOF ¶ 43). A reasonable juror could infer that she deliberately chose to disregard the evidence that Mason, not White, was the violent abuser.  "[T]he purposeful avoidance of the truth" supports a finding of actual malice.  *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692–93 (1989).[11]

4. Janey's private communications reflected her personal uncertainty.  In her Notice of Termination letter to White on June 7, she wrote that "the allegations and evidence create a cloud of uncertainty about the events and as a result, your fitness to lead the BPD."  Def. Ex. 59 at 1. She also wrote "I do not believe it is necessary to resolve the discrepancies between the report and the evidence you have provided."  *Id.*  This clearly demonstrates her own uncertainty and doubt about the truth of the allegations against White.  Yet, her public statements disclosed no doubt.  In her press statements, Janey communicated that White abused his family members

---

[11]  Janey's self-serving profession that she acted with a good faith belief in the truth of the statements, including the alleged statements of "the victims and witnesses" in the Report, is not sufficient as a defense.  A defamation defendant cannot prove the absence of actual malice on the basis of their own claim of good faith belief in the truth of their statements.  *See Lyons*, 390 Mass. at 58.  Whether the defendant acted in good faith is a question of fact for the jury.  *See id.*

REDACTED COPY FILED ON PUBLIC DOCKET

based on the "facts" and "findings" in the Report and his own "statements" and "admissions".

Pl. SOF ¶¶ 6, 31, 42.  She underscored the point by blaming him for not showing any "regret" or

"contrition".  *Id.* ¶ 40.  Janey chose to use *cautionary* language in her private communications

with White while using *definitive* terms in public statements.  Janey's unalloyed labeling of

White as a domestic abuser, without publicly communicating the countervailing evidence or even

any basis to doubt any of the allegations of abuse, is the hallmark of actual malice.  *See*

*Westmoreland v. CBS, Inc.*, 596 F. Supp. 1170, 1174 (S.D.N.Y. 1984) (actual malice may be

shown if speaker "knowingly or recklessly misstates the evidence to make it seem more

convincing or condemnatory than it is"); *Hopkins,* 817 A.2d at 442 (actual malice may be shown

if defendant aware of "inconsistencies … that contradict[] the … libelous assertions" publishes

them anyway).  A jury could reasonably infer that she acted with actual malice in her unqualified,

definitive public statements that White abused his family members.

     5. <u>Janey had an ulterior, political motive for libeling White</u>.  Janey had a personal interest

in presenting an unassailable picture of White as an abuser and part of the "blue wall of silence,"

namely, to advance her campaign for Mayor.  Def. SOF ¶ 48.  Evidence shows she involved her

campaign strategist to consult about her decisions regarding White, such as whether to publish

the Report and how to announce White's termination.  *Id*.  This self-serving motive supports a

finding of actual malice.  *See Harte-Hanks Commc'ns,* 491 U.S. at 667–68 ("it cannot be said

that evidence concerning motive or care never bears any relation to the actual malice inquiry");

*Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969) ("evidence of negligence, of motive

and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate

inferences, the fact of a defendant's recklessness or of his knowledge of falsity").

REDACTED COPY FILED ON PUBLIC DOCKET

White is entitled to a trial on his defamation claim because he has amply shown that Janey made defamatory factual statements about him with actual malice.

## II.     White's due process right to a name clearing hearing has been violated.

### A.   White did not get a name clearing hearing and he was ruinously harmed.

The elements of White's due process claim are described in *Wojcik v. Mass. State Lottery Commission,* 300 F.3d 92, 103 (1st Cir. 2002), and his right to a name clearing hearing has been articulated at length in his prior pleadings (Doc. No. 40 at 8-9; Doc. No. 46; Doc No. 51), which are incorporated herein by reference.  The only live question is whether White has obtained a hearing sufficient to satisfy his due process rights.[12]  He has not, as a matter of law, and is entitled to summary judgment on Count I.

In his Second Amended Complaint, White asserted a due process claim under state and federal constitutional law.  *See* Doc. No. 37-1 ¶¶ 135, 249.  In Massachusetts, courts have held that a person whose liberty interest has been violated has a right to a hearing with "notice of the specific charges, an opportunity to present witnesses, and, barring special considerations, an opportunity to cross-examine those who charge him with any wrongdoing on which the [governmental body] relied in discharging him."  *See Stetson v. Bd. of Selectmen of Carlisle,* 369 Mass. 755, 764 n.14 (1976); *see also Fontana v. Comm'r of Metropolitan Dist. Comm'n*, 34 Mass. App. Ct. 63, 67 (1993) (recommending a hearing that conforms to the *Stetson* hearing protocols).

