UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS WHITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil No. 21-10952-LTS |
| | ) |
| THE CITY OF BOSTON and | ) |
| ACTING MAYOR KIM JANEY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

MEMORANDUM AND ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT (DOC. NOS. 142, 146)

August 19, 2024

SOROKIN, J.

Dennis White served as the Commissioner of the Boston Police Department ("BPD") for two days in February of 2021. Martin Walsh, then the Mayor of Boston, placed White on administrative leave when "serious" and "disturbing" allegations of domestic abuse from his past resurfaced in the press. E.g., Doc. No. 143-3 at 3.[1] Walsh's temporary successor, Kim Janey, ultimately fired White in June 2021, after an investigation ordered by Walsh concluded. In this lawsuit, White advances three causes of action before the Court now after discovery and extensive summary-judgment briefing by the parties.

Though the underlying events and the record before the Court raise a number of challenging issues, most of them have little to do with the merits of the claims now pending.

---

[1] Citations to "Doc. No. __" reference documents appearing on the Court's electronic docketing system. Pincites are to the page numbers in the ECF header or, where applicable, to numbered paragraphs within the document.

This case is not about whether Janey had cause to remove White from the position of Commissioner. The Court previously dismissed that claim. It is not about whether the process White was afforded before his termination was adequate under state or federal law. The state courts determined that it was. It is not about whether White was qualified to be Commissioner in 2021, whether he was the best person for that role when Walsh appointed him to it, or what process a mayor should follow in selecting and vetting a police commissioner. Elected officials, not judges, make those decisions. It is not about whether, in the course of the dissolution of White's first marriage, he wronged his ex-wife, or she wronged him. The federal courts generally are not an appropriate forum for allocating blame between parties to a divorce finalized decades ago.

Instead, this Court is tasked with answering three straightforward questions. First, did Janey, with actual malice, make public statements of fact about White that were false? Second, did Janey violate a Massachusetts right-to-privacy statute when she authorized the release of the independent investigator's report? And third, did Janey and the City violate the United States Constitution by denying White a formal, trial-like, post-termination opportunity to clear his name by publicly refuting the aspects of the investigator's report he claims were false?

After careful consideration of the law and the record, and even viewing the evidence in the light most favorable to White, the Court finds the answer to each of these questions is "no." For the reasons explained below, the defendants' motion for summary judgment (Doc. No. 142) is ALLOWED as to each remaining claim, and White's cross-motion (Doc. No. 146) is DENIED.

I.   <u>LEGAL STANDARDS</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In

reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The moving party bears the initial burden of demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of [their] case with respect to which [they] ha[ve] the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant does so, then the nonmovant must identify facts sufficient to establish a genuine issue for trial.  Skyview Fin. Co., LLC v. Kearsarge Trading, LLC, 616 F. Supp. 3d 152, 157 (D. Mass. 2022).

These standards are not altered where the Court confronts cross-motions, which "simply require" the Court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Adria Int'l Grp., Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).  The Court "review[s] each motion independently" and "view[s] the record in the light most favorable to the nonmoving party when doing so."  Dahua Tech. USA Inc. v. Feng Zhang, 988 F.3d 531, 539 (1st Cir. 2021) (cleaned up).

White's three remaining claims in this action are for defamation and violations of his rights to privacy and procedural due process.  The Court will describe here the general elements of such claims, leaving for later sections of this Memorandum a more detailed recitation of the standards governing them.

A defamation claim under Massachusetts law requires a plaintiff to show: "(1) the defendant made a false statement about him to a third party; (2) the statement . . . could damage the plaintiff's reputation in the community; (3) the defendant was at fault in making the statement; and (4) the statement either caused economic loss or is actionable without economic loss."  Landino v. Mass. Teachers Ass'n, 621 F. Supp. 3d 185, 191 (D. Mass. 2022) (cleaned up).

If the plaintiff is a public figure, as White concedes he is for purposes of this case, he must also "prove, by clear and convincing evidence, that the defendant published the false and defamatory material with 'actual malice.'" Murphy v. Bos. Herald, Inc., 865 N.E.2d 746, 752 (Mass. 2007) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)).

Chapter 214, section 1B, of the Massachusetts General Laws (the "Privacy Act") grants "a right against unreasonable, substantial or serious interference with" a person's "privacy." To prove a violation of the Privacy Act, a plaintiff must establish, among other things, that the defendant "had no legitimate reason for" having disclosed "facts of a highly personal or intimate nature." Spencer v. Roche, 755 F. Supp. 2d 250, 271-72 (D. Mass. 2010). "The statute . . . was not intended to prohibit serious or substantial interferences which are reasonable or justified." Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 N.E.2d 912, 914 (Mass. 1991).

Finally, in some circumstances, procedural due process protections are implicated "where a public-sector employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge." Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 103 (1st Cir. 2002). Because such an employee has a constitutionally protected liberty interest in their reputation, the Due Process Clause obligates "the employer to provide the employee with an opportunity to dispute the defamatory allegations." Id. If the employer "fail[s] to provide an adequate name-clearing forum" upon request, the employee may bring a "stigma-plus" claim under 42 U.S.C. § 1983 "for the deprivation of a liberty interest without due process." Id. Courts determine the amount of process the Constitution requires in a given set of circumstances by "weigh[ing] the strength of the [plaintiff's liberty] interest, the risk of erroneous deprivation, the probable value . . . of requested additional procedures[,] and the [employer's] interest in providing (or not providing) those procedures." Baden v. Koch, 799

4

F.2d 825, 831 (2d Cir. 1986) (citing <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976)); <u>see</u> <u>Clukey</u>

<u>v. Town of Camden</u>, 717 F.3d 52, 59 (1st Cir. 2013) (identifying <u>Mathews</u> as providing the

framework for determining "[e]xactly what sort of notice and what sort of hearing the

Constitution requires," the answer to which depends "on the particulars of the case").

 With these standards in mind, the Court moves on the events that led to this lawsuit.

II. <u>FACTS</u>

 In this section, the Court describes the material facts that are undisputed, either because

the parties describe them that way or because the record reveals no dispute.  Where disagreement

exists, the Court notes the different positions supported by the record.[2]  The events at issue span

several decades, and the summary-judgment record is substantial.  Because White's federal claim

requires a context-dependent analysis, it is necessary for the Court to carefully review all of the

facts so that it can explain its evaluation of that claim and its resolution of the pending motions.

 A. <u>1981 to January 2021: White, Mason, and Their Family</u>

 White met Sybil Mason in high school, and the two married in 1981.  Their daughter,

Tiffany, was born the following year.  After several years as a Boston firefighter, White began

his career with the BPD in 1989, the year after he and Mason had welcomed their second

daughter, Brittany.  The family lived in Dorchester in a three-story, two-family house that they

occupied as a single home.

---

[2] The Court draws the facts from the record evidence cited by the parties in the summary-
judgment papers, including several audio and/or video exhibits that the Court has reviewed.
Doc. Nos. 143-2, -23, -42, -51, -60; Doc. Nos. 147-18, -19, -23, -31.  It is the parties'
responsibility to retain the audio and video exhibits and make them available upon request
(except to the extent any are sealed).  D. Mass. L.R. 79.1(a)(1).  Though certain exhibits are
sealed, the Court advised the parties at the July 30, 2024, motion hearing that its Memorandum
and Order resolving the motions would not be redacted or sealed and would recount whatever
information was necessary to explain its resolution of the issues presented.  No party objected.

Late in the summer of 1993, Mason's nineteen-year-old niece was living in the home with White's family. She was moving out on September 10, 1993, following a conflict (the nature of which is disputed, and which the Court need not resolve), when White came home. White asked the niece to return the keys and some money she owed him, and a confrontation ensued. It is undisputed that the niece lashed out verbally and physically; that White steered her by the arm out of the home; that the niece kicked White's knee, where he had suffered an injury some time before these events that had put him out on leave; and that White reacted to the kick by striking his niece with an open hand. It is also undisputed that White was at least a dozen years older, and much larger, than his niece.

Promptly after the incident, White and his niece filed dueling assault-and-battery complaints. Though both were later dismissed, the niece was granted an abuse-prevention order against White, and the BPD conducted an internal affairs ("IA") investigation. A neighbor who had witnessed part of the altercation spoke with investigators and described what he had observed—including White striking his niece. When interviewed at the time, White admitted to having struck his niece with an open hand after she kicked him. In her own statements at the time, the niece asserted that White had punched her and thrown her down the stairs—claims IA investigators determined were not credible. In early 1994, the IA process concluded with a finding that the charge of "physical abuse" was not sustained, because investigators believed that White had struck his niece reflexively, in self-defense. White has never denied that he struck his niece. Nor has he disputed that he was subject to a one-year, state-court-issued, abuse-prevention order as a result of the September 1993 event. Nothing before the Court suggests there were any further conflicts between White and the niece after the 1993 incident.

In 1994, Mason became a police officer and joined White as a member of the BPD. Sometime in the mid-1990s, White and Mason informally separated.  They continued residing together in the Dorchester home, but with White occupying the upper floors and Mason living on the first floor.  Both White and Mason have described their relationship as one characterized by distrust and arguments that sometimes turned physical.  By the fall of 1998, well after the couple had separated, White suspected Mason was involved with another BPD officer, so he followed her one day when she left their home.  He confronted her in the street outside the other officer's home, and she drove away with the other officer.[3]  Several weeks afterward, either while he was on duty or just after he had finished a shift, White ran into a woman named Linda, who was a mutual friend of his and Mason's.  He and Linda spoke about Mason's relationship with the other officer, and White described his encounter with Mason outside that officer's home.  White told Linda he had felt "so hurt" that he "could have shot them both."  Doc. No. 143-17 at 18. Linda did not report this conversation as a threat to either Mason or the authorities at the time.

Sometime in April of 1999, White told Tiffany (then seventeen years old) not to startle him when coming upstairs while he was sleeping, explaining that he kept his service weapon under his pillow.  By early May, Mason had learned of White's statement to Linda and his warning to Tiffany.  Suggesting they were both threats intended for her, Mason filed an incident report with the BPD on May 4, 1999.  According to that report, Mason described the alleged threats and stated that she and White "had argu[]ments in [the] past, but no physical abuse." Doc. No. 147-3 at 2.  The detective who took the report spoke with Mason, Tiffany, and Linda,

---

[3] When IA detectives investigated these events, they interviewed the officer with whom Mason left that day.  He told investigators that White later came to his home and delivered a threat-laden warning to stay away from Mason.  See Doc. No. 143-17 at 9.  White admits he went to this officer's home and spoke with him but denies having made any threats.  Doc. No. 147-14 ¶ 23.

and ultimately referred Mason to the domestic violence unit ("DVU") at BPD headquarters and to the state Probate Court.  The detective also noted that Mason expressed having experienced "marital problems" with White "for a long time," and feeling like "the department was not taking her seriously" despite prior contact with a DVU investigator.  Doc. No. 143-17 at 11.  No other DVU records are before the Court.

White filed his own incident report on May 4, 1999, after Mason placed a series of angry phone calls to the station where he was working at the time.  The next day, Mason obtained an abuse-prevention order against White after a hearing at which he was not present.  A state-court judge extended that order after a hearing attended by both Mason and White later in May 1999.  As a result of the order, White had to move out of the Dorchester home, and Mason was granted temporary custody of their children.  White also had to surrender his firearms, and his license to carry a gun was suspended.  Meanwhile, Mason spoke with BPD detectives conducting an IA investigation of White's alleged threats.  She reported mutual fighting, as well as verbal and physical abuse and other controlling behavior by White, throughout the couple's marriage.

White filed for divorce in mid-May 1999.  Doc. No. 150-2 at 3.  By late June, as they negotiated the terms of the divorce, White and Mason agreed that the abuse-prevention order would be terminated early, and that White could return to his portion of the Dorchester home but would continue to leave his service weapon at work.  As a result of this agreement, and at the request of White and Mason, the state court lifted the abuse-prevention order approximately six weeks into its year-long term.

The IA investigation into Mason's complaint continued.  After speaking with Mason, investigators interviewed Linda, White, the officer White believed had been having an affair with Mason in the fall of 1998, and an officer who was with White when he spoke with Linda in

8

December of 1998.  White met with investigators in early July of 1999 for an audio-recorded

interview.  After giving his account of the circumstances surrounding both alleged threats Mason

had reported, White acknowledged that the couple "always had problems," "[o]ff and on," and

that "[s]ometimes" those problems turned physical.[4]  Doc. No. 143-1 at 21.  Though he told

investigators that the "last . . . physical confrontation was ten years ago," he admitted he "[m]ight

have" broken Mason's glasses at some point.  Id.  He agreed it was "fair to say" there had "been

physical abuse in the past," "on both sides."  Id. at 21-22.  When asked whether "there [were]

instances where [Mason] precipitated this physical abuse," meaning that "she started it first,"

White responded: "I'd say both.  Some instances, myself.  I probably started it.  I['m] not proud

of it."  Id. at 22.

The IA process concluded in October of 1999, with investigators recommending that the

charge of nonconformance with the law (which arose from White sleeping with his gun under his

pillow) was "not sustained,"[5] but the charge of exercising unreasonable judgment (which arose

from White's statement to Linda that he "could have shot" Mason and the other officer) should

be sustained.  IA supervisors initially concurred with the investigators' recommendations.

However, the latter determination was changed in April 2001, after White expressed a desire to

appeal it.  Upon review by a member of the BPD's Command Staff, who decided that "the

subjective interpretation" of White's statement was "not conclusive enough to sustain a rules

---

[4] In some places, the written transcript of this interview includes lines that are partially obscured or cut off in the copies provided to the Court.  See generally Doc. No. 143-1.  The Court has reviewed the transcript while listening to the audio recording of the interview, Doc. No. 143-2, and confirmed the content in those places.  The exchange quoted in the text here arises approximately twenty minutes into the audio recording.  Later in the interview, White told investigators that police had been called to his house during a confrontation with Mason that had occurred "12 or 13 years ago," before he was a police officer.  Doc. No. 143-1 at 29.  In that instance, the responding officers told White to leave, and he complied.  Id.
[5] White had ceased this practice by the time he was interviewed by IA investigators.

violation," the finding on the charge of exercising unreasonable judgment was downgraded to "filed." The revised resolution reflects a determination that the allegations were "serious enough that the matter should remain on file pending further developments." Doc. No. 143-17 at 15.

White and Mason finalized their divorce in January of 2001. They shared joint legal custody of Brittany, with Mason having primary physical custody. By then, Tiffany was emancipated. They continued to live in separate areas of the Dorchester home until Mason refinanced the mortgage and bought out White's share. Thereafter, White remarried, he and Mason went their separate ways, and the record suggests they maintained a civil relationship when family events brought them together. That apparently remained the case for twenty years, until the events that precipitated this lawsuit.

In those two decades, White steadily advanced within the BPD despite the 1993 and 1999 IA complaints. He became a Sergeant Detective in 2007, then a Lieutenant in 2012. Doc. No. 147-14 at 3. With Walsh's approval, White was promoted to the Command Staff in 2014. Id. He became Chief of Staff to then-Commissioner William Gross in August 2018, again with Walsh's support. Id. White held that position for two-and-a-half years, until Gross "abruptly retired" on Friday, January 29, 2021. Doc. No. 143-4 at 3.

B.    Early February 2021: White's Appointment and Administrative Leave

Walsh appointed White to replace Gross as Commissioner, swearing him in on February 1, 2021, the first business day after Gross stepped down. Upon learning of Gross's departure and White's selection as his successor, reporters for The Boston Globe ("the Globe") began digging into White's background. The Globe collected publicly available court filings and requested records from the BPD, including White's IA file. Within days, the Globe had obtained court documents that contained information about Mason's allegations of domestic violence by White during their marriage. The Globe presented that information to the Walsh administration on

10

Wednesday, February 3, 2021.  The records at issue concerned "allegations that White pushed and threatened to shoot his then-wife, also a Boston police officer, and was later ordered to stay away from his family."  Doc. No. 143-4 at 3.  Walsh promptly placed White on paid administrative leave, stating publicly that the "disturbing issues" the Globe had discovered "were not known to [Walsh] or [his] staff, but should have been at the forefront."  Id.  At Walsh's direction, the City hired a lawyer to perform "a full and impartial investigation" into the allegations against White.  Id.  By Thursday, February 4, 2021, the City had identified Tamsin Kaplan, an employment lawyer and partner at the Boston law firm Davis Malm, as the independent investigator it intended to retain.  Her engagement was formalized about a week later.  Doc. No. 143-17 at 2; Doc. No. 151 ¶ 7.