---

[12]  In opposing White's motion to amend the complaint, Defendants argued that White had not adequately requested a name-clearing hearing (Doc. No. 44 at 2-3), which White opposed.  The Court decided that question in White's favor.  *See* Doc. No. 49 at 8-9.  Defendants have not made any new argument to challenge that decision, which is now law of the case. *See Naser Jewelers v. City of Concord, N.H.*, 538 F.3d 17, 20 (1st Cir. 2008); *King v. Driscoll*, 424 Mass. 1, 7-8 (1996), citing *Peterson v. Hopson*, 306 Mass. 597, 599 (1940).

REDACTED COPY FILED ON PUBLIC DOCKET

The First Circuit and other courts in this district have also indicated that a constitutionally appropriate name-clearing hearing should include the right to present and to cross-examine witnesses. *See Beitzell v. Jeffrey*, 643 F.2d 870, 879 (1st Cir. 1981) (right to name clearing hearing satisfied because plaintiff "had his lawyer present and was offered the opportunity to present, and to cross-examine, witnesses"); *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 649 (D. Mass. 2015) (right to name clearing satisfied because plaintiff "was represented by counsel, could cross-exam witnesses and put on evidence on his own behalf").

Many other circuits have also found that these procedural safeguards are required for a name-clearing hearing where the plaintiff has requested a hearing in connection with a stigmatizing termination from government employment, even if the plaintiff is a public figure with access to the media. In a case involving a limited purpose public figure with media access, the Second Circuit found that the plaintiff – an appointed municipal department head - was denied a name clearing hearing in violation of his due process rights. *See Patterson v. City of Utica,* 370 F.3d 322, 337-38 (2d Cir. 2004). The *Patterson* Court did not even discuss media access as a viable alternative to satisfy the plaintiff's due process rights, distinguishing its decision from *Baden v. Koch* (*see infra,* p. 20). *See Patterson*, 370 F.3d at 336-37 (noting that termination, as opposed to mere demotion as occurred in *Baden*, increases the importance of the process due the individual); *see also Donato v. Plainview-Old Bethpage Cent. School Dist.* 96 F.3d 623, 631 (2d Cir. 1996) (distinguishing *Baden* because it only concerned a "demotion" and thus only "implicated a 'weak liberty interest'").

In *Hostrop v. Bd. Of Junior College Dist. No. 515,* 471 F.2d 488 (1972), the Seventh Circuit found that a discharged college president – a limited interest public figure – was denied his due process right to a name clearing hearing when he was terminated, and that he is entitled

REDACTED COPY FILED ON PUBLIC DOCKET

to "notice of the evidence" against him, "a hearing before a tribunal possessing apparent impartiality, and a chance to present witnesses and confront adverse evidence at the hearing." *Id.* at 495.

In *McDonald v. Wise*, 769 F.3d 1202 (10th Cir. 2014), the Tenth Circuit found that a limited purpose public figure whose termination led to news coverage was entitled to a name-clearing hearing. The Tenth Circuit did not suggest that access to the media was sufficient. On the contrary, the Court found that "[t]he depriving governmental entity is generally responsible for the provision of due process." *Id*. at 1214. Being able to explain one's own side of the story "alone does not establish it was a name-clearing hearing." *Id*. at 1214. A non-public hearing is not adequate. *Id*. at 1214, citing *Gunasakera v. Irwin,* 551 F.3d 461, 470 (6th Cir. 2009) ("discussing the importance of a name-clearing hearing being comparably as public as the stigmatizing statements were in order to be effective").

Plaintiff has not found any case, and Defendants have cited none, where the court has found that a terminated employee with a right to a name clearing hearing, which they request, is not entitled to any process other than what they can avail themselves of through the media, even if they are a public figure of some sort. While courts have held that the nature of the name clearing hearing will depend on the circumstances, "the degree of harm" is relevant, and that "the greater the harm to an individual's reputation, the greater the corresponding process should be." *See McDonald,* 769 F.3d at 1213. Here, Defendants, in the process of terminating White, labeled him guilty of (i) repeated and brutal crimes of violence against his ex-wife and violence against his niece, and (ii) undermining the investigation and contributing to the BPD's "blue wall of silence" and officers not cooperating with and not disclosing information to outside investigators. Both labels are false, and both have ruined him. *See* Pl. SOF ¶ 46. He is entitled,

therefore, to a public name clearing hearing with an opportunity to present evidence and to cross-examine witnesses, which he requested and never received.