Walsh's decision to place White on leave so soon after announcing his appointment, and the allegations that led him to do so, became the subject of immediate and intense interest by the media and the public, in Boston and beyond.  In the twenty-four-hour period following White's suspension, at least five major Boston news outlets and one national outlet published reports describing these events.[6]  Doc. Nos. 143-3 to -8.  These news reports marked the beginning of a four-month period in which painful and intimate details impacting multiple members of White's family were aired publicly.  The first round of reports described in varying levels of detail what was then known about the allegations against White.  Generally speaking, they described one or more of the following:  accusations from 1999 that White pushed, hit, and threatened to shoot Mason; a restraining order corresponding with those allegations, which required White to leave his home, stay away from his family, and surrender his firearm; White's warning to Tiffany that

---

[6] The Court limits its focus to those articles the parties have submitted as part of the summary-judgment record.

he slept with a gun under his pillow; excerpts from divorce filings in which Mason claimed
White had hit her, White denied having done so, but White conceded "incidents of fighting" that
included "physical contact by both" spouses; inconsistencies White had highlighted in Mason's
allegations, including the fact that she had denied physical abuse in her initial May 1999 incident
report; White's filing of a police report against Mason for harassment in May 1999; White's
general denial of having abused or threatened Mason; the absence of any criminal charges
against White; and White's "long history of public service." E.g., Doc. No. 143-4.[7]  The initial
set of news reports also raised "questions about what vetting, if any, was done" before White's
swift appointment, and noted systemic transparency and accountability issues in the BPD.  Id.

On February 15, 2021, a new perspective on the allegations against White emerged in the
media when Tiffany spoke with a WGBH reporter.  Doc. No. 143-10.  She called the 1999
allegations by Mason "a lie," saying she had never witnessed White "being violent towards"
Mason.  Id. at 3.  According to Tiffany, White "never hit" Mason, and the only "aggressive
behavior" in the home had been "initiated by" Mason, who "put her hands on" White and threw
things at him.  Id.  Tiffany's statements—and those of others who criticized the decision to
suspend White on the basis of decades-old allegations that had yielded no criminal charges—
were also the subject of reporting by other news outlets, including the Globe and the Boston
Herald.  Doc. Nos. 143-11, -12.  This set of articles summarized the underlying allegations
previously reported, recounted White's denial of the claims, and noted that supporters of White
had spoken out on his behalf, expressing concerns that he was being treated unfairly.

---

[7] The reporting at the time did not name Mason or Tiffany.

C.    Late February to April 2021: The Investigation

While these news reports were circulating, Kaplan was making preliminary efforts to collect information pertinent to her investigation.  On February 24, 2021, however, the City halted the investigation, only to direct Kaplan to resume it several days later, for reasons the record does not reveal.  See Doc. No. 147-6.  By this time, White had retained attorney Nicholas Carter of the law firm Todd & Weld.  The day after the investigation resumed, Carter wrote to the City to express White's understanding that Walsh had intended to reinstate him, his dismay that the investigation was proceeding and likely would not conclude before Walsh left Boston, his concern about the scope of the investigation, his belief that the investigation was a "delay tactic," and his refusal to participate in an investigation that was "not being undertaken in good faith."  Doc. No. 143-13 at 2.[8]

On March 5, 2021, the Globe reported that the Walsh administration had refused to release White's IA file.  The article described general transparency concerns about the BPD, including in other recent cases of interest.  Regarding White, the report noted IA investigations in 1993 (for improper use of force) and 1999 (at which time one charge of unreasonable judgment was deemed inconclusive), and it described the 1999 restraining order.  The article ended by noting the "controversy" around White's appointment had "spilled" his "family history into public view."  Doc. No. 143-14 at 7.  It referenced Tiffany's recent statement supporting him, described a social-media post by Brittany accusing Tiffany of a "personal vendetta" against Mason and saying White "ain't innocent," and noted Mason had promised in a brief social-media post that "the truth will come out."  Doc. No. 143-14 at 7.

---

[8] By mid-May 2021, this letter was publicly available; it was attached to filings in state court, which the media could and did access.  See Doc. No. 143-24.

Walsh became the U.S. Secretary of Labor and resigned as Boston's Mayor in late March 2021.  Kim Janey became the Acting Mayor and promptly scheduled a meeting with White and Carter to discuss the investigation.  That meeting occurred by video on April 1, 2021.[9]  White participated from his office at BPD headquarters.  Shortly thereafter, Carter wrote a letter to the City insisting there was "no basis for any investigation," let alone "a free-wheeling, unbounded one," but expressing White's agreement "as an accommodation to" Janey to participate in the investigation subject to limitations he identified.[10]  Doc. No. 143-16.  The letter also acknowledged that the 1999 allegations had been made "publicly" during White's divorce from Mason, and it characterized the outcome of the IA investigation at the time as having "exonerated" White.[11]  Id. at 2.  Carter also quoted from a March 18, 2021, affidavit he had obtained from the detective who took Mason's 1999 complaint.  That detective opined Mason had been motivated by anger arising from "the divorce" White "had initiated," and that White had not made any "real threat" to "commit violence against her."  Id.

A few days later, the City directed Kaplan to limit her investigation "to information contained in and related to Commissioner White's personnel records and Internal Affairs files, court documents related to the Internal Affairs files and the [criminal-history] check, and to information from witness interviews, including an interview with Commissioner White relating to the revised scope of the investigation."  Doc. No. 143-17 at 4.  The criminal-history check

---

[9] These events arose amid the COVID-19 pandemic, so many of the interviews and meetings involved occurred via telephone or zoom.

[10] The limitations impacted the scope (White proposed a focus on the 1999 complaint by Mason only) and the nature of background information he would consent to producing (agreeing only to a criminal-history check).  Through Carter's letter, White declined to participate in the sort of full-scale vetting often experienced by candidates for major public offices.

[11] The latter assertion was inaccurate.  As noted, the undisputed facts demonstrate the IA process yielded an initial finding that one charge was "sustained," a determination later changed to "filed" but never downgraded to "not sustained."

revealed nothing.  Kaplan reviewed the other files and records and interviewed seven witnesses besides White.

Kaplan conducted a video interview of White on April 15, 2021.  White participated from his office at BPD headquarters, and Carter was present with him.  On Carter's advice, White refused to answer questions regarding his medical history and sexual encounters with people other than Mason (including whether he had any extramarital affairs).  He answered all of Kaplan's other questions.  Four days later, Carter sent letters to the City and Kaplan expressing his "concerns about whatever report might be issued."  Doc. No. 147-8; see Doc. No. 147-9.  He cited the need for fairness and due process, acknowledged that the Report "may become public," and warned that it would "be proven a complete sham" if it contained "new, false allegations" against which White had "not been given a meaningful opportunity to defend himself."  Doc. No. 147-8 at 3.  Writing separately to Kaplan, Carter objected to a question Kaplan had posed in which she suggested White had "admitted to 'violently' pushing" Mason.  Doc. No. 147-9 at 2.  According to Carter, White's pushing "was occasionally necessary," when Mason "would physically block his way" out of the home, and was not "violent."  Id.  He concluded by asking Kaplan to consider "a process to ensure that [her] report does not contain errors of this kind."  Id.

Carter wrote to Kaplan again on April 21, 2021, asking to receive a copy of her report before it was issued so that he could make comments and request corrections.  See Doc. No. 143-17 at 5.  Kaplan demurred, explaining she would not allow Carter "or anyone else to preview or suggest revisions" to her Report.  Id.  She requested a follow-up interview with White "to address some additional questions" in light of "commentary" by Carter in his letters.  Id.  This time, Carter demurred.  He directed Kaplan to submit any further questions in writing.  Kaplan

declined, inviting White to speak with her "directly to provide any clarification or additional information he wished"—an invitation White, in turn, declined.  Id. at 6.

Kaplan produced to the City a memorandum she prepared as her final report on the investigation on April 29, 2021 (the "Report").  As this Court has explained previously:

> The Report made no findings regarding any misconduct by White.  It offered no assessment of the credibility of witnesses interviewed during the investigation. And, it conveyed no recommendations regarding any future course of action, including White's termination or reinstatement.  Rather, it summarized information gleaned from documents, interviews with witnesses who accused White of misconduct, and information from White and others disputing those accusations.

Doc. No. 49 at 3.  The first several pages set out how Kaplan conducted her investigation.  In addition to identifying limitations on White's cooperation, she described Carter's active involvement as White's counsel for the duration of the investigation.  Kaplan recounted acts and decisions by various City personnel other than White that impacted the progress and scope of her work.  See, e.g., Doc. No. 143-17 at 3.  She described challenges she faced in locating and contacting BPD witnesses, and she noted witnesses who did speak with her expressed reluctance about participating in the investigation and being identified by name.  This explained Kaplan's decision to omit from the Report the names of most witnesses.

The bulk of the Report conveyed the "substance of [the] investigation."  Id. at 6 (capitalization omitted).  Kaplan described the 1993 altercation between White and his niece, the October 1998 incident where White followed Mason to another officer's home, the December 1998 conversation in which White said he "could have shot" Mason and the other officer, the April 1999 warning to Tiffany about the gun under White's pillow, and the May 1999 incident reports and the initiation of divorce proceedings.  As to each of these topics, Kaplan recounted information contained in the related IA files (which generally included summaries of witness interviews conducted close in time to the relevant events), information contained in any related

16

police reports or court documents, the outcome of the related IA matter, and information witnesses provided to Kaplan during her investigation.  In some places, Kaplan quoted witnesses, either as their statements appeared in underlying police or court records or as they were made to her directly.  Regarding the 1993 incident, Kaplan described an allegation by the niece that White had made "a sexual advance" toward her that in some way triggered the altercation.  In the very next paragraph, Kaplan noted White had denied this claim during his interview with her.

The Report later recounted allegations of domestic abuse by White against Mason beyond those that were the focus of the IA complaints.  These allegations were attributed, in whole or in part, to four witnesses.  The record establishes that one of the unnamed witnesses who provided this information was Mason.  This is no surprise, given the nature of the allegations.  Considered alongside the information explored in connection with the 1999 IA investigation, what emerges is a tumultuous relationship marked by arguments that often became physical, spurred by mutual distrust and suspicions of infidelity running in both directions.

The final three single-spaced pages of the Report related the substance of White's interview with Kaplan and a written statement by White that Carter emailed to Kaplan after White declined to sit for a second interview.  The Report noted White's specific denials of many of the allegations against him.  Besides "physical pushing" initiated by both of them, White denied any other physical contact during arguments with Mason.  He conceded having followed Mason in late 1998, having said he "could have shot them both" when he talked to Linda about that encounter months later, and having warned Tiffany about the gun he kept under his pillow in April 1999, but he denied that any of these incidents were intended or reasonably understood as threats.  Doc. No. 143-17 at 18-19.  In the written statement he sent after the interview, White noted he had "agreed to release [his] IAD records" because of his belief in transparency and

"strengthen[ing] community trust in the BPD." Id. at 20.  He expressed that his own experience

had led him to develop and support programs aimed at assisting other "officers who are

experiencing difficult personal relationships" and mental health issues.  Id.  It does not appear

that White conveyed to Kaplan—or to IA investigators reviewing these events in the past—

allegations that Mason had violently attacked him or any other member of the household.

     D.    May 2021: Intent to Terminate and Ensuing Litigation

     Sometime between April 29 and May 14, 2021, Janey read the Report and discussed it

with her staff.  On the morning of May 14, 2021, Janey notified White that she intended to fire

him.  She provided a letter identifying the reasons for her decision and included the Report as an

attachment.  This was the first time White received the Report.  According to Janey's letter, she

intended to dismiss White for four reasons:

- The information contained in the [Report] regarding complaints of domestic violence and abuse filed in 1993 involving your then-niece-by-marriage and in 1999 involving your then-wife, and your responses thereto.  It is particularly concerning that you failed to demonstrate an appreciation for the reasons for the public's concerns about these incidents when you were assuming the leadership of the BPD.

- As the Police Commissioner you were being investigated on a matter of public interest and concern.  Your lack of cooperation and judgment during that investigation including your initial refusal to complete forms for a background check, refusal to answer all questions posed by the investigator, and your refusal to meet for a follow-up/second interview are particularly troubling.  As Commissioner, you serve as a role model and represent the entire Department and must conduct yourself in a manner befitting that position.

- You appeared for your interview with the independent investigator in the BPD Commissioner's office, as well as at other times at BPD headquarters, while on administrative leave.  Such conduct, at the very least, gave the appearance that you were still in charge and raised the potential for confusion.  At worst, your presence was a reminder of the power of the Police Commissioner and may have intimidated some of the witnesses who were asked to participate in the independent investigation.  This reflects poor judgment.

- At no time during the investigation into the earlier domestic violence allegations did you express any appreciation of the importance of domestic violence concerns to the public or how it might affect the public's perception of the ability of the BPD to respond to incidents of domestic violence. Your approach to the concerns raised about the domestic violence allegations against you was consistently dismissive and uncooperative, which reflects poor judgment given your role as the leader of the BPD that is regularly called upon to address domestic violence in our community.

Doc. No. 143-22 at 2-3. Janey directed White to appear for a termination hearing that afternoon, invited him to provide any information he wanted her to consider before she made her final decision, and advised that he could be represented by counsel at the hearing. Id. at 3.

White promptly filed a lawsuit in state court against the City and Janey seeking to prevent his termination. Though that prevented Janey from proceeding with the hearing, she held a brief press conference about the status of the investigation and released a redacted version of the Report to the public.[12] Janey cited her commitment to transparency and accountability as having motivated her decision to release the Report. See Doc. No. 143-19 at 3-4; Doc. No. 143-23. At least half of Janey's prepared remarks, which she delivered in approximately five minutes, concerned general transparency and accountability issues and her efforts to pursue reform in those areas. Janey made three statements in her May 14 press conference that are at issue in White's defamation claim.[13] Two statements described Kaplan's investigation as having "revealed a culture of fear and silence" at the BPD, with some officers having been "intimidated into silence for fear of retaliation." The third described "White's own admitted behavior" as "not

---

[12] This version redacted names of witnesses to the relevant events, including Mason, the niece, and Linda. White received from Janey an unredacted copy of the Report, providing him notice of all witness names Kaplan included, but not those of the confidential witnesses.
[13] The statements White claims were defamatory are identified by both parties in attachments to their opening summary-judgment briefs. See Doc. No. 143 at 27-28; Doc. No. 147 at 38-39.

reflect[ing] our values."  Later the same day, Carter held his own press conference.[14]  Doc. No. 143-20 at 2.

In the wake of these events, the Globe published a pair of stories about the Report and White's lawsuit.[15]  Doc. No. 143-18.  One piece summarized the press conferences and the Report, along with some background on the events leading to them.[16]  Id. at 11-17.  The other identified "disturbing revelations" that were "uncovered" by the investigation.  Id. at 2.  Of the eleven items listed, only three concerned the details of the domestic violence allegations.  See id. at 4-5, 9 (highlighting portions of the Report describing allegations that White abused Mason and assaulted his niece and noting a witness report that Mason had reported abuse more than once).  The rest related to matters ancillary to White's alleged conduct, see id. at 5-7, 10 (describing the change in the 1999 IA ruling, retaliation a DVU detective allegedly experienced after the 1999 events, and that "many city police" including White do not live in Boston), and issues Kaplan encountered when conducting the investigation, see id. at 3, 5, 7-8 (describing "[b]lue wall of silence," missing DVU records, the City's decision to stop and then restart the investigation, and "meddling" in the investigator's work by both the City and Carter).[17]

---

[14] Before the press conferences, Carter was in touch with a journalist who sought a statement regarding what they expected Janey's announcement would be.  See Doc. No. 143-21 at 2 (disputing Janey's authority to remove White and calling his treatment unlawful).