    **B.  Defendants' case law is distinguishable.**

    _Baden v. Koch_, 799 F.2d 825 (2d Cir. 1986), concerned a "weak liberty interest" because the plaintiff was only demoted, not terminated.  *See id.* at 831. Further, the adverse statements against the plaintiff Chief Medical Examiner concerned only 'poor judgment' in his job performance.  *See Baden v. Koch*, 638 F.2d 486, 489 (2d Cir. 1980).  Despite the adverse treatment, the plaintiff "maintained a supervisory position and there is nothing in the record[13] to show that Baden as an M.D. cannot obtain government or non-government employment using his skills in forensic medicine."  *Baden*, 799 F.2d at 830.  White is in a completely different position.  White was accused of violent criminal conduct and obstructing a governmental investigation.  White was terminated, not demoted to his previous supervisory role.   As supported by the expert opinion of Timothy Horner of Kroll, LLC it is now impossible for White to secure employment in private security consulting or in law enforcement.  Pl. SOF ¶ 46.  In any event, White does not need to make that showing.  *See Patterson*, 370 F.3d at 330, n. 1 (where allegations "implicate the plaintiff's good name or honor, such as criminal allegations…, it is not necessary for plaintiff to prove that future employment opportunities were foreclosed in order for his claim [for a name clearing hearing] to be successful").[14]

---

[13]  This matter came before the Second Circuit on a full record after a lengthy trial on the plaintiff's due process claim, which he won.  *Baden,* 799 F.2d at 828.  That may also have served, in effect, as a name clearing hearing.

[14]  The Second Circuit in *Patterson* found as a matter of law that the plaintiff did not receive an adequate post-termination name clearing hearing and that, after 4 years, it is unlikely that a proper hearing would "reverse any ill effects suffered by plaintiff from the inadequacy of the former hearing."  *Patterson,* at 338.  Accordingly, the Court ordered that the jury verdict be

REDACTED COPY FILED ON PUBLIC DOCKET

*Grimaldi v. New Castle County*, 2018 WL 3435019 (Del. 2018).  The court dismissed the plaintiff's stigma plus lawsuit on summary judgment because he did not request a name clearing hearing after he was terminated.  *Id*. at *3.  Only in *dicta* did the court state that a name clearing hearing would not have accomplished more because he was a public figure and had access to the media and had taken advantage of it to get out his version of events. *Id.* at *5, *8.  By contrast, a name clearing hearing, at minimum, would allow White to demonstrate to the public the untruth of the allegations against him, as critical information was concealed from White and the public about the identity of the key witnesses and the falsity of allegations attributed to them in the Report and by Janey.  White did not learn their identities until the Court ordered disclosure.

*Liotta v. Borough of Springfield*, 985 F.2d 119 (3rd Cir. 1993).  The plaintiff Borough Administrator was charged with lying and stealing.  The plaintiff did not contend he had a "liberty interest" that was violated.  But the Court, *sua sponte,* found that if he did, the "evidentiary hearing" he had where witnesses were called to testify before the Borough council, the plaintiff was "free to call additional witnesses" if he wanted, and presumably he had the right to cross-examine adverse witnesses (though the decision does not say), was constitutionally sufficient.  *Id.* at 120, 123.

*D'Allessandro v. City of Albany*, 2008 WL 544701 (N.D.N.Y. 2008).  The court held that, because the statute (CPLR Article 78) provides a hearing for a municipal officer who challenges his termination as arbitrary and capricious and contrary to law, the officer cannot claim he was denied a name clearing hearing because the Article 78 process and hearing satisfies his constitutional due process rights.  *Id*. at *13-14.  While the court noted, in dicta, when a public

---

reversed and that the case be remanded to the trial court for a trial on damages resulting from the denial of due process.  *Id*.