[15] The parties have not submitted any other examples of such reporting immediately following the May 14 events.

[16] In this piece, the Globe reported that "Gross urged [Walsh] to appoint White," his "longtime friend," and that Walsh did so without any "public process," "vetting," consideration of "other candidates," or even "interview[ing] White for the job."  Doc. No. 143-18 at 14.  None of these facts appear in the Report.

[17] The record contains an email Carter received from a member of the media on May 15, 2021, reflecting that reporter's interest in "the puzzling chronology of the investigation," as described in the Report, rather than in the details of the alleged domestic abuse.  Doc. No. 143-24 at 2.

On May 18, 2021, in the state-court lawsuit, White submitted a sworn affidavit in which he articulated six objections to the independent investigation.  Doc. No. 147-14 ¶¶ 13-18.  He provided his version of the events underlying the 1999 IA investigation, see id. ¶¶ 19-29 (including his response after the bolded phrase "What actually happened?"), and addressed the 1993 altercation with his niece, see id. ¶¶ 30-31 (providing context but conceding he "swatt[ed] her away with a swing of [his] arm" and an "open" hand). White also responded to the other reasons Janey had identified in her May 14 letter as providing cause for his termination, saying he had cooperated with Kaplan, identifying "only four visits" he recalled having made to his office at BPD headquarters during his leave, and claiming he "had very minimal contact with anyone at the BPD during the[] visits."  Id. ¶¶ 32-34, 42-44.  White's affidavit was filed publicly, and it was the subject of reporting by at least two Boston media outlets.  See Doc. No. 143-25 (linking to the complete affidavit and describing a second affidavit in which Gross disputed Walsh's public claims that he was not aware of White's IA history); see Doc. No. 143-26 (describing and quoting from White's pleadings after a state-court hearing).

After the state court denied White's request for injunctive relief, Doc. No. 1-1 at 345-52, Carter wrote to the City on May 25, 2021, to request a "robust" and public termination hearing, with live witnesses subject to cross-examination, Doc. No. 147-16 at 2.  Carter requested the disclosure of four categories of information in advance of the hearing: Kaplan's complete investigation file, Mason's and White's IA files, and all communications between the City and Kaplan.  Id. at 2-3.  He also sought to depose Kaplan.  Id. at 3.  The letter repeated White's assertion that he "visited his office on four occasions (for legitimate purposes) during his administrative leave."  Id.

White unsuccessfully appealed the state trial court's ruling to a Single Justice of the Supreme Judicial Court.  See Doc. No. 1-1 at 359-60 (denying interlocutory review and "discern[ing] no error of law or abuse of discretion" in the trial court's "thoughtful and detailed" decision).  On May 28, 2021, the day after the Single Justice's ruling, Carter wrote to the City again to request "a name-clearing hearing" with live witness testimony, and he reiterated the discovery requests set forth in his previous letter.  Doc. No. 147-17 at 2.  Carter also urged the City to make White's pretermination hearing public, stating White "welcomes public scrutiny because . . . the public deserves to know" the truth.  Id.

     E.      May 29 to June 7, 2021: Termination Hearing and Decision

Over Memorial Day weekend in 2021, White made his own efforts to ensure "public scrutiny" of information supporting his defense against the allegations.  On May 29, 2021, Tiffany appeared in Carter's law office for a videotaped and sworn statement.  For approximately forty minutes, Carter posed questions, which she answered under oath.  She described her parents' relationship, characterizing Mason as the aggressor and White as a victim of repeated domestic abuse, both physical and verbal.  Tiffany recalled witnessing confrontations between her parents starting before she was seven years old and continuing until 1993 or 1994. She said White's responses to Mason's aggression included asking her to stop, trying to leave the home, taking Tiffany to his parents' house, and crying.  Tiffany denied that White responded physically in general, though she recalled seeing him grab Mason by the wrists once and push her aside once in a hallway so he could leave.

Carter probed Tiffany's own relationship with Mason, as well as Mason's relationships with other adults in her life.  Tiffany responded with emotional descriptions of episodes of physical and verbal abuse directed at her by Mason throughout her childhood.  She also identified by name a series of adults she characterized as Mason's "lovers," several of whom she

said had lived in the Dorchester home for periods of time before Mason and White finalized their divorce.  According to Tiffany, each of these relationships featured arguments and physical altercations, some of which she witnessed and described.  Carter also asked Tiffany questions about the 1993 incident involving White and her cousin, and about the 1999 warning about the gun under White's pillow.  As the video statement concluded, Tiffany denied having been contacted by Kaplan.

The next day, Carter took a similar sworn, videotaped statement from Connie Owens, who is one of Mason's sisters.  For about thirty minutes, Carter questioned Owens in her home about examples of Mason's temper and aggressive behavior from their childhood through adulthood.  Owens described confrontations she witnessed between Mason and White, saying they argued often.  The most physical contact she witnessed was Mason bumping up against White's chest and pointing a finger in his face while yelling at him, and White once grabbing Mason by the arms.  Generally, she said, White would walk away when Mason berated him. Owens never saw either of them hit the other.  Carter asked Owens about Mason's abuse of Tiffany, and Owens described having seen one such event (and having immediately intervened). Owens also described Mason's tumultuous relationships with other romantic partners, naming many of the same individuals Tiffany had identified and describing some of the physical fights she had witnessed or learned of from others.[18]  According to Owens, she never witnessed the types of abuse described in the Report.  She did not speak with Kaplan.

Carter provided the pair of video statements to Janey on May 31, 2021, claiming they proved that White "did not hit or otherwise commit any violence toward" Mason, and that Mason

---

[18] White took the position that his extramarital affairs, if any, were outside the bounds of Kaplan's investigation for all purposes.  Nevertheless, he elicited the same sort of information about Mason during these video statements.

was "a violent and abusive person" toward her family and others.  Doc. No. 143-28 at 3-4.  The same day, the Director of Marketing at Carter's law firm emailed both video statements to more than twenty members of the press.  Id. at 2.  The release of these statements received immediate coverage by both the Globe and the Herald in articles describing the videos as "shocking" and "explosive."  Doc. Nos. 143-29 to -31.

Meanwhile, White provided his own sworn video statement at Carter's office.  Responding to questions from Carter, White described conversations with Walsh in which he said the two discussed his marriage to Mason and the 1999 restraining order.  He expressed his belief that Gross had been appointed Commissioner without any review of his IA file, and he explained why he thought the investigation against him was illegitimate.  White addressed the 1998 and 1999 events, often reiterating statements contained in his prior affidavit, the Report, and statements he made to IA investigators.  He described Mason's violence toward him, saying he never responded physically except to push her aside on occasion, and he also described her abuse of Tiffany, saying he knew of only one incident at the time and learned of others much later.  As to the 1993 altercation with his niece, White described her kicking him and said: "I just hit her away from me and she stopped."  Doc. No. 147-23 (starting approximately forty-eight minutes into the video and demonstrating an open-handed swing of his right arm).

Carter asked White about the reasons Janey identified in her May 14 letter as providing cause to dismiss him.  Regarding his presence at BPD headquarters, White again recalled having entered the office only four times, and he described the reason for each visit.  Id. (starting approximately sixty-seven minutes into the video).  When asked about the extent of any interactions he had with other BPD personnel during those visits, he said there was "very little," claimed he always entered and exited through the door that provided the most direct access to his

office, went "straight up" to his office, and encountered no one in the hallways.  White's

recorded statement lasted more than an hour and concluded with White citing the difficulty the

investigation had caused him and his family.

On June 1, 2021, Carter sent White's video statement to Janey, and his office provided it

to the media.  Doc. No. 143-34; see also Doc. No. 143-35 (publicizing video by another BPD

official suggesting Walsh knew of White's IA history).  This triggered further reporting on the

investigation, the allegations against White, and his version of events as depicted in the video

statements.  The record before the Court includes five examples of stories published in major

Boston-area news outlets on the day White released his video.  See Doc. Nos. 143-32, -33, -36 to

-38.  At least one article quoted statements Janey had made during a WGBH public radio

appearance that day, including two more comments White alleges were defamatory.  After

noting her staff was reviewing the video statements and that she would consider any information

presented by White during a hearing the next day, Janey described Kaplan's Report has being

"pretty clear in terms of what [the investigation's] findings were."  Doc. No. 143-37 at 5.  She

said that, "by Dennis White's own admission, . . . he struck a 19-year-old woman over a fight

around $10."  Id.  She expressed that it was "time to move forward," with "leadership . . . that

would not reinforce the blue wall of silence [or] . . . deter other victims of . . . abuse from coming

forward."  Id.

Janey heard from White via zoom on June 2, 2021.  The hearing was not public.  Carter

was present, and White offered remarks without interruption or limitation by Janey.  In addition,

Carter released to the press a written copy of White's prepared statement concurrent with the

start of the hearing.  See Doc. No. 143-39; see also Doc. No. 143-43 (reflecting transcript of

White's remarks as given is consistent with the version circulated).  In his comments to Janey,

White largely repeated views he had expressed already, including in his video statement.  He denied the allegations against him, though he admitted having "swiped at" his niece after she kicked him in 1993 and having "pushed" Mason "at times."  Doc. No. 143-43 at 4, 6.  White again insisted he "only came into [his] office 4 times" (saying the "first time" was for his April 1 meeting with Janey), id. at 6, accused Kaplan of bias, suggested he was being treated unfairly because of his race, and expressed that he understood the seriousness of domestic violence because his daughter had been a victim of it.  He concluded by saying Janey did not have cause to remove him, and that his termination would prevent him from clearing his name.  Id. at 7-8.

The same day as White's hearing, Mason provided her first media interview since the controversy around White's appointment began.  Doc. No. 143-41 (reporting on interview and also quoting and linking White's prepared remarks to Janey); see Doc. No. 143-40 (reflecting the reporter for WBUR who interviewed Mason contacted Carter for a response before publishing the story).  In the days that followed, Carter continued communicating with members of the press and with Janey on White's behalf.[19]  See Doc. Nos. 143-44, -46, -47, -50.  The media continued reporting on the matter.  See Doc. No. 143-45 (describing White's request for Mason's IA file and his attacks on her credibility); Doc. No. 143-48 (same); Doc. No. 143-49 (citing the "latest turn in the ugly and increasingly public saga over" White, who was then "enmeshed in a vitriolic—and public—exchange of charges and counter charges with family members,"

---

[19] In all, Carter and others at his firm communicated with the media on White's behalf at least twenty-seven times between May 14 and June 7, 2021.  Doc. No. 151 ¶ 60.  In one of his communications, Carter responded to statements apparently made live via social media by Brittany, in which (among other things) she accused White of having abused her.  See Doc. No. 143-44.  White signed a new affidavit, circulated publicly by Carter, in which he denied Brittany's allegations.  Id.  In response to Mason's press interview, Carter obtained and provided to reporters an affidavit in which Tiffany challenged Mason's description of the source of scars on her arms, Doc. No. 143-46, and he also raised the possibility that Mason might be implicated in an overtime fraud scheme involving her BPD unit, Doc. No. 147-26.

including "two days of tawdry accusations [that] do nothing to dispel the shadow cast on the police department's internal affairs unit"); Doc. No. 147-42 (broadcasting on WCVB a portion of White's video statement).

On June 7, 2021, Janey terminated White.  In a letter notifying him of the decision, most of which the Court reproduced in an earlier decision in this case, Doc. No. 57 at 15-16, Janey stated that she credited Kaplan's Report.  She acknowledged "discrepancies between that report and the evidence that [White had] provided," but said it was not "necessary . . . to resolve" such differences before terminating White.  Doc. No. 143-59 at 2.  This was so, she explained, because "the allegations and evidence create[d] a cloud of uncertainty about the events and" White's "fitness to lead the BPD," regardless of how the different versions of events were reconciled.  Id.  The letter went on to cite White's "campaign to make [his] former wife (who would be a police officer under [his] command) a villain," and his efforts "to excuse [his] lack of cooperation and judgment during the investigation by placing the blame on the City for failing to instruct" him.  Id. at 2-3.  For these reasons, Janey doubted White's ability to "lead the BPD in a different, more effective direction," and she concluded it was "not in the best interest of the BPD, its employees or the citizens of Boston for [him] to remain as Commissioner."  Id. at 3.

After notifying White of her decision, Janey held a press conference.  See Doc. No. 143-51.  Her prepared statement included comments on the investigation and her reasons for terminating White, as well general transparency and reform issues (some of which repeated themes she had expressed during the May 14 press conference).  Her remarks included eight more statements upon which White bases his defamation claim.  Janey said White had admitted to pushing and hitting "members of his household"; that his "actions in recent weeks have done even more to erode public trust in his judgment and ability to lead," specifically referencing his

failure "to fully cooperate" with Kaplan; that his "recurring presence at police headquarters while on administrative leave" may have been confusing or intimidating during the investigation; that "he failed to lead by example" and his "return as Commissioner would send a chilling message to victims of domestic violence . . . and reinforce a culture of fear and a blue wall of silence" at the BPD; and that the public "must have confidence that the officers charged with enforcing laws are themselves people of integrity."  Noting White's implication that he was being treated unfairly due to his race, Janey said she would "not turn a blind eye to domestic violence against Black women, or any women."

The June 7 events triggered another round of reporting by local and national press outlets. See Doc. Nos. 143-52 to -54, -56 to -58, -60, -61.  Generally speaking, these articles recounted statements by Janey and Carter about the decision, in addition to summarizing the allegations and the events that had occurred between February and June of 2021.  See Doc. No. 151 ¶¶ 62-64.  Because the City rebuffed White's requests for further post-termination proceedings, the dispute shifted back to the courts.

F.    Post-Termination: Proceedings in This Court

The day Janey announced White's termination, the defendants removed to this Court the lawsuit White had filed weeks earlier in state court.  See generally Doc. No. 1.  The defendants answered the then-operative version of the complaint and promptly moved for judgment on the pleadings.  Doc. No. 11.  White responded by seeking leave to amend his complaint.  Doc. Nos. 15, 37.  The revised pleading White proposed would have transformed what began in state court as a five-page, two-count complaint into a sixteen-count pleading exceeding fifty pages.  See Doc. No. 49 at 5.  In a pair of Orders, the Court allowed White's motion to amend in part, rejecting all but three of his proposed claims as failing to satisfy the governing legal standards

28

for reasons the Court then explained.[20]  See generally Doc. Nos. 49, 57.  The three claims that

survived are: 1) defamation against Janey, arising from thirteen statements identified by the

parties and also from the release of the Report; 2) a violation by Janey of White's rights under

the Privacy Act; and 3) a "stigma-plus" claim against Janey and the City, arising under the

Constitution's Due Process Clause, for denying White an adequate opportunity to clear his name.

The defendants answered White's amended complaint, as narrowed by the Court, and

discovery ensued.  Various disputes arose, most of which concerned the appropriate scope of

discovery, and the Court resolved them.  See, e.g., Doc. Nos. 117, 118, 128, 134.  In discovery,

White obtained copies of notes Kaplan took during her interviews of the six witnesses she had

not identified by name in her Report, as well as copies of all documents Kaplan relied upon or

referenced in her Report.  See Doc. Nos. 78, 139.  The parties also conducted depositions.  White

deposed Kaplan, Janey, multiple members of Janey's staff, Mason, the niece involved in the

1993 incident, and at least two other individuals relied upon but not named by Kaplan in her

Report.  The defendants deposed White.  The summary-judgment record contains excerpts from

some of these depositions, which include the following testimony.[21]

Mason generally confirmed the substance of her statements to Kaplan, as they are

described in the Report, with minor clarifications.  E.g., Doc. No. 150-4 at 4-6 (explaining White

did not burn her hair when he allegedly pushed her face toward a stovetop that did not ignite).

She testified that the abuse she alleges generally occurred when her children were not home.

---

[20] White did not ask the Court to reconsider its rejection of many of his claims, nor did he seek to
revisit those rulings based on information he learned in discovery.

[21] The record contains more than one hundred exhibits (some of which are presently sealed),
including some the Court has not summarized because their materiality is neither facially
apparent nor established in the parties' papers.  See, e.g., Doc. No. 147-35 (including only two
pages of a transcript in which the deponent confirms that she prepared Janey's remarks for press
conferences).