REDACTED COPY FILED ON PUBLIC DOCKET

figure has access to the media, a post-deprivation hearing is not necessarily required because the option of calling a press conference is available, citing to *Baden*, the plaintiff in *D'Allessandro* in fact had a name clearing hearing through his Article 78 remedy. *Id*. *14,

    *LaForgia v. Davis*, 2004 WL 2884524 (S.D.N.Y. 2004). The court found that the plaintiff was not entitled to a name clearing hearing because, *inter alia*: (i) the plaintiff had not requested one; and (ii) the mayor's statements at most went to the plaintiff's competence. *Id*. *7-9. In dicta, the court further noted that the plaintiff was a public figure and, citing to *Baden*, the district court held that the plaintiff therefore had access to the media and made use of that access to refute the Mayor's comments about the termination. *Id*. at *9. The court did not find that access to the media would alone have been sufficient.

    *Doe v. Kerry*, 2016 WL 5339804 (N.D. Cal. 2016). The court held that plaintiffs' liberty interest was not violated because the government is authorized to transmit records relating to criminal convictions. *Id*. *25. In dicta, the court noted, any process that was due was provided because the individuals had actual criminal trials to challenge the criminal charges at issue. *Id*.

    *Senra v. Town of Smithfield*, 715 F.3d 34 (1st Cir. 2013). This case concerns a due process "property" claim, not "liberty interest" claim. *Id*. at 38. There was no alleged harm to the reputation of the dismissed employee and, thus, no need for a post termination hearing. *Id*. at 39.

    *Esposito v. Metro North Commuter Railroad Company*, 856 F. Supp. 799 (S.D.N.Y. 1994). The court found against the plaintiff on summary judgment because the basis for termination – bad professional judgment – was not sufficiently stigmatizing to support a constitutional claim. *Id*. 804-06. The court also found that the plaintiff had failed to show that

REDACTED COPY FILED ON PUBLIC DOCKET

the allegedly stigmatizing statements had foreclosed the plaintiff from obtaining employment. *Id.* 807.

By contrast with these cases, the statements against White were ruinously stigmatizing, he was terminated and has been foreclosed from employment in his field, he requested a name clearing hearing, he did not have one, and a name clearing hearing would have been productive in restoring his reputation.[15]

### C. A meaningful name clearing hearing would have enabled White to clear his name.

If White received a timely name clearing hearing, he would have been able to clear his name and to demonstrate the flaws in the Report and the untruth of the accusations against him, assisted by the following important information which he has learned in discovery and would have been able to elicit from witnesses at the hearing.

1. Janey made her statements without knowing who the unidentified witnesses were. *See* Pl. SOF ¶ 2. That fact, which White learned in discovery, will help demonstrate that the Report was not vetted in the slightest and, as discussed above, was flawed and depended on ███████

████████████████████████████████████████████████████████

2. White will be able to show that Sybil Mason is not credible. While Mason says that the children and others never observed any abuse, Tiffany (her daughter) and Connie (her sister) recount incidents where they observed Mason physically assault others, including White and Tiffany. *Id.* ¶¶ 15-20. These witnesses' accounts are detailed and consistent with each other, and

---

[15] A previously cited case, *Moody v. County of Santa Clara*, 2018 WL 2267662 (N.D. CA 2018), is also distinguishable. In *Moody*, the plaintiff was terminated on grounds of professional negligence only, and he had an opportunity to seek and obtain a public, trial-like hearing with witnesses and the right to cross-examine adverse witnesses. *Id.* *1-2. Accordingly, the Court dismissed his due process claim, while also noting that the plaintiff as a public figure had access to the media to assist in clearing his name, citing *Baden.* The charges against White were far more damaging and he had no opportunity for a trial-like hearing.

REDACTED COPY FILED ON PUBLIC DOCKET

they have no motive to lie, unlike Mason who did.  *Id.*  For example, Mason fabricated one incident where she alleged White stomped on her legs as she tried to escape under a bed.  *See* Pl. SOF ¶ 19.  As Tiffany testified, Mason actually was the perpetrator of this incident against Tiffany, when she was a young child.  *Id.*

The evidence shows that Mason did not assert allegations of abuse until White told her that he was filing for divorce on May 4, 1999.  Pl. SOF ¶ 21, 23.  Within 24 hours, she asserted the first allegation of abuse, and she falsified that report.  Pl. SOF ¶ 21.  She also told the police there had not been any physical abuse in the relationship but changed that story subsequently.  *Id.*  One witness has testified that Mason admitted she made up the allegations of abuse against White to get the house in divorce proceedings.  *Id.* ¶ 23.  Mason also apparently participated in an overtime fraud scheme as a police officer calling her truth telling into serious doubt.  *See id.* ¶ 22.