This was possible, she explained, because the fights often arose after she confronted White about her suspicions of infidelity, allowing her to ensure the children were elsewhere when she raised the topic.  Doc. No. 147-33 at 13-14.  A friend of Mason's, not identified by name in the Report, testified that she had not personally witnessed White being abusive, but that she suspected abuse because Mason would sometimes ask her not to leave after group events were winding down. Doc. No. 147-36.

White's niece, whose deposition was transcribed and video-recorded, stormed out angrily after about twenty minutes of questioning.  Doc. No. 147-32 at 5-6.[22]  She did so after having threatened to leave multiple times in response to questions that she believed were not relevant to the 1993 altercation.  See, e.g., id. at 3 (refusing to say whether any other people were at her home when she spoke with Kaplan by phone).  Before she left, she provided her version of the 1993 events, which was consistent with the summary provided in the Report.  Id. at 3-4.

Kaplan confirmed that all witnesses except one had asked not to be named in the Report. Doc. No. 147-34 at 4-5.  She often did not recall specific details of the interviews, saying she would need to refer to her notes.[23]  E.g., id. at 7.  Regarding her failure to interview Tiffany, Kaplan explained that she attempted contact using an email address located by a private investigator, and that Tiffany had not responded.  Id. at 15-18.

Janey testified that she did not recall having communicated directly with Kaplan, saying the City did so through its corporation counsel.  Doc. No. 143-66 at 21.  She relied on Kaplan's due diligence and understood that those with an interest in the matter were provided an adequate

---

[22] This citation is to the excerpts of the transcript White submitted.  The video is Exhibit 97 to White's cross-motion.  Doc. No. 147-31.

[23] The notes, which were reviewed by the Court and then disclosed to White during discovery, Doc. Nos. 137, 139, generally corroborate the quotes and summaries provided in the Report.

opportunity to participate in the investigation.  She did not recall specific discussions about whether to release the Report but said she did so to promote transparency and accountability.  Id. at 22.  Janey also did not remember whether she had personally viewed the video statements and other evidence White submitted or had received reports on the submissions from staff members who reviewed them on her behalf.  E.g., id. at 13.  When asked about White's assertion that he struck his niece only in self-defense, Janey responded:  "My expectation of a police commissioner is that they know how to defend themselves without engaging in physical violence, [and] that they know how to de-escalate the situation."  Id. at 15.

In Janey's view, pushing one's spouse is a form of physical violence.  Id. at 30.  She believes that assessing domestic violence accusations often is complicated by efforts to shield others from knowing what is happening, the possibility that people who are abused also commit abuse themselves, and the tendency for victims of domestic violence to make and then recant allegations.  She also believes that the video statements White submitted, even if credited, did not compel a finding that Mason's allegations of abuse were not credible, and that the video statements did not outweigh White's own admissions regarding the relevant incidents.  Id. at 18-19, 28.  Janey testified that she viewed the allegations of domestic violence laid out in the Report as credible.[24]

---

[24] Some of the facts in this paragraph are included in the defendants' Statement of Undisputed Material Facts and are supported by excerpts of Janey's deposition testimony in the record.  Doc. No. 151 ¶¶ 21, 43-45; see Doc. No. 143-66; Doc. No. 147-38.  Beyond the fact that Janey read the Report (which White admits), White identifies certain characterizations of what Janey believed as "disputed," citing language in Janey's June 7 letter to White acknowledging "discrepancies" between the Report and the evidence White had submitted to her and describing "the allegations and evidence" as having created "a cloud of uncertainty about the events."  Doc. No. 151 ¶¶ 42-44 (citing and quoting Doc. No. 143-59 at 2).  The language White identifies, however, does not generate a material factual dispute.  Janey's understanding that White's evidence was in some ways at odds with information in the Report is not proof that she harbored doubts about the credibility of his accusers, nor is her reference to a "cloud of uncertainty"

During his deposition, White again admitted that he had "swatted" his niece away in 1993, and that he had engaged in "some pushing" with Mason.  Doc. No. 143-67 at 8, 11-12.  He also acknowledged he had asked his niece "for some money" before their physical confrontation.  Doc. No. 147-40 at 7.  Initially, White reiterated his assertion that he went to BPD headquarters "four times" while on administrative leave.  Id. at 14.  He then described each of those four times, explaining the reason for each visit and identifying various people with whom he interacted.  Id. at 14-24.  Then, White was confronted with a report showing his access card had been used to enter BPD headquarters at least twice as many times as he had described.

The report listed by date, time, and location the instances in which White's access card was used to enter BPD facilities.  It revealed that White had visited BPD headquarters at least eight times during his administrative leave.  Doc. No. 143-27.  He used more than one door when entering the building on these visits, one of which was located near the IA offices.  See id.  Though two of the visits align with White's zoom conferences with Janey and Kaplan (April 1 and 15, 2021), three occurred before those meetings (February 16, and March 15 and 29) and three occurred after them (April 23, and May 6 and 12).  He also visited a different BPD location (not headquarters, where his office was located) on another occasion.

When defense counsel marked a copy of the door-access report as an exhibit during the deposition, Carter promptly requested a break, during which he and White discussed the door-access report.  Doc. No. 147-40 at 25.  When the deposition resumed, White confirmed he had not lent his card to anyone else, and then he testified about what he could recall of the other visits.  Id. at 25-41.  He did not dispute that he had visited BPD each of the eight times.

---

surrounding the events.  White identifies no evidence besides the June 7 letter that as creating a triable question about Janey's state of mind, and the letter is not such evidence.

III.    <u>DISCUSSION</u>

The defendants seek summary judgment on all three of White's remaining claims.  Doc.

No. 142.  White argues he is entitled to summary judgment as to liability on his privacy and due-

process claims but seeks a trial on defamation and damages.  In the sections that follow, the

Court will address each claim in turn, applying the familiar standard and drawing the appropriate

inferences in light of whichever party is the movant.  As the Court will explain, the undisputed

facts entitle the defendants to judgment as a matter of law.

A.    <u>Defamation</u>

White's defamation claim is against Janey alone, and she seeks summary judgment.

White argues that the record generates triable issues of fact that require denial of Janey's motion.

<u>See</u> Doc. No. 147 at 7, 10-22.  Thirteen comments, made at three different times, are at issue, as

is Janey's release of Kaplan's Report.  Each allegedly defamatory statement is measured against

the following legal principles.

To prove defamation in Massachusetts, a plaintiff must demonstrate that the challenged

statements were "false" and "about him," among other things.  <u>Landino</u>, 621 F. Supp. 3d at 191.

If a challenged statement is "factually true," is not "of and concerning the plaintiff," or is not

"reasonably susceptible to a defamatory meaning" when it is considered "in its totality in the

context in which it was uttered," it cannot support a defamation claim.  <u>Id.</u> at 191-92.  "Only

statements that are provably false are actionable; hyperbole and expressions of opinion

unprovable as false are constitutionally protected."  <u>Veilleux v. Nat'l Broad. Co.</u>, 206 F.3d 92,

108 (1st Cir. 2000).  Because he is a public figure, White also must prove that Janey acted with

"actual malice" when she made the challenged statements.  <u>Murphy</u>, 865 N.E.2d at 752.  That

requires proof Janey "made the[] statements knowing that they were false or with reckless

33

disregard of whether they were false." Arroyo v. City of Bos., No. 20-cv-12082-DJC, 2021 WL 2338879, at *6 (D. Mass. June 8, 2021) (citing Murphy, 865 N.E.2d at 752).

Applying these standards to the undisputed facts, viewed favorably to White, leaves no triable issue as to defamation. This is true considering the comments individually and together.

### 1. Actual Malice

Before evaluating each comment that White identifies as defamatory, the Court addresses an overarching reason that justifies entry of summary judgment in Janey's favor on this claim. Under well-settled law, where matters of public importance are concerned, "discussions of public officials like [White] deserve . . . 'breathing space' in a democratic society." Levesque v. Doocy, 560 F.3d 82, 87 (1st Cir. 2009) (quoting N.Y. Times, 376 U.S. at 272). Statements made during such discussions are constitutionally shielded from liability—regardless of falsity— absent "clear and convincing evidence that the defamatory statement was made with actual malice." Id.; see Arroyo, 2021 WL 2338879, at *6 (explaining actual malice requires more than a showing that the speaker disliked the plaintiff, and must be supported by proof that the speaker "uttered statements that he knew or should have known were false"). This is a "daunting" standard, Howard v. Antilla, 294 F.3d 244, 252 (1st Cir. 2002), that often has "profound consequences," Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 201 (1st Cir. 2006)—even for a non-moving plaintiff at summary judgment. Levesque, 560 F.3d at 87. Though the Court must (and does) view the record in the light most favorable to White, that lens does not relieve him of his burden to satisfy the "substantive evidentiary standard of proof" by "provid[ing] evidence of actual malice with 'convincing clarity.'" Id. (quoting N.Y. Times, 376 U.S. at 285-86).

White has not provided such evidence here. Instead, he offers five, scattershot theories of malice, see Doc. No. 147 at 17-22, all of which fail. They each merit only brief comment. First, White accuses Janey of having "deliberately misrepresented that [he had] admitted certain

abuse." Id. at 17.  Not so.  As the Court will explain in more detail below when addressing each statement, see discussion infra § III.A.3, the undisputed facts establish that Janey neither misrepresented White's admissions nor concealed objective facts from the public.  None of the statements at issue were materially false—let alone deliberately so.  To the contrary, Janey's public remarks concerning the allegations of domestic abuse tracked conduct to which White had admitted (often on more than one occasion).  And, by releasing the Report, Janey provided the public with the objective facts on which any opinions she expressed were based.  White argues Janey "deliberately concealed that [he] told her and [Kaplan] that he acted in self-defense" in all relevant interactions.  Doc. No. 152 at 5.  But his claims of self-defense were described in the Report, which Janey released.  There is no evidence of concealment here.

Second, White urges this case presents a "paradigm case for actual malice" because "Janey relied on unknown witnesses."  Doc. No. 147 at 18 (citing cases involving anonymous sources).  But the principle he invokes has no application here.  The Report itself explains Kaplan's decision not to name the witnesses, describes the witnesses in a way that reveals their basis for knowing about the relevant events, and makes plain that Kaplan spoke with the witnesses and knew their identities.  In other words, the witnesses were confidential, but they were not anonymous.[25]  Nothing about Janey's public comments, paired with her release of the Report itself, suggested otherwise.

---

[25] There is a difference, of course, between an anonymous source and a confidential source.  A person who phones the police to report a crime, but who does so without identifying herself and without otherwise being known to the officers acting on the tip, is an example of the former (and is the sort of witness at issue in the cases White cites).  An informant known to police, who provides information that is described in pertinent police reports which disclose the basis for the person's knowledge but do not reveal their name or other identifying information, is an example of the latter (and is more akin to the scenario presented here).

Third, there is absolutely no proof in the record to remotely suggest that Janey "purposefully avoided contravening evidence." Id. at 20.  The only evidence before the Court concerning whether Janey considered White's submissions is that she did so—either directly or via briefing by a staff member.  That she did not draw from his submissions the conclusions White prefers is not proof of actual malice.  Fourth, White suggests Janey's "private communications reflected her personal uncertainty" about the underlying events. Id.  The only "private communications" White identifies are Janey's two letters to him expressing her intent to fire him and the reasons she ultimately decided to do so.  Janey's statement in those letters that she did not need to reconcile conflicts between the Report and White's submissions is not evidence that she subjectively doubted the Report.  Indeed, she testified at her deposition that she did not doubt it, and White has pointed to no evidence suggesting otherwise.  And finally, the theoretical possibility that Janey's then-ongoing mayoral campaign could have provided "an ulterior, political motive for libeling White," id. at 21, might bear on the question of actual malice if there were any other evidence in the record supporting a finding of malice.  There is no other evidence here.[26]  Motive alone (even if what White identifies constitutes "motive") cannot establish actual malice.

Because the record is devoid of any evidence suggesting actual malice, White cannot meet his burden of establishing with convincing clarity this prerequisite to a defamation claim.[27]

---

[26] That Janey received an email from a public-relations consultant who favored releasing the Report (but had not actually seen it) is not such evidence, especially where White has not pointed to anything suggesting Janey solicited or considered the advice. See Doc. No. 147-10 at 2.

[27] Defamation generally requires consideration of the entire context in which challenged statements are rendered, so the Court notes additional undisputed facts that further undermine White's theories of actual malice.  Janey is not the decisionmaker who placed White on leave when the domestic violence allegations resurfaced.  She did not initiate the independent investigation, define its initial scope, select Kaplan as the investigator, or direct the temporary suspension of the investigation.  Those decisions were all made by her predecessor.  When Janey

This alone warrants allowing Janey's motion on this claim.  In an abundance of caution and for the sake of completeness, the Court proceeds to explain two alternative and independent reasons why the claim would fail in any event.

      *2.  Defamation by Innuendo*

The thrust of White's argument that he is entitled to a defamation trial is his view that the identified statements were components of a deliberate effort by Janey to "insinuate[]," or "communicate[] the innuendo," that White was a domestic abuser who had obstructed the investigation.  Doc. No. 147 at 12; <u>see id.</u> at 38-39 (characterizing each statement as "innuendo that White abused members of his household" and/or "innuendo that White obstructed a government investigation").  He grounds this theory in Massachusetts cases allowing for defamation by innuendo and stating that "[e]xistence of defamatory innuendo is a question of fact."  <u>E.g.</u>, <u>Reilly v. Assoc. Press</u>, 797 N.E.2d 1204, 1213 (Mass. App. Ct. 2003).  Here, however, there is no genuine issue of material fact as to whether Janey's statements evidence an undercurrent of defamatory innuendo aimed at White.

For one thing, in none of the public statements that are before the Court did Janey ever say directly the things White accuses her of conveying via innuendo.  The statements she did make simply are not reasonably susceptible to the interpretation White urges.  Though she released the Report, Janey did not publicly credit or bolster—or even comment on—the specific allegations of domestic abuse it summarized.  She confined her remarks in that regard to specific actions that White had admitted to IA investigators, in court records, during his interview with Kaplan, or in his own statements to Janey.  Similarly, she referred to issues of transparency and

inherited the responsibility of seeing this matter through to a conclusion, she scheduled a meeting with White to discuss the investigation.  There is no evidence Janey revised the focus or process of the investigation, except to clarify or narrow its scope at White's request.  Nothing about that course of events points in the direction of bias or malice by Janey.

accountability within the BPD generally, as well as limitations on BPD cooperation with the investigation in particular.  Janey did not, however, directly accuse White of obstruction or of intimidating witnesses.  Considered together and in context, any suggestion discernible in Janey's remarks regarding White's status as a domestic abuser or obstructionist is too weak to permit a reasonable juror to find defamatory innuendo here.  Cf. Brown v. Hearst Corp., 54 F.3d 21, 24-25 (1st Cir. 1995) (describing news broadcast in which "the suggestion" that an uncharged individual had committed an unsolved killing was "a fairly strong one" which ran "through the program like a gold thread," such that it might support an innuendo theory of defamation).[28]

Even if one or more of Janey's remarks were reasonably susceptible to being understood as conveying the general accusations White describes, the undisputed facts establish that such accusations were not materially and provably false.  Innuendo that White had "abused members of his household," Doc. No. 147 at 38, is supported by White's own admissions to IA investigators in 1999, Doc. No. 143-1 at 21-22 (conceding it was "fair to say" that his relationship with Mason had featured "physical abuse in the past," including "[s]ome instances" that White "probably started" himself), and his concessions on various occasions that he "swatted" (or "swiped," or "struck," or "hit") his niece.  Innuendo that White "had lied about not committing domestic abuse," Doc. No. 147 at 14, is supported by a comparison of White's more recent denials of having ever physically abused Mason, Doc. No. 143-43 at 10 ("I never physically abused her."), to his contemporaneous statements in his 1999 IA interview.  Similarly, innuendo that White had obstructed Kaplan's investigation is supported by the undisputed fact

---

[28] In Brown, the defendants were granted summary judgment notwithstanding any innuendo, because the plaintiff had not supplied evidence of the broadcaster's negligence.  54 F.3d at 25-27.  This is akin to White's failure to supply evidence that Janey acted with actual malice.

that he refused a follow-up interview and declined to answer questions on certain topics.  And, innuendo that White was aware of or contributed to a "blue wall of silence" at the BPD is supported by his own admission that such a culture existed within an organization where he held high-ranking positions of power for at least half a dozen years before the relevant events.  See Doc. No. 143-43 at 10 ("First, there is a concern about a blue wall of silence.  That exists, and we need to work to end it."); Doc. No. 143-14 at 3 (reflecting White joined BPD's Command Staff in 2014).