3.  <u>Mason's own testimony shows that certain abuse described in the Report never happened</u>.  ██████████████████████████████████████████████████████

████████████████████████████████████████████  The Report also says that "witnesses stated…Dennis coerced Sybil into sexual activities in which she did not wish to participate."  Def. Ex. 17 (Report) at 16.  But Mason testified White purportedly suggested certain sexual activities and that she agreed to do "anything he asked" "because I did love him."  Pl. SOF ¶ 24.  There was no abuse here.

4.  <u>The Report falsely attributed information about abuse to "a witness who was Sybil's friend."</u>  *Id.* ¶ 25.  The Report states that this witness said that Mason told her White burned her hair, put her face to the stove and stepped on her face."  *Id.*  The witness stated at her deposition

REDACTED COPY FILED ON PUBLIC DOCKET

that Mason never told her that, and she never told the investigator these acts of abuse happened. *Id.*

5. <u>The Report stated that Mason kept a diary which contained descriptions of abuse, yet evidence contradicts that story</u>. *Id.* ¶ 26. ████████████████████████████████████

████████████████████ Yet in 1999, after she changed her story and began to say there were other acts of abuse when questioned by BPD's Internal Affairs, IA asked her if she could say when they happened. *Id.* Even though she allegedly had a diary with the dates, she said she was unable to tell them when the alleged abuse happened. *Id.* If the diary existed, Mason could have provided dates.

6. <u>The Report indeed conveyed false and highly defamatory information from "a retired BPD officer."</u> The Report states "a retired police officer" "confirmed that Sybil repeatedly reported both physical and mental abuse to the [Domestic Violence Unit] during [the marriage with White], but that no IAD investigations resulted until [Mason] obtained a restraining order in 1999." Def. SOF ¶ 26.; Def. Ex 17 (Report) at 13. However, that witness testified under oath that they do not recall ever speaking with White or Mason on any matter and they never spoke with Mason about any allegation of abuse that Mason made against White.[16] Def. SOF ¶ 26. This witness also denied the other statements attributed to them in the Report. *See supra*, fn.1.

The false information attributed to this witness conveyed the highly damaging message – rebroadcast by Janey and the media – that Mason had for years been complaining of abuse to the

---

[16] This witness testified that they recall only one incident report being filed of alleged domestic violence involving White and Mason which their unit received in 1999, and their only role was to ensure that the written report was forwarded to the district and to IA for investigation. Def. SOF ¶ 26. That report concerned the alleged threat to shoot which Mason made in May 1999, immediately after White told her he was divorcing her. See Def. Ex. 17 (Report) at 7-12. White denies making the threat, and Mason dropped the restraining order as soon as he acquiesced on divorce demands she was making. *See* Pl. Ex. 80 (D. White Aff. 5/18/2021) ¶¶ 19-27.

REDACTED COPY FILED ON PUBLIC DOCKET

DVU, it was covered up and the members of the DVU were punished for pursuing these abuse reports. Janey conveyed the additional message, based in part on this witness, that the investigation was marred by witness intimidation which White contributed to. *See supra,* sec. I.A.2.; *see also* Def. SOF ¶ 25; Pl. SOF ¶ 7. A name clearing hearing would set the record straight.

7. <u>The video deposition of White's niece demonstrates an unreliable witness.</u> The niece stormed out of her deposition after only 20 minutes, after shouting at the attorney taking the deposition and smashing her soft drink can on the desk repeatedly. Pl. SOF ¶ 28. It was a tense and explosive incident. *Id.* It was alleged in the Report for the first time that White had made sexual advances to this niece and threw her out of his house after she rebuffed him and told Sybil. *Id.* ¶ 27. But this was a completely different story from what the niece told the police when she reported the incident in 1993. *Id.* At that time, she made no mention of any sexual harassment or advances. *Id.* ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

8. <u>The investigator never met with any of the witnesses in person or by Zoom other than Dennis White and did not put them under oath.</u> Pl. SOF ¶ 1. It is very difficult to test the credibility of a witness through a telephone call. A public name-clearing hearing would have allowed (i) the public to evaluate more reasonably the credibility of the witnesses, rather than simply accepting the Report and Janey's statements about it as the media did, and (ii) White to restore his reputation.