In these circumstances, statements like Janey's—remarks made on three different occasions separated by days or weeks, which often express opinions that are not provably false, as the Court will explain shortly—simply are not the stuff of defamatory innuendo.  Cf. Reilly, 797 N.E.2d at 1214-15 (describing in detail news article featuring charged language, incomplete recitations of material facts, summaries of anonymous and harassing phone calls, and only cursory references to plaintiff's denials, all of which combined to falsely insinuate plaintiff had falsified veterinary records to conceal professional negligence); see generally Doc. No. 147 at 12-16 (citing other cases presenting materially different facts, including some that are even older than the abuse allegations against White).  Because White's overarching theory of defamation hinges on his innuendo theory, the absence of evidence from which a reasonable factfinder could infer that Janey intended defamatory innuendo here is a second reason she is entitled to judgment as a matter of law on this claim.[29]

---

[29] Even if White had such evidence, he would also need clear and convincing proof that Janey intended the innuendo despite knowing it was false or while recklessly disregarding its falsity. As explained already, the record contains no support for a finding of actual malice.

### 3.  Individual Statements

Looking beyond the deficiencies in proof of actual malice and innuendo, White's defamation claim also founders upon considering the specific statements at issue.  Each remark about which he complains fails to satisfy the elements of defamation under Massachusetts law, in light of the undisputed facts.  Because assessing whether statements are defamatory requires their analysis "in light of the totality of the circumstances, including the entire context of the publication," Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (quotation marks omitted), the Court recounts the comments White challenges along with the surrounding material.

May 14 Press Conference:  When speaking publicly after White sued to stop his termination, Janey made three comments that White seeks to prove were defamatory.  Her prepared remarks are part of the record, Doc. No. 143-19, as is a video of the press conference, Doc. No. 143-23.  The relevant excerpt follows:

> Dennis White was installed as commissioner by the previous administration one business day after his friend and previous Commissioner William Gross announced his retirement.  As quickly as he arrived, Commissioner White was placed on administrative leave, after reports of a domestic violence restraining order issued against him became public.
>
> *[1] An independent investigation into the allegations against Dennis White was recently completed.  In addition to the facts of this case, the investigation revealed a culture of fear and silence within the Boston Police Department.*
>
> Sworn police officers refused to speak to investigators, frustrating efforts to uncover the truth.  What is often referred to as a blue wall of silence was confirmed by one retired officer who said he received five phone calls directing him not to cooperate with this investigation.  *[2] Other officers were intimidated into silence, for fear of retaliation.*
>
> This investigation of Dennis White reveals a flawed process and a misguided department culture.  *[3] Dennis White's admitted behavior does not reflect our values.*  It is clear from the report that we have to move in a different direction.

Doc. No. 143-19 at 4 (italics and bracketed numbering added).[30]  The three italicized statements do not support a triable defamation claim.

The first sentence of Statement 1 is true, and White does not argue otherwise.  The introductory clause that begins the next sentence clearly signals that the remainder of that sentence relates not to "the facts of [Dennis White's] case," but to other information revealed by the investigation that is not about the allegations against White.  Neither Kaplan (in the Report) nor Janey (in her May 14 remarks) blamed White for having established or fostered the BPD's "culture of fear and silence."  They did not attribute this general culture to White explicitly, nor did they do so implicitly.  In these circumstances, Statement 1 is not "reasonably susceptible of a defamatory meaning."  Shay, 702 F.3d at 81.  Part of it is true, and the other part is not "of and concerning" White.[31]

The portion of Statement 1 generally describing BPD culture is separated from Statement 2 by a pair of sentences that provide examples of observations by Kaplan supporting the referenced "culture of fear and silence."  Neither of the intervening sentences is about White, and he has not alleged they are defamatory.  Considered in this context, and having already explained why White's innuendo theory fails, no reasonable factfinder could conclude that Statement 2 is "of and concerning" White.  It follows and relates to a series of comments that are about general BPD culture, providing the last of three illustrations of the cited culture.  Like the two preceding

---

[30] The Court refers to the statements by number (e.g., Statement 1), using the numbering reflected in the parties' charts.  Doc. No. 143 at 27-28; Doc. No. 147 at 38-39.

[31] The second half of Statement 1 is not materially and provably false, either.  It is a fair characterization of a theme that arises from the first several pages of the Report, in which Kaplan described in detail difficulties she encountered during the investigation.  Indeed, White's remarks to Janey during his pre-termination hearing included an express acknowledgement by him that "a blue wall of silence . . . exists."  Doc. No. 143-43 at 10.

illustrations, Statement 2 expressly speaks in terms of "other officers"—not White.  Like

Statement 1, it cannot reasonably be construed as defamatory.[32]

Statement 3 also is not defamatory, but for a different reason.  The declaration that

White's "admitted behavior does not reflect our values" is an unactionable expression of Janey's

opinion.  It "does not contain 'objectively verifiable facts.'"  Arroyo, 2021 WL 2338879, at *7.

Janey's May 14 remarks were tied to her release of the Report—a redacted copy of which was

linked in the publicly released, written version of Janey's remarks—such that the contents of the

Report "communicated the non-defamatory facts that undergird [Janey's] opinion."  Piccone v.

Bartels, 785 F.3d 766, 771 (1st Cir. 2015).  Because a listener could consult the Report and

identify "behavior" that Kaplan describes White having "admitted" at one point or another,

Janey's commentary on whether such behavior reflects "our values" is an exercise in "personal

judgment" that is "subjective in character."  Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248

(1st Cir. 2000); see Currier v. Town of Gilmanton, 621 F. Supp. 3d 233, 254-55 (D.N.H. 2022)

(listing published statements by a Selectman expressing his beliefs about other public officials'

motivations and things he "never expected" others would do, and entering summary judgment in

favor of defamation defendants).  Thus, Statement 3 expresses an opinion that cannot be the

basis of a triable defamation claim.[33]

---

[32] Even if it were reasonably susceptible to a defamatory meaning, there is nothing in the record
that would permit a finder of fact to conclude Janey made Statement 2 with actual malice, given
Kaplan's summary of her efforts to identify, contact, and arrange interviews with BPD witnesses.
See generally Doc. No. 143-17 at 3-6.

[33] Janey's opinion, if understood as a reference to White's admissions that he at times pushed
Mason, echoes one White expressed himself during the 1999 IA proceedings.  See Doc. No. 143-
1 at 22 (reflecting that White, immediately after admitting he had "probably started" some
instances of physical abuse, said he was "not proud of it").

June 1 Media Interview:  Janey spoke with interviewers from Boston Public Radio on June 1, 2021. During that conversation, which was reported by other media outlets, Janey made two comments in response to questions about White that also are the focus of his defamation claim.  See Doc. No. 143-37.  After describing the next day's hearing as White's chance to "make his case," Janey said:

> [5] The investigation, the report that came out, is pretty clear in terms of what those findings were, and I think there are also just concerns of what has happened in the last two months, in terms of him serving as commissioner, even though it was just two days before he was put on leave.  What is clear is that we need to move our city forward, we need to move our police department forward, we need to have leadership that can tackle many of the long-standing issues when it comes to the culture of fear, the culture of the blue wall of silence . . . .
>
> My team is looking at [the] videos [White submitted] as we speak, and we will certainly consider all information.  I'm not sure why this information was not captured in the investigation, where folks had an ample opportunity to make their case there. . . .
>
> [4] What came out in this investigation, by Dennis White's own admission, is that he struck a 19-year-old woman over a fight around $10.  That came out, his words.  You know, at this point, it is time to move forward and we need to have leadership in our department that would not reinforce the blue wall of silence, that would not deter other victims of assault, of abuse from coming forward.

Doc. No. 143-37 at 3-5 (italics and bracketed numbering added).[34]  Like the trio of May 14 statements, the pair of italicized comments from the June 1 interview are not actionable.

In Statement 5, Janey conveys her view that "the report . . . is pretty clear"—plainly an opinion that is not provably false.  That she used the word "findings" does not alter the character of this remark.  Indeed, "findings" in this context means "the results of an investigation."  See Finding, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary /finding [https://perma.cc/9BYR-K2DS].  The Report presented the results of Kaplan's investigation, summarizing the information she gathered from IA and court records and from

---

[34] Statements 4 and 5 are listed by the parties opposite to the order in which they appeared.

witness interviews.  It was neither false nor misleading for Janey to refer to the Report's

"findings," and her opinion that such "findings" were "pretty clear" cannot ground a defamation

claim.[35]

The first two sentences of Statement 4 describe an "admission" Janey attributed to White,

saying he acknowledged during the investigation that he "struck a 19-year-old woman over a

fight around $10." This statement is not materially false. The Report described the IA records

of the 1993 altercation between White and his niece (who was then nineteen), saying "White

asked [his niece] for $10.00 that she owed him," the dispute escalated, and "White admitted that

he" subsequently "struck her with a full swing of his arm and an open hand, which he alleges

was in self-defense." Doc. No. 143-17 at 6. The relevant IA records, which are before the Court

as an exhibit offered by White, support Kaplan's description. See Doc. No. 147-2 at 4-5

(providing White's account of the events, as reported to IA investigators, including that the

interaction featured a request by White that his niece return "some money [she] owed him" and

escalated to a point where "he defended himself by striking [his niece] once with an opened right

hand"). So does White's deposition testimony in this case, excerpts of which both parties have

placed before the Court. See Doc. No. 147-40 at 7-8 (testifying that he "asked [the niece] for

some money" but did not recall "the amount," and the niece then "became violent," then

answering "[y]es" when asked whether he "did, in fact, strike her with an open right hand").

---

[35] This determination is not in tension with the Court's observation earlier in this action that
"[t]he Report made no findings regarding any misconduct by White." Doc. No. 49 at 3. Kaplan
did not "find" that White had committed any particular misconduct. She did not "find" that any
witness lied or was credible. She did not "find" that Janey should reinstate or fire White. She
did, however, review various categories of documents concerning the relevant events, speak with
witnesses about those events, and then summarize the information she "found" in that process.

White has never denied that he struck his niece (or that she was then nineteen).  Rather, he urges that the first portion of Statement 4 is false and defamatory because he disagrees that the altercation was "around $10."  See Doc. No. 147 at 12 (taking issue with Janey's "portrayal of White as resorting to 'hitting' over something so paltry").  He does not, however, cite any law supporting his characterization of this remark as "doubly libelous," id., nor does he engage with the undisputed facts establishing that the beginning of the altercation did include a request by White for some amount of money.  Additionally, Janey tied her statement to the Report, which had been released publicly and recounted White's claim that he responded in self-defense (a claim Janey was not obligated to accept or repeat).  As Janey expressed in her own deposition, she was aware of White's claim of self-defense, but she expected "a police commissioner [to] know how to defend themselves without engaging in physical violence."  Doc. No. 143-66 at 15.  In these circumstances, a factfinder could not conclude that the first portion of Statement 4 was materially false.

The remainder of Statement 4, expressing Janey's belief that it was time to "move on" and that the BPD should be led by a person with certain characteristics, "does not contain objectively verifiable facts [and] is not actionable."  Scholz v. Delp, 41 N.E.3d 38, 45 (Mass. 2015) (quotation marks omitted).  Janey's view of her "administration's approach regarding" how to choose a police commissioner, and her "opinion regarding h[er] administration's response to this type of complaint and the allegations against [White]," cannot ground a triable defamation claim.  Arroyo, 2021 WL 2338879, at *7.  They are not actionable alone, nor do they become so when considered along with the first portion of Statement 4, Statement 5, or the totality of the surrounding remarks Janey made during the June 1 interview.

June 7 Press Conference:  When Janey publicly announced her decision to fire White, her remarks included eight more comments that White believes defamed him.  The relevant excerpt follows:

> Earlier today, I informed Dennis White of his termination as Commissioner of the Boston Police Department, effective immediately.  I reached this decision after carefully considering the results of an independent investigation into multiple allegations of domestic violence against Dennis White, along with testimony and information he provided during the hearing on June 1st.[36]  Dennis White has repeatedly asserted that the domestic violence allegations against him are false.  But *[6] he stated in his hearing and during the investigation that he has hit and pushed members of his household.*
>
> The allegations and evidence of this behavior raised serious questions about his fitness to lead the Boston Police Department, and *[7] Dennis White's actions in recent weeks have done even more to erode public trust in his judgment and ability to lead.*  Instead of expressing understanding, regret, growth, or contrition regarding his admitted actions about domestic violence, Dennis White instead has continued a campaign to vilify his former wife.  Furthermore, Dennis White describes his circumstances as part of a pattern of falsely accused Black men.  The disparate treatment of Black people in our country is a genuine concern, but let's be clear: Racism is a burden carried by both men and women of color, and *[12] I will not turn a blind eye to domestic violence against Black women, or any woman for that matter,* in the Boston Police Department or anywhere else.
>
> *[8] Dennis White failed to fully cooperate during this investigation and [9a] was a re-occurring presence at police headquarters while on administrative leave.  [9b] At best this behavior created confusion among officers, and at worst it fostered a climate of intimidation during the investigation and beyond. [10] As Commissioner, he failed to lead by example and did not seem to understand the importance of cooperating with an investigation.  [11] It is clear that Dennis White's return as Commissioner would send a chilling message to victims of domestic violence in our city and reinforce a culture of fear and a blue wall of silence in our police department.*  Dennis White's documented conduct twenty years ago and during the course of the investigation led me to the inescapable conclusion that it is not in the best interest of the Boston Police Department, its employees, or the citizens of Boston for him to remain as Commissioner.
>
> \*        \*        \*
>
> To advance this effort [at police reforms aimed at transparency and accountability], I am addressing policies that govern the Boston Police Department, starting with

---

[36] This mistake about the date of White's hearing, which undisputedly occurred on June 2, has no bearing on White's claims or the Court's analysis.

background checks.  Going forward, all candidates for BPD leadership, whether internal or external, will be subject to vetting and background checks.  *[13] The residents of Boston must have confidence that the officers charged with enforcing laws are themselves people of integrity.*

Doc. No. 143-51 (italics and bracketed numbering added).[37]  Each identified statement is materially true or is an opinion not provably false.  In either case, these comments are not actionable.

Statements 7, 9b,[38] 10, 11, 12, and 13 are expressions of Janey's opinion.  They concern Janey's view that White's response to the Report and the accompanying notice of her intent to fire him "erode[d] public trust"; that his series of visits to BPD headquarters risked confusing or intimidating other officers;[39] that his limited cooperation with the investigation suggested a failure to appreciate its importance and a missed opportunity for him to model the values of transparency and accountability for officers under his command;[40] that allowing him to remain in

---

[37] The record does not include a written version of Janey's statement.  The Court provides here the pertinent excerpt based on its review of the press-conference video the parties have submitted.  The entire video lasts less than six-and-a-half minutes.  The first quoted excerpt begins at the very start of the video and continues for approximately the first three minutes.  The portion appearing after the asterisks begins about four minutes and forty seconds into the video and continues for approximately twenty-five seconds.

[38] The Court subdivides Statement 9 into portions that are not actionable for different reasons.

[39] Janey's opinion in this regard is not "demonstrably false," as White suggests.  Doc. No. 147 at 15.  For one thing, the written responses by Superintendent Long, which White cites as evidence of falsity, establish only that Long did not know if White's visits to headquarters interfered with the investigation or intimidated anyone.  Doc. No. 147-39 at 7.  They are not proof of the absence of interference or intimidation.  Notably, the question posed to Long incorporated White's claim to have "appeared" only "four times at his office during his administrative leave"—a claim since disproven by undisputed door-access records.  Id.  For another thing, even if no officer told Janey (or Kaplan) that they were confused by White's visits, White cannot prove "false" Janey's belief that his appearance at headquarters during his suspension "at best" sent a confusing message about who was in charge and what behavior was appropriate during the investigation.