REDACTED COPY FILED ON PUBLIC DOCKET

The Court should find that Defendants violated White's right to a name clearing hearing and allow a trial on damages.  *See Patterson v. City of Utica,* 370 F.3d 322, 338 (2d Cir. 2004) (finding 4 year delay made effectiveness of name clearing hearing "unlikely" and thus trial on damages for due process violation ordered); *Huntley Community School Bd. of Brooklyn, N.Y.,* 543 F.2d 979, 986  (2d Cir. 1976) (reversing and remanding to trial court to determine appropriate relief for denial of name clearing hearing, including any resulting damages plaintiff can prove he sustained); *McGhee v. Draper*, 639 F.2d 639, 644 (10th Cir. 1981) (compensatory damages appropriate for harm caused by denial of name clearing hearing).  The trial on this claim and White's other claims would constitute White's name clearing hearing.

**III. Defendants violated White's privacy rights when they made the Report public.**

**A.  The Report constitutes private information that the public did not have a right to see.**

The Report constitutes the result of Defendants' investigation of White to determine whether to reinstate or terminate him as Commissioner of the BPD.  It contains highly personal information about White, relating to his family and private health information.  It also constitutes personnel record information.  Based on well-established Massachusetts law, that kind of information is private, and the public has no right to see it.

In *Wakefield Teachers Assoc'n  v. School Comte. of Wakefield,* the Supreme Judicial Court (Marshall, J.) held that an investigative report generated for potential disciplinary purposes regarding a public employee constitutes "personnel" information, as that is defined in the statutory exemptions to the public records law.  *See* 431 Mass. 792, 796-98 (2000), citing M.G.L. c. 66, sec. 10 (public records law) and M.G.L. c. 4, sec. 7, Twenty-sixth (c) (listing exemptions). Such information is "absolutely exempt from disclosure." *Id.* at 799.  The decision in *Worcester Telegram & Gazette Corp. v. Chief of Police of Worcester*, is consistent.  *See* 58 Mass.App.Ct. 1

REDACTED COPY FILED ON PUBLIC DOCKET

(2003).  In *Worcester*, the Massachusetts Appeals Court distinguished investigative raw materials in an IA file from "the single, integrated report" that the court determined was protected from disclosure in *Wakefield.  See id.* at 9-10.  Indeed, the court in *Worcester* held that a similar investigative "memorandum[]" "detailing the findings of the internal affairs investigation" was similarly private "personnel information" that should not be disclosed to the public despite its contrary holding regarding an IA file.  *See id.*

The Report concerning White is also a "single, integrated report" for the purpose of determining White's status, including possible termination.  Janey relied on the Report to make the decision to terminate him.  Def. SOF ¶ 7.  The Report was placed in White's personnel file, as the Notice of Intent to Dismiss states.  Def. SOF ¶ 46.  Therefore, it is akin to the reports in *Wakefield* and *Worcester* that the courts found to be private, personnel information that the public had no right to see.  Defendants violated White's right to privacy when they released the Report to the public.

## B. The Massachusetts privacy statute prohibits employers from "gathering and disseminating" private information, which Defendants violated.

In the employment context, the Massachusetts privacy law prohibits employers from unreasonably "gathering and disseminat[ing]" private information concerning an employee.  *See Dasey v. Anderson*, 304 F.3d 148, 153-54 (1st Cir. 2002).  For there to be a violation, there must be both gathering and disseminating to third parties, and the information must be private.  *See id.* (no privacy violation because information was only used for disciplinary decision and "'gathering and dissemination' element has not been met"); *O'Brien v. DiGrazia,* 544 F.2d 543, 546 (1st Cir. 1976) (no privacy violation where Police Commissioner asked for financial information of officers to ensure integrity, without disclosure to public or other governmental agencies); *Broderick v. Police Comm'r of Bos.,* 368 Mass. 33, 34, 43-44 (1975) (no privacy

violation; no disclosure of private information; court only held that Police Commssioner has right to investigate own officers regarding complaints of misconduct); *cf. Tower v. Hirschorn,* 397 Mass. 581, 586-87 (1986) (disclosure of plaintiff's private medical information by her former physician to at least two others violated GL c. 214, sec. 1B).[17]

Also, the disclosure of private information must not be "unreasonable." *See Dasey*, 304 F.3d at 153, citing G.L. c. 214, sec. 1B. "In determining whether there has been a violation of § 1B in the employment context, it is necessary to balance the employer's legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure." *Ayash v. Dana-Farber Cancer Inst.,* 443 Mass. 367, 383 (2005) (internal quotes omitted).[18]

As the Massachusetts courts have held, the public does not have a right to obtain investigative reports generated by a public employer that constitute 'personnel' information and, thus, disclosure of such a report is unreasonable as a matter of law. *See Wakefield,* 431 Mass. at 796-98; *Worcester,* 58 Mass.App.Ct. at 9-10.