[40] Several times during White's statement to Janey on June 2, he made comments blaming her or the City for failing to provide guidance to him about how he should conduct himself during the investigation.  See Doc. No. 143-43 at 11-14 (citing lack of guidance about whether he could or should visit his office during his suspension, whether he had to sit for a follow-up interview with Kaplan, whether he should answer certain questions, whether he should have encouraged others

his position would have undesirable effects within the BPD and in the community; that allegations of domestic violence should always be taken seriously; and that integrity is a necessary quality expected of law-enforcement officers.[41]  Janey was expressing her "subjective views" and her "interpretation" of the information presented to her about White.  Gray, 221 F.3d at 248.  In expressing her views, Janey did not imply she was "in possession of objectively verifiable facts" she neglected to disclose, id.; rather, she articulated the basis for her opinions either expressly or by reference to the contents of the Report.  Under settled law, "defamation cannot arise" in such circumstances.  Piccone, 785 F.3d at 771.

The undisputed facts establish that the remaining comments—Statements 6, 8, and 9a—are true.  There is not a shred of evidence before the Court to support White's claims to the contrary.  Consider Statement 6.  White has consistently acknowledged having struck his niece in 1993 and having pushed Mason on occasion during their marriage.  E.g., Doc. No. 143-17 at 8, 18 (reflecting White conceded these facts in his interview with Kaplan); Doc. No. 143-43 at 9, 13 (reflecting White conceded these facts in his statement to Janey).  Both women, at the relevant times, were living with White in his Dorchester home.  These facts are undisputed. White maintains he struck his niece only once, in self-defense, and pushed Mason only to move her out of his way, but not violently.[42]  He insists he never pushed his niece and never hit Mason.

---

[41] Besides expressing a non-actionable opinion, Statement 13 is not "of and concerning" White. It followed a series of comments addressing Janey's forward-looking plans to address broader issues of transparency and accountability in policing.  Janey continued addressing similar issues after Statement 13.  Placed in this context, no factfinder could understand Statement 13 as an actionable, defamatory comment about White.  See Arroyo, 2021 WL 2338879, at *7.

[42] White does not explain the difference between a "violent" push and the sort of pushing to which he admits, nor does the Court need to concern itself with whether such a distinction exists. Janey did not characterize the manner in which White "pushed."  She described his conduct using the word he used, and nothing more.  As far as the "hit" is concerned, White appears to

at the BPD to cooperate with Kaplan, and whether he should have commented publicly about the serious nature of domestic violence).

Even accepting all of those characterizations, the fact remains that White concededly "hit" one woman and "pushed" the other, and both women were "members of his household."  Statement 6 cannot be defamatory because it is true.

So, too, are Statements 8 and 9a.  The undisputed facts establish that White <u>did</u> fail to cooperate with the investigation in various ways, and he <u>was</u> a recurring presence at BPD headquarters during his administrative leave.  Though White explains his refusal to accede to various requests or answer certain questions during the investigation, he does not (and cannot) dispute that he imposed limits on his cooperation.  For example, he sought to narrow the scope of the investigation to something less than the full vetting originally requested by Walsh, he did not agree to a second interview with Kaplan, and he refused to answer questions his lawyer unilaterally deemed irrelevant to the process.  That he had reasons, such as his lawyer's advice, for pursuing these limitations does not render "false" Janey's statement about his failure to fully cooperate.  Similarly, the undisputed facts—as evidenced by the door-access report and White's concessions upon being confronted with it in his deposition—reveal White visited his office on at least eight different days between February 3 and May 14, 2021.  Doc. No. 143-27.  When he

---

suggest a factfinder could view Statement 6 as false because he said he "swatted" his niece, and "a swat" is not "a hit."  Doc. No. 147 at 11.  This suggestion is frivolous.  When asked about the 1993 incident by his lawyer during his sworn video statement, White said: "I just <u>hit</u> her away from me and she stopped."  Doc. No. 147-23 (at approximately 47:56) (emphasis added).  The Court confirmed this statement by reviewing the video again after the motion hearing in this case, at which Carter initially denied that White had used the word "hit" in this context.  Though White elsewhere has used different words to characterize the manner in which he responded to his niece's 1993 kick, all of them are synonyms for "hit."  <u>See</u> <u>Hit</u>, Merriam-Webster Online Thesaurus, https://www.merriam-webster.com/thesaurus/hit#thesaurus-entry-1-1 [https://perma.cc/K3TQ-YN23]  (listing "slap," "strike," and "swipe" among synonyms for "hit" when used to mean "to knock" or "to deliver a blow to (someone or something) usually in a strong vigorous manner"); <u>cf.</u> <u>Hit</u>, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/hit [https://perma.cc/E6VP-AGW3] (defining "hit" as "to come in quick forceful contact with," or "to deliver (something, such as a blow) by action").

visited, White did not limit his movements to the path from his car to his office; he spoke with numerous other BPD personnel, from civilian employees to a Superintendent in IA and the Acting Commissioner, sometimes even discussing his suspension or the investigation.  Doc. No. 143-67 at 13-39.  Statements 8 and 9a are not materially false.[43]

Considering the content of Janey's June 7 statements in combination does not clear a path to trial.  The statements are not actionable for the reasons the Court has identified, and they remain unactionable for the same reasons even when stacked atop one another.

Release of Report:  White also suggests Janey defamed him by releasing the Report, and then "exacerbated" the "defamatory nature" of the Report by referring to its "findings" and by "her simultaneous termination" of him.  Doc. No. 147 at 39; accord Doc. No. 151 ¶ 65.  There is no support for such a claim.

To the extent this is an attempt to recast White's separate challenge to Janey's release of the Report as an alternate theory of defamation, it fails for one of the same reasons the Privacy Act claim fails.  See discussion infra § III.B (explaining Janey's decision to release the Report was reasonable in the circumstances, a conclusion that necessarily precludes a showing of malice).  Similarly, to the extent this theory repeats, in defamation terms, White's stigma-plus claim—which arises because of the pairing of the Report with Janey's termination of White—it fails for the same reasons the due-process claim fails.  See discussion infra § III.C (finding the record does not support a conclusion that the Report was substantially false and stigmatizing).

---

[43] Some of White's own descriptions of his visits to headquarters during the relevant period, at least one of which was under oath in a state-court filing, apparently were not true.  See, e.g., Doc. No. 147-14 at 13-14 ("On each of the four occasions I did go to the office, I went directly into the secure garage and elevator that takes me directly to the floor where my office is, and . . . I had very minimal contact with anyone at the BPD during these visits."); cf. id. ¶ 29 (reflecting White's emphasis in the same affidavit that a police officer is "duty-bound to tell the truth especially in the context of a court proceeding").

The Court has explained why references by Janey to the Report's "findings" cannot create actionable defamation where there was none to start.  And, as White acknowledged implicitly elsewhere in his papers, the Report was not materially false insofar as it summarized what witnesses alleged in conversations with IA investigators or Kaplan or according to court documents.  See Doc. No. 147 at 35 n.19 (suggesting the Report "does concern true facts," such as that various witnesses accused White of abuse).  Kaplan expressed no conclusions about what, in fact, occurred or whose version was most credible.  Nor did Janey, when she released the Report on May 14, 2021.  In these circumstances, the release of the Report—even coupled with one or more statements referencing its "findings" and notwithstanding White's subsequent termination—cannot support a triable defamation claim.[44]

The Court has also considered whether the sum of all the parts (here, the release of the Report and the thirteen identified statements), in the overall context of unfolding events, gives rise to a triable claim of defamation.  It does not.  The individual statements are not actionable, as explained above.  When Janey spoke of verifiable facts, she did so truthfully.  And when she expressed her opinions and judgments about White, his past conduct, his behavior post-appointment as Commissioner, and issues impacting the BPD generally, she did not suggest her

---

[44] White argues statements and quotations in the Report attributed to one retired police detective are provably false, citing that detective's deposition testimony, in which they generally claimed not to remember speaking with Kaplan or having made various statements.  See Doc. No. 147 at 8, 15.  The portions of the Report featuring this detective's statements concern ancillary matters (e.g., the functioning of the DVU in 1999).  Even assuming the statements attributed to the detective are false—despite Kaplan's contemporaneous interview notes confirming them, Doc. Nos. 137, 139—they would not render the entire Report materially false, such that a defamation claim could be sustained on this basis alone.  In addition, there is no evidence Janey acted unreasonably in relying on Kaplan's diligence and honesty, generally or as to the relevant detective's statements—or that Janey knew or should have known that the detective would provide different statements in a deposition years later.  Any defamation claim arising from this aspect of the Report would, therefore, also fail due to a lack of evidence of actual malice.

views were premised on undisclosed, verifiable facts.  As explained already, White's resort to a theory of innuendo cannot save the day and, White has failed to generate a material factual dispute about whether Janey made any of the statements with actual malice.

*     *     *

White is understandably upset that Janey fired him.  He is surely unhappy that Janey believed the BPD—an institution he served for decades in a variety of roles, including as a member of the Command Staff—suffered from a culture of silence.  He no doubt sincerely believes nothing about what transpired twenty years earlier should have impaired his ability to become Commissioner, despite Janey's contrary conclusion.  He may feel his efforts to challenge the investigation and prevent his termination were appropriate; Janey, however, formed a different opinion, viewing his response as sending the wrong message and demonstrating poor judgment.  Both White and Janey are entitled to their divergent opinions.  A municipal executive like Janey may publicly express her opinions on matters such as these—even when the object of the opinions disagrees with and is hurt by them.  A public official like White who is the object of such opinions may challenge them in the court of public opinion.  White has done so here— vigorously and persistently.  But such opinions are not actionable generally, and they are not actionable here.

As explained, White has not made the showing necessary to resist summary judgment on his defamation claim.  Accordingly, Janey's motion is ALLOWED, and judgment will enter in her favor, as to the defamation claim.

B.    Right to Privacy

The Court now turns to White's allegation that, by releasing the Report, Janey violated the Privacy Act.  On this issue, White and Janey each seek summary judgment.

Another session of this Court has concisely summarized the legal principles governing claims brought under the Privacy Act:

> To recover in an action for invasion of privacy . . . for dissemination of private information, "a plaintiff must establish that the disclosure was both unreasonable and either substantial or serious."  To fall under the protection of the statute, the disclosed facts must be of a "highly personal or intimate nature."  However, there can be no invasion of privacy where the facts, though highly personal, are already in the public domain.  Moreover, "[w]hen the subject matter of the publicity is of public concern, . . . there is no invasion of privacy."

Taylor v. Swartwout, 445 F. Supp. 2d 98, 103 (D. Mass. 2006) (citations omitted) (quoting Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 681-82 (Mass. 2005), and Bratt v. Int'l Bus. Machs. Corp., 467 N.E.2d 126, 134 (Mass. 1984)).

Application of these principles to this case proves straightforward.  The Court will first explain why Janey's motion succeeds, a determination that dooms White's cross-motion as to this claim.  Even when the record is viewed in White's favor, the undisputed facts demonstrate Janey's release of the Report did not violate the Privacy Act for at least two reasons.

First, a factfinder could not conclude that the Report sets forth the sort of information that the Privacy Act protects from dissemination.  The Report's contents generally fall into one of three categories, none of which "fall under the protection of the statute."  Taylor, 445 F. Supp. 2d at 103.  One category is statements White asserts are false.  This includes, for example, allegations that White made sexual advances toward his niece that precipitated the 1993 altercation between them, claims that Mason disclosed or reported domestic abuse more than once, and descriptions of instances of physical abuse that were not included in Mason's original 1999 incident report.  The Privacy Act does not provide White a cause of action arising from the disclosure of information he claims is false.  See Dasey v. Anderson, 304 F.3d 148, 153 (1st Cir. 2002) ("Massachusetts does not recognize a cause of action for false light invasion of privacy.").

As a result, portions of the Report containing such information cannot support a triable claim under the Privacy Act.[45]

Another category is facts that were already publicly available at the time the Report was released. This covers a host of details about the 1999 allegations, including the verbal threat, the allegation of physical abuse, the resulting restraining order and its requirement that White surrender his firearm, and the related IA matter; the existence of and charge involved in the 1993 IA matter; and the divorce and statements made in public court filings related to it. It also includes the fleeting reference made in the Report to a recommendation during White's divorce proceedings that he should "obtain outpatient mental health treatment." Doc. No. 143-17 at 15. Regardless of state-court rules governing use of such material, it is undisputed that the same recommendation was described in a publicly filed court document during the divorce proceedings. Doc. No. 150-2 at 6. Because information in this category was "already in the public domain," it cannot ground a claim under the Privacy Act. Taylor, 445 F. Supp. 2d at 103.

The last category is information that does not concern private, personal, or intimate details about White. This includes details about how Kaplan conducted her investigation, descriptions of White's limited cooperation during the investigation, White's visits to his office during his administrative leave, and references to broader reluctance or lack of cooperation by others associated with the BPD. It also includes at least some details regarding White's physical altercation with his niece in 1993, which was witnessed by others, including a neighbor. Cf.

---

[45] To the extent White suggests the Privacy Act can be violated by accurate descriptions of witness accusations, so long as the accusations themselves are false, the Court rejects such circular reasoning, in support of which White cites no legal authority. Doc. No. 147 at 35 n.19.

Dasey, 304 F.3d at 154 (observing "that activity in the presence of others who owe no duty of confidentiality . . . is hardly 'private'").[46]

In his papers, White references the entire Report as the basis for his Privacy Act claim. He specifically cites only one example of "confidential health information," coupled with some general references to "accusations of abuse," Doc. No. 147 at 35; accord Doc. No. 152 at 7—but, as the Court has noted, those examples are within categories that the Privacy Act does not reach. White has identified nothing else in the Report that specifically qualifies for protection under the Privacy Act. Cf. Worcester Telegram & Gazette Corp. v. Chief of Police, 764 N.E.2d 847, 852 (Mass. 2002) [Worcester I] (explaining that if "only a portion of a public record [is] within an exemption to disclosure," the remainder of it "is subject to public access"). Because the undisputed facts could not support a finding that the Report contains the type of facts the Privacy Act shields from dissemination, Janey is entitled to judgment as a matter of law on this claim.

Second, even if the Report had contained private and highly personal information about White, Janey's decision to release it was reasonable on the undisputed facts. The investigation and White's status as Commissioner were matters of public concern. The relevant events began with a media inquiry. White's appointment as Commissioner and his background, including the past allegations of domestic abuse, received press attention from the moment his selection was announced through (and after) the date Janey released the Report. Press coverage of these events consistently raised questions regarding the sufficiency of any vetting that preceded Walsh's selection of White. The record further establishes that, during the same period, there also was

---

[46] Of course, White's niece owed him no duty of confidentiality. The Court is aware of no basis for finding that a person owes their family member (or, even, their spouse) a duty that in any way limits the person's ability to report allegations of domestic abuse. Though false allegations of such conduct might support a defamation claim, the Privacy Act would provide no refuge from allegations grounded in truth.

ongoing public attention on broader questions of police accountability and transparency.  In this context, the release of the Report was reasonable.  No factfinder could conclude otherwise.

White suggests that, because Kaplan's investigation "was neither an internal affairs investigation, nor the result of a citizen complaint," the Report is different from other police misconduct records that state law treats as public records.  Doc. No. 152 at 7 n.9.  This ignores the fact that the investigation began because of a press inquiry about White's background, and not as an internal police personnel matter.  Moreover, much of the Report summarizes and provides context for IA records, which are subject to disclosure under state law.  See Mass. Gen. Laws ch. 4, § 7 (clause Twenty-sixth, subclause (c)); Worcester Telegram & Gazette Corp. v. Chief of Police, 787 N.E.2d 602, 608 (Mass. App. Ct. 2003), further review denied, 795 N.E.2d 574 (Mass.) (table) [Worcester II].  The record demonstrates White understood this all along; his lawyer's communications with the defendants during the investigation reflected an expectation that any report would likely become public, Doc. No. 147-8 at 3, and White himself touted his consent to the release of his IA files, Doc. No. 143-17 at 20.