---

[17] The media cases cited by Defendants are not applicable because they do not involve an employer gathering private information and then disseminating it; they only concern the media's dissemination of purportedly private information. *See Howell v. Enterprise Pub. Co., LLC,* 72 Mass. App. Ct. 739 (2008); *Riley v. Harr*, 292 F.3d 282, 298 (1st Cir. 2002). Nor is *Albright v. Morton* applicable, because it did not involve the wrongful disclosure of private information. *See* 321 F. Supp. 2d 130, 134 (2004) (plaintiff did not have privacy claim as he was paid for defendants' right to use his information).

[18] *Mulgrew v. City of Taunton,* which Defendants rely on, holds only that it was reasonable for a police chief to provide information about the plaintiff's poor job performance in response to the City Council's request. There, the City Council had authority to reinstate the plaintiff but voted not to after receiving the information. *See* 410 Mass. 631, 633-34, 637 (1991). By contrast, here, Defendants were not responding to a request for information; they were the decisionmakers regarding White's status as Commissioner. They had no obligation to disseminate the Report.

REDACTED COPY FILED ON PUBLIC DOCKET

Further, the facts disclosed in the Report were of a private nature. They concerned information about White's family, and specifically, accusations of abuse.[19] *See Polay v. McMahon,* 468 Mass. 379, 383-84 (2014) ("Nowhere are expectations of privacy greater than in the home, and '[i]n the home ... *all* details are intimate details....'"). It was especially unreasonable to disclose information based on unidentified and unsworn witnesses where the allegations were so serious and ruinous and were contradicted by others in the family who were not interviewed, including Mason's daughter and sister. Contrary to Defendant's argument, the information in the Report was not already in the public sphere; as the Globe reported, it contained many significant 'revelations.' *See* Def. Ex. 18. Also, Janey did not give White an opportunity to respond, instead she published the Report within hours of providing a copy to White even though she had received the Report more than two weeks earlier. Janey was not required to disclose the Report and could have still terminated White.

The facts disclosed in the Report also concerned confidential health information, which constitutes highly sensitive and protected personal information. *See Wakefield,* 431 Mass. at 799 (medical information "absolutely exempt" from public record law); *Ayash,* 443 Mass. at 385 (health information "exceedingly personal"). Further, the health information allegedly came

---

[19]  Defendants argue that because White asserts the information about alleged abuse is false, this is a false light claim which is not recognized in Massachusetts law. *See* Doc. No. 143 at 10. This misconstrues White's claim and the law. White's claim is based on the public disclosure of private, 'personnel' information about him, which Defendants collected and disseminated. Even if White asserts the information regarding abuse in the Report is false, he still has a claim arising from the wrongful disclosure of this 'personnel' report. *See Wakefield,* 431 Mass. at 796-98; *see also Haggerty v. Gobe Newspaper Co.,* 383 Mass. 406, 407-408 (1981) (plaintiff had viable invasion of privacy claim where articles published based on "unsubstantiated" information about him from his government personnel files). Even if Defendants were correct, the disclosure does concern true facts – namely, that White's ex-wife and niece *accused* him of abuse (as well as certain confidential witnesses) – and the disclosure of the fact of those *accusations* has caused him significant harm.

REDACTED COPY FILED ON PUBLIC DOCKET

from a confidential Guardian ad Litem ("GAL") report generated when White and Mason were getting divorced.  *See* Def. Ex. 17 (Report) at 14.  In that report, the GAL ███████████ ████████████████████████████████████████████████████████ *See id.*  There was absolutely no reason for Defendants to disclose this confidential health information to the public.  *See Tower v. Hirschorn,* 397 Mass. at 586-87 (disclosure of plaintiff's private health information violated GL c. 214, sec. 1B).  Further, any information from a GAL report is deemed highly confidential pursuant to Standing Order 2-08, and GAL reports are required to be impounded and "unavailable for public inspection."  *See* Pl. Ex. 71, Standing Order 2-08. Defendants' disclosure of this alleged health information from the GAL report was unreasonable as a matter of law.