Janey's decision also was entirely consistent with the principles driving state-court decisions concerning when public employers must release, or may withhold, information about employees sought in public-records requests.[47]  For investigations of police misconduct in particular, the state courts have differentiated "the bricks and mortar of the investigation and the documenting of its results" from "the actual order and notice of disciplinary action issued . . . to the target of the disciplinary investigation."  Worcester II, 787 N.E.2d at 609.  The former "fall

---

[47] White has supported his Privacy Act claim by arguing that the Report was a "personnel record" exempt from mandatory disclosure under a different state statute.  Whether the Report is such a record does not dictate the outcome of White's Privacy Act claim, but it is one relevant consideration in assessing the reasonableness of Janey's decision to release the Report.

outside the [personnel file] exemption"; the latter are "exempt."[48]  Id.  Applying that distinction

to this case, the Report—akin to "the bricks and mortar" of Kaplan's work, "documenting" the

information she gathered—is not properly viewed as a personnel record.[49]  In explaining the

basis for this distinction, the state courts have observed:  "It would be odd, indeed, to shield from

the light of public scrutiny . . . the workings and determinations of a process whose

quintessential purpose is to inspire public confidence."  Id. at 608.  The same reasoning applies

here and underscores the reasonableness of Janey's release of the Report.[50]

> In sum, White has no avenue to success on his Privacy Act claim, even when the record

is viewed through the lens applicable to the defendants' motion.  The Report's contents were

either false (according to White), in the public domain already, or not the sort of intimate and

private details about which the Privacy Act is concerned.  And, in any event, Janey's decision to

release the Report was reasonable given the nature of White's position, the allegations against

him, and the level of public interest.  Janey's motion is ALLOWED as to the Privacy Act claim.

---

[48] Here, as in Worcester II, White does not advance any of other exemption enumerated in the
same state statute.

[49] Janey's May 14 letter to White notifying him of her intent to fire him and the reasons
supporting that course, however, might be one.  The record reflects that Janey did not release that
letter along with the Report; rather, White made the letter public when he appended it to an
affidavit he filed in state court days later.  See Doc. No. 147-14 at 12 n.2, 21-22.

[50] White relies on a different state-court decision, concerning a request for records generated by a
school superintendent who had disciplined a junior-high teacher for writing inappropriate notes
on two students' homework papers.  See generally Wakefield Teachers Ass'n v. Sch. Comm.,
731 N.E.2d 63 (Mass. 2000).  There, the superintendent's report about his investigation was
deemed a personnel record, exempt from disclosure in response to public-records requests.  The
decision—which does not address the Privacy Act—does not aid White.  His role as a law-
enforcement officer selected to lead the police department in a major city poses different
considerations, as the Worcester decisions acknowledge.  And, the opinion in Wakefield reveals
that the superintendent did issue a public statement describing the misconduct and his response.
Id. at 66.  Wakefield did not broadly hold that "[t]he public was not entitled to . . . know [the]
contents" of the underlying personnel record, as White suggests.  Doc. No. 152 at 7.

That ruling dictates the result of White's cross-motion on this claim.  See Doc. No. 147 at 7.  If White was unable to muster a genuine dispute to be tried when the record was viewed in his favor, it necessarily follows that he cannot make the showing required to obtain summary judgment when the record is viewed through a lens less charitable to him.  White's cross-motion, therefore, is DENIED as to the Privacy Act claim.

    C.    <u>Stigma-Plus</u>

One claim remains.  White has alleged that the defendants violated his constitutionally protected liberty interest in his reputation by releasing the Report (the requisite "stigma"), and then publicly tying its contents to his removal as Commissioner (the "plus").  See Doc. No. 49 at 6-7.  Both sides urge they are entitled to judgment as a matter of law on White's stigma-plus claim—his only federal cause of action, and the reason the case proceeded in this forum.  As it did in the foregoing subsection, the Court will explain why the record supports the defendants' motion as to this claim, even when the defendants are held to their burden under Rule 56 and the evidence is viewed in the light most favorable to White.  But first, the law.[51]

    *1.    Elements of a Stigma-Plus Claim*

Generally speaking, "defamation, even from the lips of a government actor, does not in and of itself transgress constitutionally assured rights."  <u>Pendletown v. Haverhill</u>, 156 F.3d 57, 62-63 (1st Cir. 1998).  In the First Circuit, a stigma-plus claim like the one White advances here requires proof of five elements:

> First, the alleged statements must level a charge against the employee that might seriously damage his standing and associations in his community and place his good name, reputation, honor, or integrity at stake. . . . Second, the employee must dispute the charges made against him as false. Third, the stigmatizing statements or charges must have been intentionally publicized by the government. . . . Fourth, the stigmatizing statements must have been made in conjunction with an alteration of

---

[51] The Court and the parties have described the law governing a claim such as this in previous Orders and submissions.  See Doc. No. 49 at 6-13; Doc. Nos. 51, 52; <u>see also</u> Doc. No. 57 at 8-9.

the employee's legal status, such as the termination of his employment. Finally, the government must have failed to comply with the employee's request for an adequate name-clearing opportunity.

Wojcik, 300 F.3d at 103 (cleaned up). The Court already has found that White received an adequate opportunity to clear his name before his employer, i.e., the defendants. Doc. No. 49 at 10-11. He did not challenge that determination before, nor does he urge the Court to revisit it now. Thus, the question remaining can be further narrowed to whether the defendants denied White "an adequate" public "name-clearing opportunity." Wojcik, 300 F.3d at 103; see Doc. No. 49 at 11.

As this Court noted in an earlier Order, "the precise parameters of the name-clearing opportunity that must be provided are context dependent and, thus, are not firmly defined." Doc. No. 49 at 7 n.5 (citing Wojcik, Baden, and two decisions of other Courts of Appeals). "The purpose of the hearing is only to allow the employee to clear his name of the false charges; compliance with formal procedures is not necessarily required." Wojcik, 300 F.3d at 103 (citing Baden, 799 F.2d at 833); accord Gunasekera v. Irwin, 551 F.3d 461, 469 (6th Cir. 2009). The Constitution does not prescribe a particular form of process in this context—let alone a formal, trial-like proceeding with live witnesses and cross-examination. See, e.g., Endicott v. Huddleston, 644 F.2d 1208, 1216 (7th Cir. 1980) ("While the Constitution is unbending in its requirement that there be some form of hearing when a due process liberty interest is implicated, the formality and procedural requisites for that hearing may vary."); Campbell v. Pierce Cnty. ex rel. Bd. of Comm'rs, 741 F.2d 1342, 1345 (11th Cir. 1984) ("In cases involving only liberty interests, the courts have required only that the claimant be accorded notice of the charges against him and an opportunity 'to support his allegations by argument however brief, and, if need be, by proof, however informal'" (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 16 n.17 (1978))); Boston v. Webb, 783 F.2d 1163, 1166-67 (4th Cir. 1986) ("The right of

cross-examination is . . . not an absolute in respect of all alleged deprivations of constitutionally protected . . . liberty interests."); Chilingirian v. Boris, 882 F.2d 200, 206 (6th Cir. 1989) (concluding "a name-clearing hearing need only provide an opportunity to clear one's name and need not comply with formal procedures to be valid," and explaining that a plaintiff's "failure to receive a hearing in the manner contemplated by him" is immaterial if "he did indeed receive a hearing at which he was extended ample opportunity to clear his name"); Miller v. Metrocare Servs., 809 F.3d 827, 834 (5th Cir. 2016) (declining plaintiff's "invitation to make confrontation of witnesses a mandatory requirement for an adequate name-clearing hearing"); but see Hostrop v. Bd. of Jr. Coll. Dist. No. 515, 471 F.2d 488, 490, 494-95 (7th Cir. 1972) (finding college president who was fired without any pre- or post-termination hearing or opportunity to respond had liberty and property interests and First Amendment rights at stake, such that hearing before impartial tribunal with "a chance to present witnesses and confront adverse evidence" was required).

The resulting analysis is a flexible one, with different contexts calling for different forms and degrees of process. The strength of the employee's liberty interest matters, as does the nature of any pre-termination proceedings that occurred. See Senra v. Town of Smithfield, 715 F.3d 34, 39 (1st Cir. 2013) (explaining that "a reviewing court studies the totality of the process received," and not only the events that occurred "post-termination," in order "to determine if the procedural due process was sufficient"). The relevant "context" also can include opportunities the employee had to address the allegations and consideration of a public-figure plaintiff's access to and use of the press. See, e.g., Baden, 799 F.2d at 832; D'Allessandro v. City of Albany, No. 04-cv-788, 2008 WL 544701, *14 (N.D.N.Y. Feb. 26, 2008); see also Doc. No. 143 at 11-13 (citing additional cases where media access was a factor).

Finally, the constitutional guarantee of an adequate name-clearing opportunity does not entitle the employee to anything beyond the opportunity itself.  In particular, it does not "compel a government employer to change its mind and believe or endorse the person's refutation of the stigmatizing information," and it does not "guarantee the person their job back."  Doc. No. 47 at 10 (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 573 n.12 (1972)); see also Grimaldi v. New Castle Cnty., No. N15C-12-096, 2018 WL 3435019, at *6 (Del. Super. Ct. July 13, 2018) (rejecting idea that name-clearing hearing must include a "definitive conclusion" about the underlying allegations or endorse the employee's attempt to clear their name); cf. Lyons v. Barrett, 851 F.2d 406, 411 (D.C. Cir. 1988) (noting name-clearing hearings "are different" from other proceedings in that "they do not address the correctness of a particular course of action" and "have no effect on the underlying decision to terminate an employee").  In circumstances where a public name-clearing opportunity is required, e.g., Gunasekera, 551 F.3d at 470, the employer providing the public forum is not obligated to (and, indeed could not) ensure the media or any other particular members of the public attend, remain, report on, or accept the information conveyed during such forum.

No matter what lens is applied to the undisputed facts, no factfinder could conclude that White was entitled to any additional process as of June 7, 2021, when Janey terminated him. Examination of several elements of a stigma-plus claim demonstrates why this is so.

### 2.     False, Stigmatizing, and Linked to Termination

As the "stigma" underlying his due-process claim, White gestures broadly to the Report as a whole, combined with Janey's public comments referencing its "findings."  See, e.g., Doc. No. 147 at 28 (referencing "the flaws in the Report" and his desire for an opportunity to "demonstrate that the Report was not vetted in the slightest").  But the first three elements articulated in Wojcik require a narrower focus here.

61

White cannot base his due-process claim against the defendants on information that already was within the public sphere before Janey released the Report—even if the information was allegedly false and stigmatizing.  That is because the first and third elements of a stigma-plus claim require proof that the defendants were responsible for publicizing the charge and thereby stigmatizing White.  See Wojcik, 300 F.3d at 103.  Where someone other than the government employer makes public statements that are the source of the alleged stigma, those elements are not satisfied.  For example, if every major newspaper in the Boston area ran a story reporting that Mason alleged White pushed her into a wall during their marriage, and then sometime afterward Janey announced publicly that she was firing White because he had pushed Mason into a wall during their marriage, White would have no stigma-plus claim.  In those circumstances, the press (not the defendants) would have publicized the information and generated the stigma.  Thus, portions of the Report conveying information and allegations publicized by others before May 14, 2021, cannot support a triable stigma-plus claim.

Likewise, White has no stigma-plus claim against the defendants arising from portions of the Report that are true.  The second element articulated in Wojcik requires that White base his claim on "charges" he disputes "as false."  Id.  To the extent the Report recounts information and allegations that White has admitted or that are proven true by the undisputed facts, it cannot support a triable stigma-plus claim.

Wojcik also provides that an employee's liberty interests are not implicated by "[s]tatements merely indicating the employee's improper or inadequate performance, incompetence, or neglect of duty."  300 F.2d at 103 (citing Codd v. Velger, 429 U.S. 624, 627-28 (1977)).  A stigma-plus claim, then, is not an avenue through which White may "clear his name" by contesting statements concerning his performance or judgment or larger culture issues at the

BPD (or Janey's opinions about those matters), unless the same statements reasonably call into question White's own reputation and integrity.  Id.  Nor does such a claim provide him a means of generally challenging the manner in which Kaplan conducted her investigation.

Applying these limitations here, White's stigma-plus claim shrinks in scope.  He is not constitutionally entitled to a name-clearing hearing of any sort concerning at least the following aspects of the Report:  1) the section in which Kaplan described how she conducted the investigation, which contains no "charges" against White that are false and stigmatizing under the foregoing legal standards and in light of the undisputed facts; 2) the section concerning the "1998-1999 Incidents," which summarizes public records and other information that was already subject to extensive public reporting before the Report was released; and 3) the section recounting Kaplan's interview of White, which conveys his version of events in a manner consistent with the other instances in which White has responded to the allegations at issue here, including his state-court affidavit and his own sworn video statement.  What remains, at most, are limited aspects of the description of White's 1993 altercation with his niece,[52] and the section of the Report summarizing information Kaplan learned in witness interviews regarding acts of alleged domestic abuse beyond those that were the subject of the 1999 IA matter.[53]

---

[52] As to this incident, the Report mostly recounts information documented in the related IA file, which White has agreed is subject to public disclosure.  Further, White has admitted to striking his niece and physically leading her from the home, and he has not disputed the description provided by a neighbor who witnessed the event.  The focus of White's stigma-plus claim as it relates to this incident, then, is on the allegation that White made sexual advances toward the niece sometime before the altercation.

[53] Affording White the benefit of the inferences he is due on the defendants' motion, the Court will assume that these limited categories of statements exacerbated, in a constitutionally significant way, whatever stigma had already arisen from the information that circulated publicly before the Report's release.

With the focus of this claim appropriately circumscribed, the fourth element identified in Wojcik presents a challenge. That element requires proof that the defendants publicized this narrower set of "stigmatizing statements . . . in conjunction with" White's termination. Here, White's termination did not occur until weeks after the Report was made public. When Janey did announce White's firing, her public statements explaining her decision included only limited commentary on the decades-old domestic violence allegations. She made no reference at all to the niece's allegation about the genesis of the 1993 dispute, nor did she cite or otherwise draw attention to any specific instance of alleged abuse that Mason described to Kaplan. Instead, Janey expressly tied her decision almost entirely to White's conduct during the investigation. That conduct undisputedly included public attacks on Mason (an officer who would be under White's command) and refusal to fully participate in the investigation. To the extent she commented at all on the underlying allegations of domestic violence, Janey confined her remarks to conduct supported by White's admissions to IA investigators, Kaplan, and Janey herself.[54] In other words, the defendants did not directly and publicly link White's firing to any false and stigmatizing information that was publicized for the first time via the release of the Report.

Thus, the undisputed facts prevent White from establishing the first four elements of the Wojcik standard. That is reason enough to grant the defendants' motion.

### 3. Adequacy of Name-Clearing Opportunity

Even if the record, viewed favorably to White, could support inferences from which a factfinder might resolve the first four elements in his favor, it is beyond dispute that he was

---

[54] Again, Kaplan's Report did not render credibility findings or endorse either version of the disputed events (White's or Mason's). Janey relied on conduct White admitted, without adjudicating conclusively which version of the decades-old events was true. The Court, likewise, need not resolve—and has not in this Memorandum resolved—whether all, some, or none of the abuse Mason alleges took place as she describes.

Case 1:21-cv-10952-LTS   Document 159   Filed 08/19/24   Page 65 of 74

entitled to no further process after Janey fired him on June 7, 2021.  For starters, White has cited

no case that would have required the defendants to afford him any particular trial-like feature as

part of an "adequate" name-clearing opportunity.  That is because there is no such case.  Though

the First Circuit has found a process that included cross-examination of adverse witnesses

satisfied the Constitution in a particular set of circumstances, it did not hold that cross-

examination is <u>necessary</u> in order to satisfy the Constitution in <u>every</u> set of circumstances.