In light of White's strong privacy interest in his family and in his health information, and clear public policy against the disclosure of any information from a GAL report, it was unreasonable as a matter of law for Defendants to disclose the Report to the public and summary judgment should be granted in White's favor.  Alternatively, White is entitled to a trial as to whether Defendants' decision to publish the Report was unreasonable and violated his privacy.

## Conclusion

For these reasons, the Court should deny Defendants' motion for summary judgment in its entirety and allow White's cross-motion for summary judgment on his due process claim (Count I) and his privacy claim (Count IX).  The trial on White's defamation claim would also serve as a trial on damages arising from Defendants' denial of a name clearing hearing and for violation of White's privacy rights.  The trial would constitute White's name clearing hearing.

REDACTED COPY FILED ON PUBLIC DOCKET

Respectfully submitted,

DENNIS WHITE,

By his Attorneys,

*/s/ Nicholas B. Carter*
Nicholas Carter (BBO No. 561147)
Elizabeth Gardon (BBO #711867)
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02110
Telephone: 617-720-2626
ncarter@toddweld.com
egardon@toddweld.com

Dated: February 29, 2024

REDACTED COPY FILED ON PUBLIC DOCKET

## APPENDIX

| # | Statement | White's Position[20] |
|---|-----------|---------------------|
| 1 | "An independent investigation into the allegations against Dennis White was recently completed.  In addition to the facts of this case, the investigation revealed a culture of fear and silence within the Boston Police Department." | Part of innuendo that White obstructed a government investigation |
| 2 | "Other officers were intimidated into silence for fear of retaliation." | Part of innuendo that White obstructed a government investigation |
| 3 | "Dennis White's own admitted behavior does not reflect our values." | Part of innuendo that White abused members of his household and obstructed a government investigation |
| 4 | "What came out in this investigation, by Dennis White's own admission, is that he struck a 19-year-old woman over a fight around $10," Janey said.  "That came out, his words. You know, at this point, it is time to move forward and we need to have leadership in our department that would not reinforce the blue wall of silence, that would not deter other victims of assault, of abuse from coming forward." | Demonstrably false. *See supra* sec. II.A.1. Part of innuendo that White abused members of his household and obstructed a government investigation |
| 5 | "The investigation, the report that came out, is pretty clear in terms of what those findings were." | Part of innuendo that White abused members of his household and obstructed a government investigation. |
| 6 | "[Dennis White] stated in his hearing and during his investigation that he has hit and pushed members of his household." | Demonstrably false. *See supra* sec. II.A.1. Part of innuendo that White abused members of his household and obstructed a government investigation |
| 7 | "...Dennis White's actions in recent weeks have done even more to erode public trust in his judgment and ability to lead." | Part of innuendo that White abused members of his household and obstructed a government investigation |
| 8 | "Dennis White failed to fully cooperate during this investigation." | Part of innuendo that White obstructed a government investigation |

---

[20] As to Defendants' arguments regarding the issues of "material falsity" and whether the statements are "of and concerning" White, he has addressed these issues in the body of his memorandum.  *See supra* sec. I.

REDACTED COPY FILED ON PUBLIC DOCKET

| 9 | "[Dennis White] was a recurring presence at police headquarters while on administrative leave.  At best this behavior created confusion among officers and at worst it fostered a climate of intimidation during the investigation and beyond." | Part of innuendo that White obstructed a government investigation |
|---|---|---|
| 10 | "As commissioner he failed to lead by example and did not seem to understand the importance of cooperating with an investigation." | Part of innuendo that White obstructed a government investigation |
| 11 | "It is clear that Dennis White's return as Commissioner would send a chilling message to victims of domestic violence in our city and reinforce a culture of fear and a blue wall of silence in our police department." | Demonstrably false. As Janey's Chief of Staff testified, he understood this to mean that Dennis White abused members of his household. Pl. SOF ¶ 40.<br><br>Part of innuendo that White abused members of his household and obstructed a government investigation |
| 12 | "I will not turn a blind eye to domestic violence against black women, or any women, for that matter." | Part of innuendo that White abused members of his household. |
| 13 | "The residents of Boston must have confidence that the officers charged with enforcing laws are themselves people of integrity." | Part of innuendo that White obstructed a government investigation and lied about not abusing members of his household. |
| "Janey's publication of the investigative report (and the statements in it), and Janey's statement that the report consisted of "findings" and her simultaneous termination of Dennis White." | | |