<u>Beitzell v. Jeffrey</u>, 643 F.2d 870, 879 (1st Cir. 1981).  Rather, all of the cases cited by both

parties demonstrate that the amount of process required in a given case depends on the facts of

that case, and that there is no one-size-fits-all approach to fashioning an "adequate" name-

clearing hearing.  <u>See</u> Doc. No. 52 at 1-6 (making this point, with ample supporting authority);

<u>see also</u> discussion <u>supra</u> § III.C.1 (string-citing cases); <u>cf.</u> <u>Chmielinski v. Massachusetts</u>, 513

F.3d 309, 316 (1st Cir. 2008) (rejecting plaintiff's "call to transpose the procedural protections of

a court of law into his termination hearing").  In some cases—this one included—the undisputed

facts permit a court to assess at summary judgment the adequacy of the process provided.

A host of circumstances bearing on the nature and strength of White's interest, "the need

for and usefulness of" further procedures, and "the burden [or] other adverse consequences" the

defendants would incur by undertaking further procedures, <u>Baden</u>, 799 F.2d at 832, had accrued

by June 7, 2021, when Janey terminated White.[55]  They are beyond dispute and include:

---

[55] The Court focuses on June 7, 2021, because that is when White's present stigma-plus claim
ripened.  Though White asserts the "stigma" arose when Janey released the Report weeks earlier,
his employment status was a matter of ongoing consideration then.  The pre-termination process,
which unfolded pursuant to guidance from the state courts in response to White's lawsuit, had
not yet concluded.  The June 2 hearing was a necessary part of the process, which continued to
evolve until Janey communicated to White, then announced publicly, her decision to terminate
him on June 7.  Those events provided the "plus" for purposes of the claim White has presented
in this action.  At the hearing on the pending motions, White's counsel acknowledged this,

- Media reporting on the 1999 allegations against White, as revealed by public court records and available IA information, began almost immediately upon his appointment in February 2021.

- From the start, the reporting included descriptions of allegations that White had hit, pushed, and threatened to shoot Mason; that Mason had obtained a restraining order that required White to move out of his home, stay away from his children, and surrender his firearms; that divorce records described fights that escalated to include physical contact by both parties; that White slept with a gun under his pillow; that Mason reported being afraid of White; that White had been the subject of three IA complaints; and that Walsh believed the allegations were "serious" and "disturbing" enough to warrant White's suspension pending an investigation.

- The reporting also included descriptions of an interview Tiffany White provided to the press in which she defended her father and denied he had abused her mother.

- White was represented—zealously—by counsel for the duration of the investigation.

- White received notice of the scope of the inquiry and was permitted to object— sometimes successfully—to its breadth.

- White and his lawyer met with Janey soon after she replaced Walsh, to discuss the status of the investigation and how Janey expected it to move forward.

- White was interviewed by Kaplan, who provided him advance notice of the topics she intended to explore with him, and his responses to her were summarized and included in the Report. His lawyer was present for the interview, lodged contemporaneous objections, and wrote to the defendants on White's behalf to express concerns and objections afterward.

- White was offered, but declined, a follow-up interview with the investigator.

- White submitted a written statement to Kaplan after his interview, and that statement was included in the Report.

- White submitted an affidavit of the detective who took Mason's 1999 complaint, which Kaplan reviewed and included in the Report, and which also resulted in Kaplan interviewing that detective as part of the investigation.

conceding that White would have no stigma-plus claim if events had unfolded the same way up to June 7, but if on that date Janey had announced a decision to retain White as Commissioner.

- White received an unredacted copy of the Report along with written notice from Janey of her intent to terminate him and the underlying reasons.

- White's lawyer communicated with the media and also held a press conference immediately after Janey's on the day the Report was released, challenging the Report and disputing that Janey could fire White.

- White, represented by counsel, filed a lawsuit challenging Janey's authority to fire White and the process the defendants intended to use in connection with his termination.

- In support of the lawsuit, White prepared and submitted an affidavit responding to the Report and Janey's notice of intent. The affidavit was public and received attention in the media, as did hearings held in connection with the state-court proceedings.

- State courts at the trial and appellate level reviewed White's claims and issued reasoned decisions denying him injunctive relief.

- White obtained sworn video statements from his daughter and Mason's sister, both of which he submitted to Janey and released to the media, which reported on them.[56]

- White provided his own sworn video statement, offering over an hours' worth of his responses to questions about the contents of the Report and Janey's notice of intent. That statement was also submitted to Janey and released to the media, which reported on it.

---

[56] As noted, the Constitution is concerned only with whether a person has had a name-clearing opportunity. Regarding the video statements by Mason's sister and Tiffany, White created his own opportunity to collect the statements and then circulate them publicly. The Constitution does not require that he receive a second such opportunity, nor does it guarantee that his view of the relevant events must prevail. The Court observes, however, that the sometimes-salacious accounts of Mason's past conduct shared in the video statements—even if credited in their entirety—do not necessarily exonerate White. Whether Mason was violent toward Tiffany or others does not resolve whether White was ever violent toward her. The same is true of reports that the witnesses saw nothing more than White pushing Mason aside. One could credit the video statements and still believe that White had engaged in the conduct described in the Report. One could also reach a different conclusion, thus ending at the beginning: The Constitution guarantees an opportunity to clear one's name, not an adjudication that one was wronged. It requires this Court to evaluate the adequacy of the opportunity provided to White but does not entail a finding by this Court about whether White or Mason has provided the more truthful version of events. That is a question of defamation, and the Court already has explained why such a claim cannot proceed here. See discussion supra § III.A.

- White's counsel and his law firm communicated with the media more than two dozen times, sharing information supporting White's defenses against the allegations and challenging the credibility of his accusers.

- Janey held a termination hearing with White, at which he was represented by counsel and was permitted to make whatever statement he wished without interruption and without any time limitation.  Though the hearing was not public, White's lawyer released a written copy of his prepared remarks to the press around the time the hearing began.

- Between the hearing and the announcement of his termination, White's counsel continued to submit letters and information to Janey and to the media in support of White and his version of events and challenging the credibility of his accusers.[57]

After careful consideration of the competing interests at play when assessing whether and to what extent additional process was due, see Mathews, 424 U.S. at 335, the Court concludes that, as of June 7, 2021, the Constitution did not require the defendants to provide White any further opportunity to publicly clear his name.  This is so for several reasons.  First, by the time Janey released the Report on May 14, 2021, substantial media reporting had already publicly explored many of the damaging and stigmatizing allegations contained in the Report.  Though releasing the Report added some new facts to the mix, as explained above, only two narrow categories of new facts concerned matters that were potentially stigmatizing to White.  Cf. Doc. No. 143-18 at 2-10 (listing eleven "disturbing revelations," only three of which pertained to White and the domestic violence allegations against him).  This reduces the potency of White's liberty interest.[58]

---

[57] No reasonable factfinder could consider this series of events and conclude, as White does, that "the process that [he] received was scant."  Doc. No. 152 at 3.

[58] White correctly distinguishes his case from Baden, which the Court flagged at an earlier stage as presenting a persuasive analogy to the circumstances presented here, by pointing out that Baden was demoted (not fired, like White) and therefore had "a weak liberty interest" at stake.  Doc. No. 147 at 25; see 799 F.2d at 831.  That is a meaningful difference.  However, none of the stigmatizing information about Baden was public before it was released by his employer, see 799 F.2d at 827, leaving intact Baden's interest in his reputation until that time.  The same cannot be said here, where the information publicized before the Report's release had indisputably

Second, White vigorously and publicly aired his own statements and evidence in response to the Report and the reasons Janey cited as justifying his termination.  The Report itself conveyed White's version of events, as expressed in contemporaneous IA and court records, during his interview with Kaplan, and in writing thereafter.  It also described information provided by a detective White had identified, who expressed skepticism about Mason's allegations, and it explained that each relevant IA charge had ultimately been resolved with something less than a "sustained" finding.  In other words, the Report did not provide a one-sided account that ignored White's version of events.  Beyond the Report, White's counsel persistently and effectively communicated—to the defendants and to the public—his objections and challenges to the accusations, the portions of the Report he claimed were false, and the reasons cited by Janey as possibly justifying White's termination.  Carter did this on White's behalf via a press conference immediately following the Report's release, multiple letters to Janey that were also forwarded to the press, detailed video statements totaling more than two hours in length, and supplemental affidavits responding to subsequent events including Mason's eventual statements to the media.  Given these undisputed facts, by June 7, 2021, any further process would have served little purpose.[59]

---

damaged White's reputation.  Though the reason is different, the result is the same: both Baden and White seek to vindicate "relatively weak" liberty interests.

[59] The discovery in this case provided to White much of the information he requested from the defendants in advance of his termination.  See Doc. Nos. 147-16 and -17 (seeking information including a deposition of Kaplan and White's IA files).  And, during discovery, White had an opportunity to depose witnesses including Mason.  Nothing before the Court suggests anything White learned while litigating this case would have meaningfully added to the mix of "name-clearing" information that was already available and public in June 2021.  See Doc. No. 147 at 28-32 (listing eight topics White suggests warrant further process, most of which are directed toward challenging Kaplan's process or topics White already explored publicly); Doc. No. 150 at 18-19 (explaining why a handful of minor discrepancies between deposition testimony and Report, such as whether Mason reported White had stomped on her legs or her head in one instance, neither suggest the absence of abuse nor exonerate White).

Third, the government interests that run contrary to White's are significant in this
context, for reasons articulated by the Baden court:

> [A] City's interest is in the ability of its executive officer to respond promptly and
> effectively to complaints about a high level official who is serving at the executive's
> discretion.  Preserving that ability is plainly important to the functioning of
> government.  The creation of such discretionary posts by the legislature is a
> recognition that quick adjustments among top personnel may sometimes be
> necessary for the executive branch to continue to do its job. . . . An executive who
> fails to act when the facts demand action will often be taken to task by the
> legislature, the media and the public for the continued shortcomings of [their]
> subordinates.  In deciding what procedures are constitutionally required when such
> adjustments are made, therefore, [courts] must not unnecessarily hinder municipal
> executives in their ability to make these important personnel decisions.
>
> *     *     *
>
> If [the court] were to hold that a government executive's public statement of reasons
> for a discretionary personnel decision automatically triggered a requirement for a
> formal trial-type hearing, executives would be tempted to refrain from explaining
> their personnel actions in public, a result contrary to the strong policy of
> maintaining an informed electorate.  As a nation, we have a tradition of wanting
> our elected officials to explain why they do what they do.  Furthermore, faced with
> the prospect of expensive, time-consuming trial-type hearings whenever an
> explanation is given for a discretionary employee's removal from office, municipal
> executives might well hesitate to make personnel decisions except in the most
> egregious cases. . . . Executives would make do with subordinates whose
> performance is inept rather than face the high cost of transferring or replacing them.
> The legislature's deliberate decision that certain high level employees should serve
> at the executive's discretion would be rendered meaningless.

799 F.2d at 831-33.

Though Baden served at the unfettered discretion of his city's mayor, the BPD's
Commissioner can be removed only for cause.  That distinction, however, does not meaningfully
diminish the force of the principles expressed in the foregoing passage.  As the Court explained
earlier in this case, Boston's mayor retains broad discretion in determining whether cause exists
to remove a Commissioner; she may do so for "any legitimate reason" that, in her "honest
judgment," relates to the needs of the City or serves "the interests of the public."  Doc. No. 57 at
13-14 (quotation marks omitted).  And, if the mayor believes she has such cause, state law

permits her to remove the Commissioner "after notice and hearing," but (according to the state courts that rejected White's requests for injunctive relief in this case) without a trial-like proceeding.  See id.  Making the formal proceeding White seeks here a prerequisite to the removal of a BPD Commissioner or a required post-termination event would risk interference with or chilling of a mayor's discretion and supersede the state law that exists to specifically govern this relationship.

The undisputed facts establish that, as of June 7, 2021, "any benefits derived from affording" White the trial-like hearing he seeks would have been "more than outweighed by the burdens imposed on the government thereby."  Baden, 799 F.2d at 832.  This is especially so in light of White's "high degree of access to the news media"—and his consistent use of it during the relevant period—which underscores the extent to which he "did not need a formal hearing as a forum in which to repeat his side of the story."  Id.  Any further hearing after June 7 would have imposed significant burdens on the defendants (even more so in the midst of their response to a global pandemic) without "materially lessen[ing] the already small risk that any false charges had gone unanswered."  Id.

Accordingly, as a matter of law, the Court concludes that the Due Process Clause did not require the defendants to provide White any further name-clearing opportunity after he was fired. The defendants' motion is ALLOWED as to the stigma-plus claim.

One further point bears mention.  The defendants offered brief but reasoned argument in their opening memorandum that the doctrine of qualified immunity shields Janey from liability in her individual capacity for money damages arising from White's stigma-plus claim (were it to survive on its merits).  Doc. No. 143 at 14 n.4.  This conclusion follows, in the defendants' view, from the "flexible" nature of name-clearing hearings and the absence of a "robust consensus"

71

regarding the contours of such proceedings under controlling and persuasive precedent.  Id.

White's own opening brief, opposing the defendants' motion and cross-moving for summary

judgment as to this claim, contained no response to this argument.  See generally Doc. No. 147.

Noticing White's silence, the defendants urged in reply that he had conceded the point.  Doc. No.

150 at 16 n.8.  Under well-established principles, the defendants are right.  By not responding in

his opening brief, White waived the opportunity to resist Janey's invocation of qualified

immunity.  Cf. Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000)

(noting that "issues advanced for the first time in [a] reply brief are deemed waived").

In his surreply, White finally acknowledged the issue, suggesting for the first time that

the Court's earlier determination that qualified immunity was not a reason to reject this claim at

the pleading stage left "no basis to relitigate that issue" at summary judgment.  Doc. No. 152 at 5

n.5.  Not so.  The ruling in which "the Court indicated Janey was not entitled to qualified

immunity," id., was expressly tied to the record as it then existed and the standard that was then

applicable.  Doc. No. 49 at 8 n.7 (concluding Janey "cannot [be] grant[ed] qualified immunity . .

. now" (emphasis added)).  It has no effect on the resolution of the question on a fuller record

and under the summary-judgment standard.  White offers no further reasoned argument opposing

the application of qualified immunity here—another ground for finding waiver.  See United

States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Even if the Court were to look beyond his double waiver, the result would be the same.

Government officials enjoy qualified immunity when "performing discretionary functions," and

"are shielded from liability for civil damages[,] insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  To overcome a defendant's invocation of

qualified immunity, a plaintiff "must show (1) that [the defendant] infracted his federal rights and (2) that these rights were so clearly established that a reasonable offic[ial] should have known how they applied to the situation at hand." Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 23 (1st Cir. 2016).  The second element is "routinely" subdivided into two components: "whether the right was clearly established at the time of the alleged violation, and whether a reasonable offic[ial], similarly situated, would understand that the challenged conduct violated that established right." Justiniano v. Walker, 986 F.3d 11, 26 (1st Cir. 2021) (cleaned up).

Here, the undisputed facts prevent White from satisfying either of those elements.  His right to procedural due process was not "infracted" for the reasons the Court already has explained.  And because the right at issue is so vaguely defined and context-dependent, no factfinder could conclude that a reasonable person in Janey's situation would have or should have known her conduct violated the Due Process Clause of the United States Constitution. Janey is entitled to qualified immunity.

As he did with respect to the Privacy Act claim, White cross-moved for summary judgment on the stigma-plus claim.  See Doc. No. 147 at 7.  Assigning to White the burden a moving party faces at summary judgment and taking a defendant-friendly view of the record only amplifies the reasons articulated above for concluding no finder of fact could resolve White's stigma-plus claim in his favor.  White's cross-motion, therefore, is DENIED.

## IV.   CONCLUSION

White's two days as the BPD's Commissioner were followed by more than three years of contentious proceedings before his employer and the state and federal courts.  After all that, the evidence presented to this Court leaves no material disputes for a jury to resolve.  As the Court has explained, and as a matter of law, White cannot prevail.

For the foregoing reasons, the defendants' motion for summary judgment (Doc. No. 142) is ALLOWED, and White's cross-motion for partial summary judgment (Doc. No. 146) is DENIED.  Judgment shall enter separately in favor of the defendants, with each side to bear its own fees and costs.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge